IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

TOWN OF OYSTER BAY,

        Plaintiff,

v.

NORTHROP GRUMMAN SYSTEMS
CORPORATION,

        Defendant.

**COMPLAINT**

Civil Action No. _____

Plaintiff Town of Oyster Bay (the "Town"), for its Complaint against Defendant

Northrop Grumman Systems Corporation ("Northrop Grumman"), alleges as follows:

## I.    <u>NATURE OF THE COMPLAINT</u>

1.    This is a civil action for injunctive and declaratory relief against Northrop

Grumman Systems Corporation ("Northrop Grumman") arising out of past and present releases

and threatened releases of hazardous substances at an 18-acre property in Nassau County, New

York, now known as Bethpage Community Park (referred to interchangeably as the "Community

Park" or "Community Park Property"). The New York State Department of Environmental

Conservation ("DEC") has utterly failed for ***more than a decade*** to diligently prosecute Northrop

Grumman's contamination of the Community Park Property. Though DEC issued a Record of

Decision in March 2013 ("2013 ROD") for an area including the Community Park, DEC has not

enforced the 2013 ROD. Since 2013, the DEC has not issued or enforced a schedule for the

cleanup of the Community Park, nor set or imposed any penalties, nor undertaken any other normal

indicator of enforcement against Northrop Grumman as the polluter of the Community Park Property.

2.    Not only has DEC failed to enforce the 2013 ROD, but the 2013 ROD also violates state and federal law. The 2013 ROD provides for excavated soil containing Polychlorinated Biphenyls ("PCBs") to be used as backfill of excavated areas below a depth of ten feet. This provision allows the Community Park to continue to be used as a PCB landfill without adhering to the applicable or relevant and appropriate federal and state requirements for siting, designing, constructing, or operating a landfill. New York State law prohibits the creation of any new landfill on Long Island. That provision of the 2013 ROD violates New York's Long Island Landfill Law, which expressly prohibits the creation of any new landfill on Long Island due to the region's uniquely vulnerable water supply. *See* N.Y. E.C.L. § 27-0704. DEC itself has previously ruled that that the excavation of contaminated soil to a depth of twenty-one feet and backfilled with clean fill amounted to starting a new landfill. *See* DEC Declaratory Ruling 27-32 (Coltec Industries, Inc.) (2001). Yet the 2013 ROD would illegally permit a PCB landfill to be created at the Community Park Property.

3.    DEC also took *ultra vires* action in the 2013 ROD by setting a cleanup standard for PCBs at the Community Park Property that was beyond the State's power. Under federal law, PCB cleanup standards are under the control of the United States Environmental Protection Agency ("EPA") alone, and the State must seek and obtain EPA approval of a PCB cleanup standard, which DEC did not do.

4.    After more than a decade of DEC's failure to enforce the ROD against Northrop Grumman, the Town has been forced to take matters into its own hands by filing this suit pursuant to the Resource Conservation and Recovery Act ("RCRA") and other federal and state statutes to

ensure a proper and expedited cleanup of the Community Park Property and to protect Town citizens.

5.      The Town seeks injunctive relief to expedite the cleanup of the Community Park and to ensure it is properly measured and enforced under the supervision of the Court:

> A.      A mandatory injunction against Northrop Grumman pursuant to RCRA, to immediately investigate and remediate the Community Park Property in order to take all actions necessary to address imminent and substantial endangerment that may be presented by the solid and hazardous wastes at Community Park Property.
>
> B.      A mandatory injunction pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2619(a), requiring Northrop Grumman to obtain EPA approval for a PCB remediation waste disposal plan, or, in the alternative pursuant to RCRA Section 7002 (42 U.S.C. §§ 6973(a)(1)(a)), permanently enjoining Northrop Grumman from creating and maintaining a PCB landfill at the Community Park Property in violation of federal and state law.
>
> C.      Finally, the Town seeks a mandatory injunction against Northrop Grumman pursuant to Clean Water Act Section 505 (33 U.S.C. § 1365), barring it from continuing to discharge pollutants from Community Park Property at levels greater than effluent limitations.

## II.      THE PARTIES

6.      Plaintiff Town of Oyster Bay is a municipal corporation organized under the laws of the State of New York.  Its principal offices are located at 54 Audrey Avenue, Oyster Bay, New York, 11771.

7.    Defendant Northrop Grumman is a corporation incorporated under the laws of the State of Delaware. On information and belief, its principal place of business is in Falls Church, Virginia.

### III.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over the Town's federal claims pursuant 28 U.S.C. § 1331, 15 U.S.C. § 2619(a), and 42 U.S.C. §§ 6972(a)(1)(A) and (B), 9607(a), and 9613(f). This Court has supplemental jurisdiction over the Town's state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the Town's federal claims.

9.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the Town's claims occurred within this district.

### IV.  BACKGROUND AND GENERAL ALLEGATIONS

**A.    Northrop Grumman's Bethpage Facility Disposed Of Hazardous Substances On Land That It Donated To The Town For Express Use As A Park, Causing Contamination Of The Park That Has Spread Throughout The Town.**

10.    Beginning in the 1930s, Northrop Grumman, through two of its predecessors, Grumman Aircraft Engineering Corporation and Grumman Corporation, developed, tested, and manufactured military aircraft used in World War II and during the Cold War, and conducted related administrative operations, among other activities, on an approximately 600-acre site in Bethpage, New York formerly known as the Grumman Aerospace-Bethpage Facility (the "Bethpage Facility").

11.    The former Grumman Aerospace-Bethpage Facility included both Northrop Grumman-owned and operated plants (the "Grumman Facility") and a U.S. Navy-owned facility, which Northrop Grumman operated under contract with the U.S. Navy (the Naval Weapons

Industrial Reserve Plant or "NWIRP"). Northrop Grumman's operations at the Grumman Facility began in 1937 and started at the NWIRP in 1942.

12.     By the time its manufacturing operations at the Bethpage Facility concluded in 1996, Northrop Grumman had produced tens of thousands of military aircraft but had also generated massive amounts of waste containing CERCLA hazardous substances, including heavy metals, volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOC"), and PCBs.

13.     Northrop Grumman's past disposal practices of hazardous substances at the Bethpage Facility have contaminated groundwater at the facility and the EPA-designated Long Island Sole Source Aquifer system, which is the primary source of drinking water for 2.6 million Long Island residents.   The migration of the groundwater contamination from the Bethpage Facility, referred to by the DEC as the "Navy Grumman Groundwater Plume," has now spread beneath a nearly seven-square-mile, heavily developed commercial and residential area of the Town and Nassau County.

14.     Contaminants in the Navy Grumman Groundwater Plume have contaminated the groundwater intakes at 11 public water supply wells, and the continued expansion of the plume threatens to contaminate groundwater intakes at additional public water supply wells in the Town.

15.     The Community Park Property is an approximately 18-acre parcel adjacent to the eastern edge of Northrop Grumman's Bethpage Facility.

16.     From approximately 1949 through 1962, Northrop Grumman owned and operated the land that became the Community Park Property.

17.     During the period of time from approximately 1949 to 1962, Northrop Grumman used the land that became the Community Park Property to dump wastes containing hazardous

substances that it generated from its Bethpage Facility operations conducted at both the Grumman Facility and the NWIRP.

    a.  The wastes disposed by Northrop Grumman at the Community Park Property included:

- Paint, coating materials and oily wastes;
- PCBs;
- Chromium laden sludge;
- Cadmium and arsenic;
- Chlorinated and non-chlorinated solvents;
- Semi-volatile organic compounds.

    b.  Wastewater treatment sludge generated at Northrop Grumman's Plant 2 Industrial Wastewater Treatment Facility located at the Bethpage facility was transported to the Community Park Property and placed in sludge drying beds.

    c.  The sludge drying beds at the Community Park Property, also known as the former Grumman Settling Ponds, were used for dewatering of sludge, including chromic acid waste, from the Northrop Grumman industrial wastewater treatment facility.

    d.  Spent rags generated from paint booth cleaning in Northrop Grumman's Plant 2 were transported to the Community Park Property where they were emptied into a pit located on the property.

    e.  Spent paint, coating materials, waste rags and machine oil containing chlorinated and non-chlorinated solvents were buried in the rag pit on the Community Park Property.

    f.  A portion of the Community Park Property was used by Northrop Grumman as a fire training area where waste oil and jet fuel were ignited and extinguished.

18.    At some point in 1960 or 1961, Northrop Grumman conducted "autoclave" operations at Plant 3 of the Bethpage Facility. The autoclave process used a fluid called "therminol," which contained approximately a 97% to 98% concentration of PCBs. Northrop Grumman's autoclave operations used and stored several thousand gallons of the PCB-laden therminol at any given time.

19.    Some of the therminol fluid spilled and leaked onto the floor in the areas of autoclave operations, which contained one or more floor drains. The therminol fluid traveled

through the drains which, eventually, discharged to a storm water collection system that was directed to recharge basins located east of Plant 3.

20.    Prior to October 1962, Northrop Grumman employees used bulldozers to scrape the soils at the bottom of the recharge basins located east of Plant 3, and, again, dumped these scraped soils on various areas of the Community Park Property.

21.    On or about October 17, 1962, Northrop Grumman conveyed the Community Park Property to the Town, with an express condition that the property be used as a park.

22.    After the Town took ownership of the Community Park Property, the Town developed it into Bethpage Community Park.  Bethpage Community Park featured and continues to feature swimming pools, an ice-skating rink, basketball courts, a baseball field, playground, tennis courts, and other amenities for Town residents.

**B.    Environmental Contamination From Northrop Grumman's Waste Dumping Operations At The Community Park Are Discovered, Forcing The Town To Partially Close the Community Park.**

23.    From the late 1980s through mid-1990s Northrop Grumman and the U.S. Navy conducted numerous environmental investigations and implemented remedial activities to address soil and groundwater contamination at the Grumman Facility and the NWIRP.   These investigations revealed elevated levels of PCBs, metals, VOCs, and SVOCs at both the Grumman Facility and the NWIRP.

24.    In 1983, the DEC listed the Grumman Facility and the NWIRP as "the Grumman Aerospace Bethpage Facility Site" (No. 130003) on its Registry of Inactive Hazardous Waste Disposal Sites in New York State.

25.    The DEC subsequently divided the Grumman Facility and the NWIRP into separate sites for purposes of the Registry of Inactive Hazardous Waste Disposal Sites, and later, further subdivided the Grumman Facility. The resulting three sites, now known as the Northrop Grumman

Bethpage Facility (No. 130003A), the NWIRP site (No. 130003B), and the Northrop Grumman-Steel Los Plant 2 (No. 130003C) are also organized into four Operable Units ("OUs"). Operable Unit 1 is the soil remediation at both the Northrop Grumman Bethpage Facility and NWIRP manufacturing plants. Operable Unit 2 consists of the groundwater contamination at and migrating away from both the Northrop Grumman Bethpage Facility and NWIRP sites, and Operable Unit 3 is the former Northrop Grumman Settling Ponds, which includes the Community Park, the Northrop Grumman Access Road immediately south of the Community Park, and soil and groundwater at and migrating away from the Community Park Property. Finally, Operable Unit 4 is a U.S. Navy site addressing soil, soil vapor, and groundwater contamination at a former drum marshaling site.

26.     In 2002, after the discovery of PCBs in soil samples from the Northrop Grumman-owned Access Road adjacent to the south of the Community Park, the DEC ordered Northrop Grumman to obtain soil samples from areas within the Community Park Property. That testing revealed the presence of PCBs and certain hazardous metals, including chromium, at concentrations that exceeded New York State's standards, criteria, and guidance for acceptable levels.

27.     The results of Northrop Grumman's testing at the Community Park were disclosed to the DEC, and, in May 2002, the Town closed the Community Park for the protection of the public in recognition of the threat to health of those who use and work at the Community Park. Following the installation of a fence to prevent access to certain grassed areas, the Community Park partially reopened in November 2002. However, the ballfield, which was built over portions of Northrop Grumman's rag disposal pit and sludge settling pond, has remained continuously

closed nearly 22 years after the discovery of the immediate threat to public health and the environment.

28.     In 2003, Northrop Grumman conducted an initial groundwater investigation at the Community Park.  VOCs consistent with residual chlorinated solvents were found at levels in three monitoring wells at the Community Park that exceeded the New York State groundwater standards, and Northrop Grumman indicated that "…the baseball field area may be an historic source of these VOC concentrations."  The baseball field area was constructed over top of Northrop Grumman's rag disposal pit, where "solvent-soaked" rags were disposed.

29.     Northrop Grumman concluded that further investigation was necessary to determine the source of the VOCs detected in the groundwater beneath the Community Park.

**C.     Northrop Grumman Undertakes A Slow And Incomplete Remedial Investigation That Reveals Extensive And High-Level Contamination Of The Community Park And The Groundwater For Miles Beyond.**

30.     Between 2004 and 2007, Northrop Grumman conducted a Remedial Investigation of the Community Park (referred to as the "Site Area") and the VOC-contaminated groundwater that had migrated south and south-east of the Community Park (referred to as the "Study Area") to define the nature and extent of contamination as required by an Administrative Order on Consent executed by Northrop Grumman and DEC, effective July 4, 2005 (the "2005 AOC").

31.     The results of the Remedial Investigation of the Community Park, which were not finalized and submitted to DEC until February 2011, revealed extensive and high-level contamination of soil, groundwater, and soil gas at the Community Park:

      a.  Soil contamination was identified in areas designated as PCB Fill Material, a Low Permeability Zone, Rag Disposal Pit, the Former Grumman Settling Ponds, and beneath the parking lot located to the east of the ballfield. These areas were impacted with TCE, PCE, dichlorothene ("DCE"), toluene, xylene, and Freon. The former rag pit area "is highly impacted with chlorinated and non-chlorinated solvents…Additionally, the low permeability zone…has also been highly impacted

with Site-related VOC contamination including TCE, PCE, DCE, toluene and xylene."

b. Contamination was found in the groundwater beneath the Community Park at levels that exceed the New York State groundwater quality standards. Contaminants found included chlorinated VOCs such as TCE, DCE, vinyl chloride, as well as non-chlorinated VOCs such as toluene and xylene. Groundwater migration from the Community Park has resulted in a significant off-site groundwater plume.

c. Soil gas sampling results indicated TCE, DCE, and toluene at elevated levels that posed a risk of vapor intrusion to Park structures and to the residences located south of the Community Park.

32.     The results of the Remedial Investigation of the groundwater underlying the area south and southeast of the Community Park, which were not finalized and submitted to DEC until February 2011, revealed widespread VOC contamination:

a. VOC-contaminated groundwater was reported to extend approximately 3.5 miles in length by 1.6 miles in width, including an area immediately south and south-east of the Community Park approximately 8,300 feet in length and 2,100 feet in width.

b. Chlorinated VOCs, including TCE and DCE, as well as toluene and other VOCs were found in the groundwater.

c. VOCs were detected in several Bethpage Water District public water supply wells.

33.     Notwithstanding the Remedial Investigation findings of extensive contamination at the Community Park and the groundwater at and beyond the Community Park, a significant portion of the VOC Source Area at the Community Park that feeds the groundwater contamination beneath and migrating away from the Community Park was not found until about 10 years after the submittal of the Remedial Investigation reports to DEC, as further described later in this Complaint, pointing to the inadequacy of Northrop Grumman's remedial investigations.

34.     As required by the 2005 AOC, Northrop Grumman implemented two Interim Remedial Measures ("IRMs") to address contaminant migration in soil vapor and groundwater leaving the Community Park.

35.     In February 2008, Northrop Grumman installed and began operating a soil gas containment system IRM along the Northrop Grumman-owned access road adjacent to the southern and western Community Park boundaries. The purpose of the soil gas IRM is to mitigate the migration of VOCs in soil gas from the Community Park.

36.     In July 2009, Northrop Grumman installed and began operating a groundwater extraction and treatment system IRM using four recovery wells installed in the Northrop Grumman-owned Access Road adjacent to the southern Community Park boundary.  The purpose of the groundwater IRM is to mitigate the migration of VOCs in groundwater leaving the Community Park.

37.     The groundwater IRM was designed to capture groundwater that had total VOC concentrations greater than 5 micrograms per liter ("ug/L") in the upper 20 feet of the surficial aquifer, and to capture groundwater below the upper 20 feet of the surficial aquifer that had total VOC concentrations greater than 50 ug/L.  As such, the groundwater IRM was not designed to capture all the VOC contamination leaving the Community Park in groundwater, but only the VOC concentrations exceeding an arbitrary level.

38.     The groundwater captured by the IRM was and continues to be treated at a treatment plant at Northrop Grumman's McKay Field located west of the Community Park, and the treated water is discharged to a Nassau County-owned recharge basin, where it percolates back into the groundwater on the adjacent former NWIRP property.  Northrop Grumman referenced the interim State Pollutant Discharge Elimination System ("SPDES") discharge limits as the applicable regulatory discharge limits.

**D.     The Town Expedites The Cleanup Of 7 Acres of Northrop Grumman's Contaminated Soil At The Community Park But Has Not Yet Recovered The $22 Million It Spent To Do So.**

39.     In 2005, while waiting for Northrop Grumman and DEC to come to an agreement on the required further investigation and remediation of the Community Park Property, the Town sought DEC approval "…to expedite remediation of a portion of the property…" comprising a seven-acre area, where the Town planned to construct a new ice skating rink and other recreational facilities ("the Construction Area").

40.     In March 2005, the Town voluntarily entered into an Order on Consent ("Town Consent Order") with the DEC to conduct investigation and remedial activities with respect to the historically contaminated soils within the Construction Area. The Town Consent Order required: (1) that the Town develop an Interim Remedial Measure ("IRM") to address the presence of contamination in the soil in the Construction Area; (2) that all actions taken by the Town to discharge its obligations under the Town Consent Order be approved by the DEC; and (3) all actions taken by the Town to discharge its obligations be consistent with CERCLA and the National Contingency Plan.

41.     In November 2005, the Town submitted an Investigation Report and Remedial Action Plan (the "November 2005 RAP") to DEC.  The November 2005 RAP described the results of extensive soil and shallow groundwater investigations conducted in the Construction Area, which confirmed the presence of VOCs, PCBs, and metals, including arsenic, cadmium, chromium, mercury, and zinc, above New York State recommended levels in soil.  SVOCs called polycyclic aromatic hydrocarbons ("PAHs") including benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, and dibenzo(a,h)anthracene were also detected in soils. VOCs including 1,2-dichloroethene, trichloroethene (TCE), tetrachloroethene

(PCE), and Freon-12 were also detected in soil vapor. VOCs including 1,2-dichloroethene and trans-1,3 dichloropropene, were detected in groundwater.

42.     In the November 2005 RAP, the Town proposed to remedy the contamination by removing all contaminated soils in the Construction Area to meet DEC's recommended soil cleanup objectives for unrestricted use to a depth of at least ten feet below grade.  As indicated in the November 2005 RAP, "A depth of ten feet was chosen because most typical construction/development and maintenance activity would not require deeper excavation."  In effect, the Town planned to remediate Northrop Grumman's soil contaminants to a depth that would allow for unrestricted use, consistent with DEC's Unrestricted Use soil cleanup standards at this time.

43.     The Town subsequently submitted to DEC a revised Remedial Action Plan (the "2006 RAP"), which was a comparative analysis of five remedial alternatives to address Northrop Grumman's soil contamination in the Construction Area. The Town advised the DEC that the Town had selected "Remedial Alternative IV," which required excavation and off-site disposal of all contaminated soil throughout the Construction Area to a depth of at least ten feet, with some additional deeper contaminant removal to 20 feet in certain areas to meet the recommended Unrestricted Use soil cleanup levels.

44.     DEC ultimately approved the Town's selection of "Remedial Alternative IV," noting that the selected remedy "…is beyond what the NYSDEC would require…," but stating that the selected remedy "…is protective of public health and the environment."

45.     By June 2007, four years before Northrop Grumman completed its Remedial Investigation of the Community Park, the Town finished remediation of the seven-acre Construction Area by removing over 173,000 tons of contaminated soil and debris.

46.     The Town spent in excess of $22 million in investigating the extent of Northrop Grumman's contamination in the Construction Area and expediting the cleanup of the seven-acre area.

47.     In November 2005, the Town filed a lawsuit against Northrop Grumman and the federal government to recover the money that the Town had expended remediating the Construction Area as a result of the waste generated by Northrop Grumman pursuant to its work for the U.S. Navy.  The Town brought its claims pursuant to CERCLA, 42 U.S.C. §§ 9607 and 9613, and the common law of the State of New York.

48.     Northrop Grumman counterclaimed against the Town pursuant to CERCLA, alleging that Northrop Grumman had incurred costs responding to contamination at the Community Park caused by the Town.

49.     In 2009, after the Town, Northrop Grumman, and the federal entities named in the Town's complaint (the U.S. Navy and the United States of America) had fully briefed cross-motions for summary judgment, the District Court granted summary judgment to Northrop Grumman and the federal entities, dismissed the Town's CERCLA claims with prejudice, and dismissed the Town's state law claims without prejudice.  On a motion for reconsideration by the federal entities, the Town's state law claims were dismissed with prejudice.

50.     The District Court denied the Town leave to immediately appeal the dismissal of the Town's CERCLA claims, and Northrop Grumman's counterclaims against the Town remain pending.

**E.    DEC Issues Its Flawed 2013 Record of Decision For OU3, Including The Community Park, But Without Required EPA Review And Approval Of The PCB Cleanup Levels Or Remedial Actions.**

51.    In March 2013, the DEC issued a Record of Decision ("2013 ROD") for Operable Unit 3 of the Northrop Grumman Bethpage Facility, which includes the Community Park Property. The 2013 ROD stated that the soil and groundwater at Operable Unit 3 contained more than a dozen constituents of concern that exceeded State of New York standards, criteria, or guidance. Among the constituents of concern were Trichlorethylene, Tetrachloroethene, 1,1,1 Trichloroethane, Aviation engine oil, Chrome Etchant, Machine Oil, Paint, Paint Solvents, Polychlorinated Biphenyl, oil, Toluene, Chlorodifluoromethane (Freon 21), Dichlorodifluoromethane (Freon 12), Chromium, Cadmium, Arsenic, and Freon 113.

52.    The 2013 ROD stated that the majority of soil contamination was located in the area of Northrop Grumman's former sludge settling ponds and rag pit disposal area. The constituents of concern in those two areas were chlorinated and non-chlorinated solvents and highly impacted fill materials containing mainly PCBs and chromium.

53.    The 2013 ROD also identified Northrop Grumman's solvent-soaked rag disposal pit and a larger Low Permeability Zone, as sources of groundwater contaminated with TCE and other VOCs (the "VOC Source Area" or "source area"). The ROD further stated that the contaminated groundwater from the source area was traveling outside the boundaries of the Community Park Property and Operable Unit 3, where it commingled with the plume emanating from the Grumman Facility and the NWIRP site. The entire area of VOC-contaminated groundwater originating from the Grumman Facility and the NWIRP site (OU 2 and OU 3) is now referred to by DEC as the Navy Grumman Groundwater Plume.

- 15 -

54.     To address the contamination at Operable Unit 3, the 2013 ROD selected as the preferred remedial action an extensive cleanup, "Remedial Alternative 5," the present cost of which DEC estimated at $81 million.

55.     The components of Remedial Alternative 5 required by the ROD included, among other measures:

a.  Excavation in the former Grumman Settling Ponds area, located in the ballfield and areas adjacent to the ballfield, of all soils with concentrations of PCBs in excess of 50 parts per million ("PPM") and disposal off-site at a permitted disposal facility.

b.  Excavation in the former Grumman Settling Ponds area of all soils to a depth of 10 feet of all other contaminants with concentrations in excess of the DEC's restricted-residential soil cleanup objectives and disposal off-site at a permitted facility.

c.  Provision for soil that is excavated from the former Grumman Settling Ponds area that has less than 50 ppm PCBs to be reused as backfill in excavation areas deeper than 10 feet.

d.  Implementation of a site cover to assure that restricted residential soil cleanup objectives in the upper 2 feet of the Operable Unit 3 area are achieved.

e.  Implementation of in-situ thermal remediation of the VOC Source Area "…to attain the protection of groundwater SCOs [soil cleanup objectives] for the VOCs present".

f.  Installation of a groundwater extraction and treatment system to remediate the VOC-contaminated groundwater "…emanating from OU 3" and to "…capture and treat the 'hot spot' area of the plume…".

g.  Continued operation, and upgrading as necessary, of Northrop Grumman's groundwater extraction and treatment system IRM "…to assure the capture/containment of the full depth and area of contaminated groundwater leaving the site".

h.  Continued operation of Northrop Grumman's soil vapor extraction and treatment system IRM.

i.  Implementation of institutional controls on the Community Park Property, in the form of an environmental easement that would include use and development restrictions, as well as a site management plan.

56.     The 2013 ROD has several flaws that present a threat to public health and the environment:

a.  The soil cleanup requirements are unclear and inconsistent in different areas of the Community Park. For example, in the former Grumman Settling Ponds area, the 2013 ROD requires that contaminated soil that exceeds the DEC's restricted-residential use SCOs to a depth of 10 feet be excavated and disposed off-site in a permitted facility. However, in other areas of the Community Park, a cover system is specified to attain restricted residential use SCOs only in the upper 2 feet.  There is no rational basis for differing cleanup levels for different areas of the Community Park given that the Town has the same potential need to conduct excavations deeper than 2 feet in all areas of the Community Park, not just the ballfield, to perform maintenance and improvements.   Such excavations will expose workers to the hazards of any of Northrop Grumman's soil contamination left behind.

b.  The 2013 ROD provides for excavated soil containing PCBs at concentrations less than 50 ppm to be used as backfill of excavated areas below a depth of 10 feet. In effect, this provision allows the Community Park to continue to be used as a PCB landfill without adhering to the applicable or relevant and appropriate federal and state requirements for siting, designing, constructing, or operating a landfill. New York State law prohibits the creation of any new landfill on Long Island.

c.  The EPA was not consulted, nor did it review or approve, the PCB cleanup requirements stipulated in the 2013 ROD.  The EPA, not DEC, has primary authority for review and approval of the cleanup of PCB remediation waste under 40 CFR 761.61.  These rules require the responsible party to prepare a Risk Based Cleanup and Disposal application, which requires, among other things, that the owner of the property be consulted on the current and planned future use of the property before PCB cleanup levels will be approved by EPA. Northrop Grumman did not prepare a Risk Based Cleanup and Disposal application, nor did it consult with the Town as the property owner, before DEC issued the 2013 ROD and the purported PCB cleanup levels.  The Town's current and future use of the Community Park Property conflict with the 2013 ROD cleanup levels in a manner that present a risk to public health.

**F.     Northrop Grumman Initiates A PCB Risk-Based Cleanup and Disposal Program Without EPA Oversight And Approval Under TSCA.**

57.     Pursuant to a 2014 Order on Consent and Administrative Settlement ("2014 AOC") with DEC pertaining to the implementation of the 2013 ROD, Northrop Grumman conducted

sampling in 2014 through 2017 to delimit the extent of PCB and hazardous metals contamination within OU3, including the Community Park.

58.     The results of the 2014-2017 sampling for PCBs and hazardous metals were presented in two reports submitted to DEC titled Pre-Design Sampling and Remedial Alternative Evaluation Report for PCBs and Metals in Soil, dated January 2016, and Addendum to Pre-Design Sampling and Remedial Alternative Evaluation Report for PCBs and Metals in Soil, dated March 2018 (the "2016 and 2018 PCB Sampling Reports"). These reports describe the results of hundreds of soil samples collected at the Community Park, and also evaluate potential PCB remedial technologies.

59.     Northrop Grumman's 2014-2017 sampling for PCBs to obtain data to support PCB cleanup was conducted without EPA review and approval, even though the 2016 PCB Sampling Report acknowledged that for PCB cleanup, "Both the ROD remedy and the alternate remedy described herein would require submittal of an application to the U.S.EPA for a risk-based disposal under 40 CFR 761.61(c) and the agency's written approval of the remedy as set forth in this report."

60.     Even prior to the 2014-2017 PCB sampling program, Northrop Grumman was aware of EPA's authority over a risk-based PCB cleanup. Its 2011 Feasibility Study report for OU3 noted that a 2009 Human Health Risk Assessment was conducted in consideration of both DEC and EPA guidance, and that "The HHRA differed slightly from a standard baseline risk assessment in that certain exposure assumptions were made…", and "…the results of the HHRA confirmed that the Northop Grumman recommended remedy…is protective of human health." Neither Northrop Grumman nor DEC sought EPA's review and approval of the 2009 HHRA as

required under TSCA for a risk-based cleanup of PCBs before DEC issued its 2013 Record of Decision for OU3, including the Community Park Property.

61.     Notwithstanding its recognition that its PCB cleanup at the Community Park required a Risk-Based Cleanup and Disposal application ("RBDA") to EPA under 40 CFR 761.61(c), Northrop Grumman violated TSCA's implementation rules when it conducted the 2014-2017 sampling at OU3, including the Community Park, and failed to obtain EPA approval for the sampling pursuant to 40 CFR 761.61(c), which states, "Any person wishing to sample in a manner other than prescribed in paragraphs (a) or (b) of this subsection, must apply in writing. . . . No person may conduct cleanup activities under this paragraph prior to obtaining written approval by EPA."); *see also* EPA, Polychlorinated Biphenyl (PCB) Site Revitalization Guidance Under the Toxic Substances Control Act at 35 (Nov. 2005) ("If sampling is to be conducted per a § 761.61(c) approval, await receipt of approval from EPA."). Paragraphs (a) and (b) of 761.61 pertain to self-implementing PCB sampling and cleanup protocols, which Northrop Grumman acknowledged were not applicable to the Community Park PCB cleanup. Nevertheless, Northrop Grumman collected hundreds of samples over a period of four years with the express purpose of using the results of those samples to implement a risk-based cleanup and disposal, but without securing EPA review and approval for sampling as required under 40 CFR 761.61 (c).

62.     In June 2022, nearly ten years after the 2013 ROD, EPA informed the Town that Northrop Grumman had approached EPA about implementing a PCB risk-based cleanup and disposal under TSCA for OU3, including the Community Park. As part of the RBDA to EPA, EPA required Northrop Grumman to prepare and submit a Current Conditions Report ("CCR") in accordance with a CCR outline that EPA provided to Northrop Grumman in September 2022.

63.     EPA's CCR outline, which runs nearly 4 pages of single-spaced type, specifies the communication, steps, and documentation required from Northrop Grumman to allow EPA to review the PCB cleanup that Northrop Grumman proposed for OU3, including the Community Park.   EPA's CCR outline highlights many deficiencies in Northrop Grumman's sharing of information and data with the EPA and the Town, including the requirements, among other things, for Northrop Grumman to consult with the Town on "current and proposed future land uses" of the Community Park Property, and to conduct a comprehensive PCB data gaps analysis to support a proper cleanup.   The CCR outline makes clear EPA's authority under TSCA for review and approval of PCB cleanup at the Community Park, an authority that was ignored in DEC's 2013 ROD and in Northrop Grumman's actions for nearly ten years afterward.

64.     In February 2023, Northrop Grumman submitted a Current Conditions Report to EPA.  Ignoring EPA's requirements described in EPA's CCR outline, Northrop Grumman did not consult with the Town on current and future uses for the Community Park, nor on PCB cleanup objectives in consideration of the Town's plans for the Community Park.

65.     The CCR indicates that Northrop Grumman intends to excavate and re-bury a significant portion of the PCB-contaminated soil on the Community Park Property exactly as described in the 2013 ROD and against the express objections of the Town.

66.     To implement the PCB remedy described in the 2013 ROD and CCR, 40 CFR 761.61(a) requires that a deed restriction and certification be provided to EPA by the landowner wherever PCB remediation waste is left behind at levels greater than 1 PPM.  Northrop Grumman has never approached the Town, nor executed an agreement with the Town, to establish a deed restriction for the Community Park Property and to submit a certification of such deed restriction to EPA. As such, Northrop Grumman has shown that it does not respect the Town's legitimate

position as landowner, nor does it respect the EPA's authority to establish PCB cleanup levels, an authority which trumps DEC's.

67.     Northrop Grumman's ongoing failure to address the PCBs at the Community Park in accordance with TSCA, and its failure to communicate with the Town on critical matters of current and future Community Park uses and the need for a deed restriction for its proposed remedial actions that will leave behind PCBs behind at the Community Park, represent a threat to public health and the environment related to potential public and worker exposure to PCBs present in Community Park soil both now and in the future.

68.     As of the filing of this Complaint, EPA is reviewing the CCR, and more sampling to address PCB data gaps, among other requirements, are pending from EPA.

**G.     After Initiating The VOC Cleanup At The Community Park, Northrop Grumman Discovers The VOC Source Area To Be Almost Four Times Bigger, But Has Not Committed To A Complete Cleanup.**

69.     In June 2016, three years after the 2013 ROD, Northrop Grumman submitted a Remedial Design Work Plan for VOC Source Area for the Community Park.

70.     In DEC's approval of the above work plan in an August 18, 2016 letter to Northrop Grumman on which the Town was not copied, DEC also approved a less stringent VOC cleanup standard for the VOC Source Area soil than stipulated in the 2013 ROD.  The 2013 ROD had recognized the importance of VOC Source Area cleanup by establishing the VOC cleanup levels as the "protection of groundwater" soil cleanup objectives stipulated in 6 NYCRR Part 375 Table 375-6.8(b).  However, without notice to the Town or public or the opportunity for comment, DEC set aside the "protection of groundwater" cleanup levels for a less stringent and arbitrary standard of 10 PPM total VOCs, which allows certain VOC hazardous substances to remain behind in the Community Park soil at levels more than ten times higher than those stipulated in the 2013 ROD.

71.     Neither Northrop Grumman nor DEC provided a technical justification for why a concentration of 10 PPM of total VOCs was an acceptable cleanup goal given that any remaining VOCs in soil have the potential to leach into groundwater and continue to feed the plume.

72.     In 2020, Northrop Grumman received approval to construct and operate an in-situ thermal remediation ("ISTR") system for the VOC Source Area in the former rag pit disposal area and adjacent area, covering approximately 0.5 acres in the ballfield of the Community Park Property.  This system involved numerous wells that heat the soil and volatize the VOCs, which are captured by vapor extraction wells and then treated.

73.     The ISTR system was operated from August 2020 to February 2022, but before Northrop Grumman had completed a full delineation of the size of the VOC Source Area in need of remediation.  During the period from January 2020 to March 2022 encompassing the ISTR operation, Northrop Grumman conducted soil sampling as required by DEC to delineate the full extent of the VOC Source Area.  As a result of this soil sampling, the VOC Source Area, where Northrop Grumman found total VOC concentrations in soil greater than the DEC-revised cleanup goal of 10 PPM, was discovered to be approximately four times larger (i.e., approximately 2 acres) than the area being treated by the ISTR system (i.e., approximately 0.5 acres).

74.     The areas with previously unknown elevated levels of VOCs extend beneath the Community Park's parking lot, skateboard park, tennis courts, and recharge basin.

75.     In June 2023, Northrop Grumman submitted a Remedial Action Work Plan Addendum for Phase 2 In-Situ Thermal Remedy to address a portion of the much larger VOC Source Area.  Construction and operation of Phase 2 is projected to run for almost two years between September 2023 and August 2025.

76.     During Northrop Grumman's 2020-2022 soil sampling programs to fully delineate the VOC Source Area, the Town had to close portions of the parking lot, skateboard park, and tennis courts.

77.     During construction and operation of Phase 2, the Town will have to close the skateboard park and portions of the parking lot and tennis courts.

78.     Phase 2 does not treat the entire VOC Source Area delineated by Northrop Grumman, and as of the date of the filing of this Complaint, Northrop Grumman has not provided any work plan or schedule for completion of VOC Source Area remediation as required by the 2013 ROD.

79.     As long as the VOC Source Area remains partially treated, VOC contaminants in the soil will continue to leach into the groundwater beneath the Community Park and potentially migrate with groundwater flowing off-site, a condition that may present an imminent and substantial endangerment to the Sole Source Aquifer system that provides drinking water to Town residents.

**H.      The Effectiveness Of Northrop Grumman's Groundwater Extraction System Near The Community Park Boundary Is Not Sufficiently Demonstrated To Prevent Continual Recontamination Of The Sole Source Drinking Water Aquifer.**

80.     The 2013 ROD stipulated that Northrop Grumman's groundwater extraction system IRM "…assure the capture/containment of the full depth and area of contaminated groundwater leaving the Site."

81.     Northrop Grumman's groundwater extraction system IRM was not designed to fully capture the contaminants migrating in groundwater leaving the Community Park as required by the 2013 ROD.

82.     Northrop Grumman's and DEC's basis for setting aside the 2013 ROD cleanup standards for VOCs (the "protection of groundwater" SCOs) for a less stringent and arbitrary

standard of 10 PPM total VOCs was that the groundwater extraction IRM would prevent migration of contaminants from leaving the Community Park Property.  Northrop Grumman's and DEC's reliance on the groundwater extraction system IRM to justify a lesser VOC cleanup standard has not met an adequate burden of proof that the groundwater extraction system is and will be perpetually effective.

83.     During the period between approximately 2015 and 2018, and in accordance with a condition of the 2013 ROD, Northrop Grumman commissioned studies of the effectiveness of the groundwater extraction IRM to prevent contaminants in the groundwater beneath the Community Park from leaving the OU3 site.  The studies concluded that the groundwater extraction IRM was effective.

84.     However, the studies of the effectiveness of Northrop Grumman's groundwater extraction IRM were based on a very limited and insufficient number and depth of monitoring wells that leave unacceptable uncertainty regarding the full capture/containment of the contamination, as required by the 2013 ROD, given that anything less than full capture of the contaminants at the Community Park will cause continuing harm to the Sole Source Aquifer system.

85.     The uncertainty in the effectiveness of Northrop Grumman's groundwater extraction IRM means that the lack of a full cleanup of the VOC Source Area, in terms of both the less stringent VOC cleanup standard, and the discovery that the VOC Source Area is almost four times larger, means that Northrop Grumman's contaminants may continue to be leaving the Community Park, contaminating the Sole Source Aquifer system that provides drinking water to hundreds of thousands of people and causing an imminent and substantial endangerment to human health and the environment.

I.     **DEC's 2019 Amended Record Of Decision Admits That Previous RODs Were Ineffective At Preventing The Vast Expansion Of Northrop Grumman's Contamination, Pointing To The Need For Complete And Expeditious Cleanup Of The Community Park.**

86.     In December 2019, DEC issued an Amended Record of Decision (the "2019 AROD") that amended and expanded the remedy for the vast region of groundwater contamination, referred to as the Navy Grumman Groundwater Plume, whose source is the Grumman Facility and the NWIRP, including the Community Park.

87.     The 2019 AROD was issued because:

> "…with data showing that the existing remedies are not fully effective at achieving remedial action objectives, this remedy has been developed to supplement the existing remedies and to address off-site groundwater contamination not adequately addressed under the existing RODs. Specifically, under the existing remedies, not only does groundwater contamination continue to migrate south toward currently unimpacted public water supplies and unimpacted portions of the Long Island Sole Source Aquifer, but this southward migration is causing contaminant concentrations to increase in off-site groundwater. This remedy specifically addresses these threats to public health and the environment associated with this off-site groundwater contamination."

88.     The 2019 AROD explicitly and plainly acknowledges the threat to public health and the environment caused by Northrop Grumman's groundwater contamination based on data showing the ineffectiveness of existing remedies.

89.     The selected remedy in the 2019 AROD comprised the installation, long-term operation, and maintenance of 24 groundwater extraction wells and five treatment plants, among other requirements, with an estimated present worth cost of $585,000,000.00 ($585 million).

90.     The selected remedy in the 2019 AROD did not amend the remedy for the Community Park stipulated in the 2013 ROD.

91.     In July 2022, Northrop Grumman and DEC entered a Consent Decree (the "2022 Consent Decree") that stipulates, among other things, Northrop Grumman's responsibilities for implementing certain remedial elements of the 2019 AROD. (2022 Consent Decree, Paragraph 9).

92.     The 2022 Consent Decree stipulated that "Northop Grumman shall construct the remedial elements set forth in Paragraph 9 within five (5) years from the Effective Date of this Decree". (2022 Consent Decree, Paragraph 23).

93.     The 2022 Consent Decree did not stipulate a completion schedule for OU3, including the Community Park, even though eight years (now nine years) had passed since the effective date of the 2014 AOC governing Northrop Grumman's responsibilities for remedial actions at the Community Park. The lack of an enforceable schedule in the 2014 AOC for the cleanup of the Community Park, when compared to the inclusion of an enforceable schedule in the 2022 Consent Decree, clearly demonstrates that DEC has failed to diligently prosecute Northrop Grumman's contamination and remedial response actions at the Community Park.

94.     Furthermore, given the fact that the VOC Source Area at the Community Park is four times larger than assumed by the 2013 ROD, and considering the uncertainty in the data regarding the effectiveness of Northrop Grumman's groundwater extraction system IRM for the Community Park, Northrop Grumman and DEC have failed to act with urgency to complete a full cleanup of the VOC Source Area and decrease reliance on the IRM to prevent threats to public health and the environment engendered by not capturing/containing the full depth and width of VOC contamination in groundwater leaving the Community Park.

**J.**     **Northrop Grumman Is Discharging 1,4-Dioxane From Its Groundwater Extraction And Treatment System At Levels That Exceed The State Groundwater Effluent Limitation And Maximum Contaminant Level For Drinking Water.**

95.     The effluent from Northrop Grumman's groundwater extraction and treatment system IRM is discharged to a Nassau County-owned groundwater recharge basin located to the west of the Community Park Property.

96.     The effluent discharged to the recharge basin percolates down through the soil and enters the groundwater that feeds the Sole Source Aquifer system.

97.     The levels of 1,4-dioxane in Northrop Grumman's treated effluent to the groundwater recharge basin have routinely exceeded both the New York State groundwater effluent maximum allowable concentration of 0.35 micrograms per liter ("µg/L") and the maximum contaminant level for drinking water of 1.0 ug/L.

98.     Northrop Grumman's past and present discharge of 1,4-dioxane in its treated effluent to the groundwater that feeds the Sole Source drinking water aquifer may present an imminent and substantial endangerment to health and the environment.

**K.**     **Northrop Grumman Does Not Have A Schedule For Cleanup Of The Community Park, And DEC Has Failed To Enforce A Schedule.**

99.     Ten years after the 2013 ROD, and nine years after the 2014 AOC between Northrop Grumman and DEC, Northrop Grumman has not produced a comprehensive schedule for the full cleanup of the Community Park Property.

100.     DEC is an enforcement agency, yet DEC failed to include a "time is of the essence" provision in the 2014 AOC and enforce a schedule for the full cleanup of the Community Park Property.

101.     DEC's failure to establish or enforce a schedule for the cleanup of the Community Park is inconsistent with the fact that DEC stipulated a schedule for Northrop Grumman in the

2022 Consent Decree pertaining to the cleanup of the Navy Grumman Groundwater Plume.  It is nonsensical for the cleanup of a principal source area of the larger plume to not be subject to an enforcement schedule, particularly given that portions of the Community Park have been closed for over 20 years because Northrop Grumman's contamination threatens Community Park patrons and workers.

102.    Northrop Grumman's typical practice has been to submit a task-specific schedule with its work plans submitted to DEC.  However, the milestones in these schedules are routinely missed without penalty.  For example, when Northrop Grumman submitted an updated schedule for the VOC Source Area Remedy on October 31, 2019, the completion date for the Remedial Action Work Plan Addendum to address the expanded VOC Source Area was indicated to be the first quarter of 2020.  The Remedial Action Work Plan Addendum was submitted on June 30, 2023, more than three years later. Notwithstanding the lateness of this submittal, the document is not complete in that it does not address remediation of the entire VOC Source Area in the Community Park Property.

103.    The absence of a comprehensive schedule from Northrop Grumman, and the failure of DEC to enforce a schedule for Northrop Grumman to complete the full cleanup of the Community Park, means that the VOC Source Area continues to release contaminants to the groundwater beneath the Community Park, which has the potential to migrate beyond the Community Park Property, re-contaminate the Sole Source drinking water aquifer, and present an imminent and substantial endangerment to human health and the environment.

**L.    Summary of Northrop Grumman's On-Going Negligence And DEC's Inconsistent And Inadequate Oversight.**

104.    There is no dispute that Northrop Grumman's historical waste disposal operations of hazardous substances at the Community Park Property have contaminated the soil and

groundwater at and beneath the Community Park, resulting in the long-term closure of portions of the Community Park, and caused the widespread contamination of the EPA-designated Sole Source Aquifer that provides drinking water to Town residents.

105.    Over 20 years ago, the Town closed portions of the Community Park because PCBs and certain hazardous metals from Northrop Grumman's waste disposal operations were found in Community Park soil at levels that exceeded State standards, presenting an immediate and continuing threat to Community Park patrons and workers.  Despite this threat, Northrop Grumman has not made meaningful progress on removing these hazardous PCBs and metals from the Community Park.  Northrop Grumman's lack of progress stands in stark contrast to the Town's expeditious cleanup of Northrop Grumman's contamination of a 7-acre area during the period of 2005-2007 to enable the construction of a new ice rink.

106.    Northrop Grumman completed a 2009 Human Health Risk Assessment and embarked on PCB sampling to support a risk-based cleanup of PCB waste without obtaining EPA approval as required by federal rules and regulations under TSCA.

107.    Northrop Grumman intends to re-bury PCB remediation waste on the Community Park Property, in effect creating a PCB remediation waste landfill in violation of federal and state law that may present a threat to public health and the environment.

108.    Northrop Grumman has failed to adequately investigate and remediate the full extent of the VOC Source Area that feeds the groundwater contaminant plume that has impacted the Sole Source Aquifer, despite the requirements to do so stipulated in the DEC's 2013 ROD and 2014 AOC.  The VOC Source Area is approximately four times larger than Northrop Grumman's initial estimates, yet Northrop Grumman has not committed to its complete cleanup.

109.     Northrop Grumman has discharged 1,4-dioxane at levels that exceed the State groundwater effluent limit and maximum contaminant level into the Sole Source drinking water aquifer system that serves Town residents.

110.     DEC has failed to diligently prosecute Northrop Grumman's contamination of the Community Park Property as evidenced by the following:

a.  DEC changed the VOC cleanup goal stipulated in its 2013 ROD to an arbitrary, less stringent level without notice to the Town, public comment, or other opportunity for Town and public input.

b.  Ten years after the 2013 ROD, DEC has not secured a commitment or schedule for Northrop Grumman to clean up the entire VOC Source Area, notwithstanding the fact that the VOC Source Area was discovered to be approximately four times larger than initial assumptions.

c.  DEC has not ensured that the groundwater extraction system IRM is capturing the full depth and area of the contaminated groundwater leaving the Community Park, a situation exacerbated by the discovery of the larger VOC Source Area.

d.  DEC stipulated PCB cleanup levels for PCBs at the Community Park Property and the OU3 area in the 2013 ROD without the authority under TSCA to do so.

e.  As an enforcement agency, DEC failed to establish a "time is of the essence" provision in the 2014 AOC and enforce a schedule for the full cleanup of the Community Park Property.  The absence of a schedule for cleanup of the Community Park is inconsistent with the fact that DEC stipulated a schedule for Northrop Grumman in the 2022 Consent Decree pertaining to the cleanup of the Navy Grumman Groundwater Plume, which is fed in part by the contamination at the Community Park.

f.  More than twenty years after Northrop Grumman's initial investigations of the Community Park forced the Town to close portions of the Community Park to the public for health and safety reasons, ten years after the 2013 ROD, and nine years after the 2014 AOC, no progress (in the case of PCBs and hazardous metals) or inadequate progress (in the case of the VOC Source Area) has been made by Northrop Grumman and DEC towards the complete cleanup of the Community Park and the elimination of on-going potential threats to public health and the environment.

## COUNT I – RESOURCE CONSERVATION & RECOVERY ACT (RCRA)
## 42 U.S.C. 6972(A)(1)(B)

111.     The Town repeats and realleges the allegations contained in paragraphs 1 through 110.

112.     RCRA § 7002, 42 U.S.C. § 6972 provides that "any person may commence a civil action on his own behalf . . . against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

113.     Northrop Grumman is a "person" within the meaning of RCRA § 7002, 42 U.S.C. § 6972(a)(1)(B), *see id.* § 6903(15).

114.     RCRA defines "solid waste" to include "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities."  42 U.S.C. § 6903(27)

115.     RCRA defines "hazardous waste" as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may--(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."  42 U.S.C. § 6903(5).

116.     RCRA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).

117.  RCRA defines "storage" as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste."  42 U.S.C. § 6903(33).

118.  RCRA defines "treatment" as "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous."  42 U.S.C. § 6903(34).

119.  While under Northrop Grumman's ownership, control, and management, its facility generated "solid waste" and "hazardous waste" within the meaning of 42 U.S.C. § 6903(27) and 42 U.S.C. § 6903(5).

120.  Northrop Grumman contributed to the handling, storage, treatment, and/or disposal of solid and hazardous wastes into the environment within the meaning of 42 U.S.C. § 6903(3), 42 U.S.C. § 6903(33), and 42 U.S.C. § 6903(34).

121.  The solid and hazardous wastes handled, stored, treated, and/or disposed of at the facility remain onsite in a manner that may present an imminent and substantial endangerment to health or the environment.  42. U.S.C. § 6972(a)(1)(B).

122.  No responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action pursuant to a court order, consent decree, or administrative order under RCRA with respect to the conditions which may have contributed or are contributing to the activities which may present the endangerment to the environment or human health.

123.    Pursuant to RCRA 42 U.S.C. Section 6972(a)(1)(b), Northrop Grumman is liable for all equitable relief, including, without limitation, a mandatory injunction to immediately implement remedial measures at the Community Park Property.

**COUNT II – TOXIC SUBSTANCES CONTROL ACT (TSCA)**

124.    The Town repeats and realleges each allegation set forth in paragraphs 1 through 123.

125.    TSCA Section 20(a)(1), 15 U.S.C. § 2619(a)(1) provides that "any person may commence a civil action against any person . . . who is alleged to be in violation of this chapter or any rule promulgated under section 2603, 2604, or 2605 of this title, or subchapter II or IV of this chapter, or order issued under section 2604 of this title or subchapter II or IV of this chapter to restrain such violations."

126.    Pursuant to 15 U.S.C. § 2605, the United States Environmental Protection Agency promulgated 40 C.F.R. Part 761, rules for the storage and disposal of PCBs.

127.    40 C.F.R. § 761.3 defines "PCB remediation waste" as "waste containing PCBs as a result of a spill, release, or other unauthorized disposal, at the following concentrations: Materials disposed of prior to April 18, 1978, that are currently at concentrations 50 ppm PCBs, regardless of the concentration of the original spill."

128.    40 C.F.R. § 761.61 authorizes three different options disposing PCB remediation waste, (a) a self-implementing on-site method described in paragraph, (b) a performance-based disposal method described in paragraph, and (c) a risk-based disposal method.

129.    40 C.F.R. § 761.61(c) states that "[a]ny person wishing to . . . dispose of PCB remediation waste in a manner other than prescribed in paragraphs (a) or (b) of this section . . .

must apply in writing" to EPA and further and that "[n]o person may conduct cleanup activities under this paragraph prior to obtaining written approval by EPA."

130.    On information and belief, Northrop Grumman is planning to dispose of PCB remediation waste on the Community Park Property in a manner that is not prescribed in 40 C.F.R. § 761.61(a) or (b).

131.    On information and belief, Northrop Grumman has not obtained EPA's approval for disposal of PCBs, as required by 40 C.F.R. § 761.61(c).

132.    Northrop Grumman has begun PCB cleanup activities at the Community Park Property without proper EPA approval.

133.    Northrop Grumman's unsanctioned PCB investigation and cleanup plans fail to adequately protect TOB residents or to even identify the full extent of the risk.

### COUNT III – RCRA (IN THE ALTERNATIVE TO COUNT II) 42 U.S.C. 6972(A)(1)(A)

134.    The Town repeats and realleges each allegation set forth in paragraphs 1 through 133.

135.    Northrop Grumman's unsanctioned PCB investigation and cleanup plans would create an illegal PCB landfill on Community Park Property, in violation of federal and state solid waste regulations.

136.    Northrop Grumman has not installed an impermeable liner nor a leak detection system to ensure necessary and safe management of PCBs.

137.    Northrop Grumman's illegal landfill poses a direct threat to the Town and to the Sole Source Aquifer used by much of Long Island, and even potentially to the Great South Bay.

138.    Northrop Grumman's unlined PCB landfill is a non-complying solid waste disposal facility, or "open dump," under 40 C.F.R. § 257.2, and is prohibited under RCRA Section 4005.

139.   Grumman has made no attempt to comply with any of the applicable state permitting, design, or operating requirements under 6 N.Y.C.R.R. § 360.1 *et seq.*

140.   Even if Grumman had attempted to comply with these important safety standards, New York law prohibits the creation of any new landfill on Long Island due to the region's uniquely vulnerable water supply.  N.Y. E.C.L. § 27-0704.

## <u>COUNT IV – CLEAN WATER ACT</u>

141.   The Town repeats and realleges each allegation set forth in paragraphs 1 through 140.

142.   As part of its current inadequate remediation attempts, Northrop Grumman is discharging additional harmful pollutants into public water supplies at levels far above state guidelines and without required permits.

143.   Although Grumman is treating the groundwater it extracts for VOC contamination, Grumman is not removing other dangerous substances before discharging the water back into the environment.

144.   Specifically, Grumman's discharges of 1,4-dioxane regularly exceed state maximum contaminant levels and groundwater guidance values.

145.   Grumman's discharges are in violation of an effluent standard or limitation under 33 U.S.C. § 1365.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, the Town respectfully requests that this Honorable Court:

A.   Enter judgment for the Town as against Defendant Northrop Grumman;

B.   Declare that Defendant Northrop Grumman is in violation of RCRA;

C.      Pursuant to RCRA Section 7002 (42 U.S.C. § 6972(a)(1)(B)), permanently enjoin Defendant Northrop Grumman to immediately investigate and remediate the Community Park Property in order to take all actions necessary to address imminent and substantial endangerment that may be presented by the solid and hazardous wastes at Community Park Property;

D.      Declare that Defendant Northrop Grumman is in violation of TSCA;

E.      Pursuant to TSCA Section 20 (15 U.S.C. § 2619), permanently enjoin Northrop Grumman to obtain EPA approval for a PCB remediation waste disposal plan, or, in the alternative pursuant to RCRA Section 7002 (42 U.S.C. §§ 6973(a)(1)(a)), permanently enjoin Northrop Grumman from creating and maintaining a PCB landfill at the Community Park Property in violation of federal and state law;

F.      Declare that Defendant Northrop Grumman is in violation of the CWA;

G.      Pursuant to Clean Water Act Section 505 (33 U.S.C. § 1365), permanently enjoin Northrop Grumman from continuing to discharge pollutants from Community Park Property;

H.      Order Northrop Grumman to pay the Town's costs and attorneys' fees;

I.      Award such other relief as this Court deems just and proper.


Dated: September 26, 2023                    Respectfully submitted,
                                            Town of Oyster Bay

                                            By its Attorneys,

                                            /s/ J. Michael Showalter
                                            J. Michael Showalter
                                            ArentFox Schiff LLP
                                            1301 Avenue of the Americas, 42nd Floor
                                            New York, NY 10019 United States
                                            Phone:  212.484.3900

Email:  j.michael.showalter@afslaw.com

Russell Selman (*pro hac vice* forthcoming)
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Phone:  312.258.5500
Email:  Russell.Selman@afslaw.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney hereby certifies that on September 26, 2023, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Service will be perfected upon other parties once a service copy of this Complaint and the related summons are issued.


_/s/ J. Michael Showalter_