IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOWN OF OYSTER BAY,<br><br>        Plaintiff,<br><br>v.<br><br>NORTHROP GRUMMAN SYSTEMS<br>CORPORATION,<br><br>        Defendant. | Civil Action No. 2:23-cv-07146 |

## DEFENDANT NORTHROP GRUMMAN'S OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Mark A. Chertok
Amy Cassidy
Daniel Goldberg-Gradess
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th floor
New York, New York 10022
(212) 421-2150
mchertok@sprlaw.com

and

Grant J. Esposito
Robert J. Baehr
Claire N. Abrahamson
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
(212) 969-3010
gesposito@proskauer.com


*Attorneys for Defendant Northrop
Grumman Systems Corporation*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

    A.   The Town's Tactics Are Delaying Northrop Grumman's Overall Remedial Effort ........ 3

    B.   The Town Now Asks the Court to Micromanage a Pilot Survey to Investigate Geophysical Study Anomalies. .......................................................................... 5

        1.   The Drum Investigation ........................................................................... 5

        2.   DEC Approves the Work Plan for Test-Pitting, Rejecting the Very Arguments the Town Now Brings to the Court. ................................................................ 6

    C.   The Town's Belated Motion Has Delayed Remediation Indefinitely. ............................. 9

ARGUMENT ....................................................................................................... 9

    I.   THE TOWN FAILS TO ESTABLISH SUBJECT MATTER JURISDICTION OVER ITS COMPLAINT. ........................................................................................ 9

    II.   THE COURT SHOULD REFUSE TO EXERCISE JURISDICTION OVER PLAINTIFF'S MOTION. ........................................................................... 10

    III.   INJUNCTIVE RELIEF IS NOT APPROPRIATE. ........................................... 13

    A.   The Town Cannot Establish Any Likelihood of Prevailing on Its RCRA Claim. ......... 15

        1.   The Town Ignores Its Burden to Prove Imminent and Substantial Endangerment. ... 15

        2.   The Town's Claims of "Endangerment" Are Speculative and Nonsensical. ............. 16

        3.   The Town Misrepresents the Record Regarding Hexavalent Chromium. .................. 19

    B.   The Town Has Not Shown an Irreparable Injury. ........................................................ 21

    C.   The Balance of Equities Does Not Weigh in the Town's Favor. ................................... 23

    D.   The Town's Requested Injunction Does Not Serve the Public's Interest. ...................... 23

    IV.   BY NOT MOVING EARLIER, THE TOWN HAS CONCEDED THERE IS NO RUSH, AND NO IMMINENT HARM. ...................................................................... 24

CONCLUSION .................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

C<small>ASES</small>

*Amoco Prod. Co. v. Village of Gambell, AK*,
  480 U.S. 531 (1987) ......................................................................................................... 16

*Christie-Spencer Corp. v. Hausman Realty Co.*,
  118 F. Supp. 2d 408 (S.D.N.Y. 2000) ........................................................................... passim

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) ............................................................................................ 24

*City of N.Y. v. Anglebrook Ltd. P'ship*,
  891 F. Supp. 908 (S.D.N.Y. 1995) ................................................................................. 21

*Collins v. Olin Corp.*,
  418 F. Supp. 2d 34 (D. Conn. 2006) .................................................................... 10, 11, 12

*Ellis v. Trib. Television Co.*,
  443 F.3d 71 (2d Cir. 2006) .......................................................................................... 10, 12

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) .............................................................................................. 21

*JTH Tax, LLC v. Agnant*,
  62 F.4th 658 (2d Cir. 2023) ............................................................................................. 15

*Life Techs. Corp. v. AB Sciex Pte. Ltd*,
  No. 11 Civ. 325, 2011 WL 1419612 (S.D.N.Y. Apr. 11, 2011) ...................................... 24

*Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*,
  988 F. Supp. 404 (S.D.N.Y. 1997) ................................................................................. 21

*Mastrovincenzo v. City of N.Y.*,
  435 F.3d 78 (2d Cir. 2006) .............................................................................................. 14

*Phoenix Beverages, Inc v. Exxon Mobil Corp.*,
  No. 12-CV-3771 PKC JO, 2015 WL 588826 (E.D.N.Y. Feb. 11, 2015) ................ 18, 21, 22

*Read v. Corning Inc.*,
  351 F. Supp. 3d 342 (W.D.N.Y. 2018) ...................................................................... 11, 12

*Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry., Co.*,
  857 F. Supp. 838 (D.N.M. 1994) .................................................................................... 10

*Silber v. Barbara's Bakery, Inc.*,
  950 F. Supp. 2d 432 (E.D.N.Y. 2013) ............................................................................ 24

*Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*,
  575 F.3d 199 (2d Cir. 2009) ......................................................................... 16

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
  549 U.S. 422 (2007) ....................................................................................... 9

*Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*,
  823 F. Supp. 1077 (S.D.N.Y. 1993) ............................................................. 15

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995) .............................................................................. 14

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995) ............................................................................ 24

*United States v. Price*,
  688 F.2d 204 (3d Cir.1982) ........................................................................... 14

*Vernon Vill., Inc. v. Gottier*,
  755 F. Supp. 1142 (D. Conn. 1990) .............................................................. 18

*Weight Watchers Int'l, Inc. v. Luigino's Inc.*,
  423 F.3d 137 (2d Cir.2005) ........................................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................... 9, 15

*Yang v. Kosinski*,
  960 F.3d 119 (2d Cir. 2020) .......................................................................... 14

STATUTES

15 U.S.C. § 2601 .................................................................................... 3, 9, 15

42 U.S.C. § 6901 .................................................................................... passim

42 U.S.C. § 6921 ........................................................................................... 12

42 U.S.C. § 6972 ............................................................................... 15, 16, 21

N.Y. Envtl. Conserv. Law § 27-1313 .......................................................... 11

OTHER AUTHORITIES

40 C.F.R. § 268.1 ...................................................................................... 8, 12

40 C.F.R. § 761.61(c) .................................................................................... 12

**INTRODUCTION**

The Town of Oyster Bay (the "Town") asks this Court to overrule the New York State Department of Environmental Conservation ("DEC") and revise a soil investigation work plan that Northrop Grumman prepared, that the Town reviewed, commented on, and discussed with DEC, and that DEC then approved. As part of those discussions, the Town raised the exact same demand it raises here (*i.e.*, that all excavated soil should be removed from the Park). DEC *and* the U.S. Environmental Protection Agency ("EPA") considered that request and specifically *rejected* it. This Court should do the same.

The Town's motion for a preliminary injunction provides no basis for the extraordinary relief it seeks—having the Court overturn these two expert agencies' interpretation of a statute they effectuate. The Town's attack on the DEC-approved work plan fundamentally misrepresents the presence of certain hazardous materials in the soil and the mechanics of how Northrop Grumman Systems Corporation ("Northrop Grumman" or "NG") planned to conduct the soil excavation work at the Bethpage Community Park (the "Park"). Specifically, the Town falsely claims that the work plan calls for potentially contaminated soil being excavated from deep underground to be "redeposited on the surface of the Park."

In fact, the work plan preserves the status quo by directing contractors to return this excavated soil to the ground in the reverse order it was excavated (*i.e.*, to the same depth underground from which it was removed) once the investigation is complete. The Town's claim that injunctive relief is needed because the backfilled soil may never be removed is entirely speculative and inaccurate, particularly because the workplan already provides for carting away excavated soil where appropriate, and because the DEC-approved remediation of the Park will likely result in excavation and removal of additional soil.

The Town does not and cannot satisfy its burden to show how or why this Court should exercise jurisdiction to assume regulatory authority over the management and supervision of one relatively small aspect of a highly complex remedial effort that DEC has led for decades. Worse, the Town knew for weeks that the regulator-ordered excavation at the Park was set to begin the morning of November 12, 2024. The Town waited until literally the night before to file its motion. In so doing, the Town delayed the remedial work and wasted taxpayer money. The Town's belated motion comes after months of delay tactics by the Town, in which the Town has repeatedly refused DEC's invitations to attend a meeting with Northrop Grumman to discuss in good faith how to advance the very remediation that the Town has complained to this Court is not moving fast enough. For remediation to proceed, the Town's tactics must stop, starting with denial of the Town's belated preliminary injunction request and dismissal of this action.

## BACKGROUND

A year ago, the Town filed this case alleging that it had no say in the State-led remedial process at the Park. But both before this lawsuit and while this case has been pending, the Town has been in ongoing discussions with both DEC and EPA (but not Northrop Grumman) about the very relief it seeks in this lawsuit. Northrop Grumman moved to dismiss, and its motion remains pending. *See* ECF No. 31-1 (NG Mem. of L. in Supp. of Mot. to Dismiss ("Mot. to Dismiss")). The Town's voice has been more than heard. The Town's real problem is that, as the regulators concluded, it is not entitled to the requested relief. With the Town's present request for a preliminary injunction seeking to overrule DEC's decisions about a soil excavation work plan, the Town continues its pattern of engaging with the regulators but not Northrop Grumman, making unrealistic demands unsupported by current law or regulation that the regulators thus refuse, and then running to court falsely claiming it has no forum to express its wishes and

2

asking this Court to overrule the decisions of expert regulators. That pattern improperly delays the very remediation the Town professes to want expedited.

**A. The Town's Tactics Are Delaying Northrop Grumman's Overall Remedial Effort.**

The Town's overall suit against Northrop Grumman alleges violations of the Resource Conservation and Recovery Act ("RCRA") and the Toxic Substances Control Act ("TSCA"), based in part on claims that Northrop Grumman failed to seek EPA approval to remediate PCBs in soil, which DEC otherwise had ordered in its March 2013 Record of Decision for the Park cleanup ("ROD"). ECF No. 22 (Am. Compl.) ¶ 36. Contrary to the Town's allegations, Northrop Grumman had been in talks with EPA since long before the Town sued. *See* ECF No. 33 (NG Repl. in Supp. of Mot. to Dismiss ("Mot. to Dismiss Repl.")) at 5.

For more than six months, EPA also has met repeatedly with the Town and DEC regarding the PCB remediation. *See* Declaration of Mark Chertok, dated Nov. 25, 2024 ("Chertok Decl.") Ex. 2 (Sept. 26, 2024 Letter from Sean Mahar, Acting Commissioner of DEC, to Joseph S. Saladino, Supervisor at the Town ("Sept. 26, 2024 Mahar Letter")) at 2. At the Town's insistence, however, Northrop Grumman has been excluded from participating in these meetings. *Id.*, Ex. 1 (Sept. 25, 2024 Letter from Mark A. Chertok, Counsel to NG, to Russell B. Selman, Counsel to the Town ("Sept. 25, 2024 Chertok Letter")) at 1; Ex. 6 (Nov. 25, 2024 Letter from Edward J. Hannon, Environmental, Safety, Health Manager at NG, to Richard W. Lenz and Matthew Russo, Commissioners at the Town's Dep't. of Pub. Works) ("Nov. 25, 2024 Hannon Letter")) at 2. Moreover, the Town has refused to meet with Northrop Grumman on these issues for years. For example, in August and again in September, DEC attempted to schedule a meeting that included Northrop Grumman, the Town and EPA, to reach agreement on a soil-sampling plan, a necessary component of Northrop Grumman's application to EPA for a risk-based PCB cleanup—referred to as a Risk-Based Disposal Approval ("RBDA"). *Id.*, Ex. 2

3

(Sept. 26, 2024 Mahar Letter) at 2.  The Town refused, however, to attend any of those meetings, holding hostage the very process that it now tells the Court is not advancing. *Id.*; *see id.*, Ex. 1 (Sept. 25, 2024 Chertok Letter) at 2.

On September 26, DEC Commissioner Maher wrote the Town to emphasize that delays in the Park cleanup are the result of this impasse of the Town's own making.  Chertok Decl. Ex. 2 (Sept. 26, 2024 Mahar Letter) at 1.  DEC assured the Town that DEC had developed an expedited cleanup schedule at the Town's behest.  *Id.* at 2.  But the "largest single impediment to progress" on cleanup has been the Town's refusal to negotiate and its unwillingness to reach agreement with the regulators and Northrop Grumman on the soil sampling plan that is necessary for the PCB remediation to move forward.  *Id.* at 1.  DEC stressed that "[t]he clear impasse is the result of the Town refusing to meet with the parties to engage in a meaningful discussion."  *Id.*

Instead of accepting the regulators' invitations to collaborate, the Town persists in demanding from DEC and EPA "cleanup actions that are well beyond what is necessary to protect public health and environment in a public park and inconsistent with cleanups conducted in every other community space."  *Id.* at 2.  The core of the Town's grievance remains that it wants DEC and EPA to deviate from applicable cleanup standards—*i.e.*, for DEC to change its ROD and for EPA to direct a cleanup that ignores its regulations for a risk-based remediation and, instead, requires the excavation of virtually every molecule of PCBs from underneath the eighteen-acre Park.  *See* ECF No. 40-8 (Decl. of D. Shea in Support of the Motion ("Shea Decl.") Ex. E (Town Aug. 2024 Work Plan) at 1-2.)  DEC has been clear that the Town's proposed standard for cleanup would be ***necessary only if the park were to be used for agricultural purposes to grow food for human consumption.***"  Ex. 2 (Sept. 26, 2024 Maher Letter) (emphasis added) at 2.  Because the Park is not, and never will be, a working farm, the

Town's position is untenable.  Faced with the regulators' proper refusal to succumb to the Town's pressure to direct a patently unreasonable cleanup, the Town asks this Court to order a cleanup contrary to law.  Its request for an injunction is a backdoor attempt to get that ultimate relief of a full excavation of the Park, to which it is not entitled.

### B.  The Town Now Asks the Court to Micromanage a Pilot Survey to Investigate Geophysical Study Anomalies.

#### 1.  The Drum Investigation

During ongoing remedial investigation activities, Northrop Grumman's contractors discovered concrete-encased drums buried underground at the Park.  ECF No. 33 (Mot. to Dismiss Repl.) at 6.  At the time, the Town falsely told this Court that the concrete-encased drums leaked.  *See* ECF No. 32 (Town's Opp. to Mot. to Dismiss) at 7.  The Town repeats that false claim in its instant motion.  *See* ECF No. 40-1 (Mem. of L. in Supp. of Mot. for Prelim. Injunction ("Mot." or "Motion")) at 3.  But the drums did not leak.  As DEC reported publicly in April, "field crews documented no signs of leakage from the drums," and "the discovery of the drums presents no immediate threat to the public health and safety at the site."  ECF No. 33-3 (Decl. of Mr. Hannon in Supp. of Mot. to Dismiss Repl., Ex. B (DEC Apr. 2024 Community Update)).

In June 2024, Northrop Grumman continued to investigate whether any additional drums remained buried at the Park by conducting geophysical surveys involving electromagnetic ("EM") induction metal detection and ground-penetrating radar ("GPR"), which began in a limited 60-foot by 60-foot area for a pilot study.  *See* ECF No. 40-10 (Shea Decl., Ex. G, July 2024 Geophysical Survey Pilot Survey Results ("Geophysical Survey Results")) at PDF 2-5, 14-20; ECF No. 40-4 (Shea Decl., Ex. A, Aug. 1, 2024 Pilot Survey Area Anomaly Investigation

Work Plan ("Pilot Survey Work Plan")).[1]  At the request of DEC and the Town, Northrop

Grumman then conducted geophysical surveys of 12 of the 18 acres in the Park by an EM survey

in July and GPR in October.  ECF No. 40-10 (Geophysical Survey Results) at PDF 3, 8.

The geophysical survey of the pilot area revealed potential objects underground (called

"anomalies") for further investigation, and DEC asked that Northrop Grumman's geophysical

consultant further investigate.  *Id.*  To comply with DEC's directives and determine the type of

objects detected by the surveys, the consultant proposed a process called "test-pitting."  The

proposed test-pitting requires that the ground be excavated up to ten feet below the surface at

sixteen locations ("test pits") within the pilot study area.  ECF No. 40-4 (Pilot Survey Work

Plan) at 1-2.  Any objects uncovered in each test pit will be removed and examined and, once

that analysis is complete, the excavated soil will be returned to its original location in the test pit.

*Id.*  The test-pitting in this pilot study area is vital because it will provide information to the

geophysical consultants to interpret the results of the Park-wide geophysical surveys undertaken

in July and October, for example, to help consultants ascertain if remaining anomalies that the

surveys identified are pipes, transmission lines, scrap metal, containers, or other objects.

### 2.  DEC Approves the Work Plan for Test-Pitting, Rejecting the Very Arguments the Town Now Brings to the Court.

Northrop Grumman, with input from the Town and DEC, prepared a work plan for this

test-pitting.  *See generally* ECF No. 40-4 (Pilot Survey Work Plan).  During discussions about

the plan, the Town repeatedly demanded that *all* excavated soil from test-pitting be shipped

offsite for disposal.  After considering that request, DEC concluded that the Town's request was

"wasteful" and nonsensical, particularly because returning the soil to the ground would preserve

---

[1] EM and GPR are complementary technologies that identify potential objects underground.  *See* ECF No. 40-10 (Geophysical Survey Results) at PDF 2-23.

the status quo until the parties agreed to a further plan to complete soil remediation throughout the Park. *See* Chertok Decl., Ex. 3 (Oct. 11, 2024  Letter from Jess LaClair, Section Chief at DEC, to Mr. Russo ("Oct. 11, 2024 LaClair Letter")).  As DEC explained, it makes no sense to "transport and dispose of test pit soils" offsite now—which at this stage would *increase* required work and planning by DEC to ensure public safety when potentially contaminated soils are trucked away through public streets—only to then "backfill with clean soil, and subsequently remov[e] that same soil (which would then be intermixed with contaminated soils around it) a second time" during later remediation.  *Id.* at 1-2.  Rather, DEC concluded the proper approach is that if soil involved in test-pitting is later determined to qualify for offsite removal, it will be carted away during later phases of soil remediation.  *Id.* at 2.

Unfortunately, the Town's motion attempts to mislead the Court about the very issue for which it seeks injunctive relief:  how the excavated soil will be replaced.  The Town falsely claims that the work plan will result in subsurface soils being unearthed and "redeposited on the surface of the Park."  Mot. at 4.[2]  But the DEC-approved work plan *prohibits* soil excavated from deeper depths being left at the surface.  ECF No. 40-4 (Pilot Survey Work Plan) at 2. Instead, the work plan directs Northrop Grumman to "backfill[ soil] in the reverse order it was removed from the test pit"—*i.e.*, return the deepest soil excavated to the bottom of the test pit. *Id.* at 2.  The plan further directs Northrop Grumman to add "a final gravel surface cover . . . if originally present."  *Id.*  As the work plan notes, this approach is "consistent with procedures previously used" for prior subsurface investigation in the Park.  *Id.*  For good measure, "[i]f any

---

[2] The Town's consultant, David Shea, repeats this same misstatement.  *See* ECF No. 40-2 (Shea Decl.) at ¶¶ 2, 23.  Mr. Shea makes numerous other misstatements and advances unsupported theories throughout his declaration, such as claiming that the presence of hazardous waste and hexavalent chromium at the Park is ubiquitous.  *See id.* at ¶¶ 11-12, 16, 22-23.  To the extent germane to the Town's motion, these are addressed *infra*.

grossly contaminated media [*i.e.*, soil] is encountered during test pitting," "it will not be returned to the excavation as backfill but will be characterized and properly disposed offsite." *Id*. Further, if any "drums or concrete encasements are observed, the excavated soil would be characterized and properly disposed offsite." *Id*. In the meantime, the relevant area of the Park is closed to the public and surrounded by a locked security fence with warning signs and video surveillance so that access is limited to all but licensed contractors. *Id*.

The Town also incorrectly argues that the DEC-approved work plan fails to comply with EPA's land disposal restrictions ("LDRs") under RCRA. Mot. at 10. Here, again, the Town ignores that DEC and EPA already considered the Town's argument and rejected it. *See* Chertok Decl., Ex. 3 (Oct. 11, 2024 LaClair Letter). As DEC explained to the Town, "DEC, in consultation with the EPA, has determined the LDRs would not be triggered by the work described" in the work plan and would not require Northrop Grumman to cart away excavated soil at this stage. *Id*. at 1.[3]

In fact, as the regulators explained to the Town, it is *the Town's requested relief* that would be inconsistent with State environmental cleanup policies, because to cart away soil, replace it, only to cart it away again "is inefficient, wasteful, and incompatible with the State's policy under DER-31 to reduce greenhouse gas emissions during remedy implementation." Chertok Decl., Ex. 3 (Oct. 11, 2024 LaClair Letter) at 2. Contrary to the Town's claims to the Court, Northrop Grumman is not trying to "work around" any DEC or EPA requirements. Mot. at 10. Rather, Northrop Grumman is trying to perform the work the regulators have directed it to perform, in the manner and on the schedule of the regulators' direction. Further, if the Town's

---

[3] The Town also exaggerates the applicability of the LDRs, as they are only applicable to hazardous waste, and not all contaminated soil. *See* 40 C.F.R. § 268.1.

improper demands are heeded, the delay, waste, and inefficiencies that DEC concluded would come from carting away the soil from the test locations within the 3,600 square foot pilot area would exponentially increase because this approach would also have to be applied to any anomalies identified in the 12-acre Park-wide survey that will need to be test-pitted.

### C. The Town's Belated Motion Has Delayed Remediation Indefinitely.

The Town had known for at least a month that regulators rejected its demand regarding backfilled soil.  Having waited to file the Motion until literally the evening before the test-pitting was to begin, the Town is solely responsible for delays.  Chertok Decl. Ex. 6 (Nov. 25, 2024 Hannon Letter).

### ARGUMENT

This Court already has before it Northrop Grumman's Motion to Dismiss the Town's Amended Complaint, which sets forth multiple independent grounds for dismissing the Town's entire case.  Those same grounds warrant denying the Town's instant request for a preliminary injunction.  Regardless, the Town's motion fails because the Town fails to establish any imminent risk of harm that justifies the requested "extraordinary remedy" of a preliminary injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

### I.    THE TOWN FAILS TO ESTABLISH SUBJECT MATTER JURISDICTION OVER ITS COMPLAINT.

Northrop Grumman's Motion to Dismiss establishes that the Town's TSCA and RCRA claims are both, *inter alia*, unripe and moot.  *See* ECF No. 31-1 (Mot. to Dismiss) at Parts I.A–B, II.  "Without jurisdiction the court cannot proceed at all in any cause," including the Town's instant request for a preliminary injunction.  *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (citations omitted).  Northrop Grumman's jurisdictional arguments apply with equal force to the Town's Motion.  The regulators have been clear that if the Town

wants to try and justify deviations from DEC's current remedial plan, it needs to sit down with them and Northrop Grumman and have a discussion. The Town instead refuses to meet with Northrop Grumman and burdens this Court with baseless litigation where jurisdiction is lacking.

## II.    THE COURT SHOULD REFUSE TO EXERCISE JURISDICTION OVER PLAINTIFF'S MOTION.

This Court also should reject the Town's instant motion under the primary jurisdiction doctrine. Consistent with the doctrine, the Town cannot compel this Court to overrule DEC's decision regarding the appropriate steps in the work plan. Indeed, Northrop Grumman's primary jurisdiction argument in its Motion to Dismiss is reinforced by the Town's instant attempt to have the Court supplant expert agencies' technical decision-making on a specific remedial plan.

In particular, "issues of injunctive relief . . . are more properly within the [regulators'] field of expertise and discretion." *Collins v. Olin Corp*., 418 F. Supp. 2d 34, 44 (D. Conn. 2006). *Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry., Co*., 857 F. Supp. 838, 843 (D.N.M. 1994) (finding that "if injunctive relief is called for, requiring scientific or technical expertise, the doctrine [of primary jurisdiction] is more readily applicable" and citing cases). The Second Circuit has held that where, as here, a party's requested relief requires the resolution of issues "placed within the special competence of an administrative body," like DEC, under a regulatory scheme, courts should balance the following four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Ellis v. Trib. Television Co*., 443 F.3d 71, 81, 82–83 (2d Cir. 2006) (quotation omitted). For the following reasons, each of those factors weigh heavily in favor of recognizing the regulators' primary jurisdiction as to the Town's requested relief (and, indeed, the Town's entire case).

**First**, the question of whether any excavated soil must be immediately removed from the Park at this stage of the remediation is a matter properly within DEC's field of expertise. DEC has overseen the remediation of the Park and other sites in the area of the legacy Navy/Bethpage Facility for nearly three decades. *See* Mot. at 3-4; *see, e.g.*, *Collins*, 418 F. Supp. 2d at 46 ("[B]ecause the [regulator] is actively overseeing the implementation of the consent order, the doctrine of primary jurisdiction counsels in favor of dismissal"). More broadly, DEC is familiar with relevant scientific considerations as to whether the work plan is sufficiently protective of public health and the environment and will comply with applicable state regulations and policies governing remediation. Similarly, in *Read v. Corning Inc.*, 351 F. Supp. 3d 342 (W.D.N.Y. 2018), the court declined to enter injunctive relief overriding DEC's judgment that excavation of two feet of potentially contaminated soil (as opposed to plaintiff's requested fifteen feet) was appropriate, because "[t]he DEC deals with problems arising from environmental contamination on a regular basis, and presumably is well equipped to deal with such matters." *Id.* at 353. The same considerations apply here and weigh in favor of judicial restraint.

**Second**, the work plan is properly within DEC's discretion. As in *Read*, "the underlying question at issue—how best to remediate the contamination—has been committed to the DEC's discretion by the New York legislature." *Id.* at 353-54 (finding that N.Y. Envtl. Conserv. Law § 27-1313 "provides that the DEC 'shall be responsible . . . for inactive hazardous waste disposal site remedial programs'"). Likewise, discretion as to the appropriate standards for a large, complex, risk-based cleanup of PCBs at issue here—which the Town seeks to have the Court

decide and oversee implementation of—is committed to the EPA under applicable federal regulations.  *See* 40 C.F.R. § 761.61(c).[4]  Thus, this factor too weighs in favor of the doctrine.

*Third*, there is a substantial danger of inconsistent rulings because (*i*) DEC has already issued findings as to the appropriate course of action for the test-pitting; (*ii*) the parties are engaged in ongoing discussions with DEC and EPA as to the appropriate course of remediation at the Park writ large, which includes the question of what kind and how much excavated soil must be disposed of offsite; and (*iii*) ultimately, the parties anticipate that EPA will review and approve a PCB remedy.  The Court's involvement at this stage as to whether *any* excavated soil must be removed offsite during a *single step* in a *single phase* of the overall investigation and remediation, in which DEC has warned many steps must proceed "in parallel," will result in several "proceedings moving forward, on separate tracks, with the possibility of inconsistent rulings, [which] would inject needless confusion into the process, as well as likely inefficiency and delay into the actual remediation, which is supposed to be the ultimate goal here." *Read*, 351 F. Supp. 3d at 354; *see* Chertok Decl., Ex. 2 (Sept. 26, 2024 Maher Letter).

That the Court could order relief that is at cross-purposes with remedial measures DEC has required weighs heavily in favor of declining jurisdiction.  *See Ellis*, 443 F.3d at 88 ("Courts should be especially solicitous in deferring to agencies that are simultaneously contemplating the same issues.  Because an agency 'is currently conducting an investigation into the lawfulness of the [practice] under attack,' 'to permit the court below initially to determine [the issue] would invite the very disruption . . . that the doctrine is meant to discourage.'") (citation omitted); *see also, e.g.*, *Collins*, 418 F. Supp. 2d at 45 (invoking primary jurisdiction where the requested

---

[4] EPA and DEC are also specifically empowered to interpret and enforce provisions of the RCRA relevant here.  *See* 40 C.F.R. § 268.1 *et seq*; 42 U.S.C. § 6921 *et seq.*

relief "could create a situation where [defendants] may be substantially complying with their obligations under the consent order, and thus free from the threat of injunction or penalty from the [regulator], yet they may also need to conduct additional or different remedial actions on [the] same . . . property pursuant to an injunction issued by this Court.").

**_Finally_**, because the very issue for which the Town seeks injunctive relief has been put to and rejected by DEC, the fourth factor too weighs in favor of this Court recognizing the primary jurisdiction of the regulators. The parties discussed the Town's specific request regarding backfilled soil months ago. DEC considered and determined, in consultation with EPA, that governing regulations did not require removal of all excavated soil at this stage, and indeed that the Town's proposal was "wasteful" and inconsistent with State policy. Chertok Decl., Ex. 3 (Oct. 11, 2024 LaClair Letter). This Court should not disturb that determination.[5]

## III.    INJUNCTIVE RELIEF IS NOT APPROPRIATE.

As for the injunction itself, as a threshold matter, the Town relies on the wrong standard of review. That is because the relief it seeks is not a proscriptive preliminary injunction, but rather a mandatory one that alters the status quo. The Town is entitled to neither, but by seeking permanent removal of soil, rather than allowing the status quo to be maintained by returning it to the ground, the Town seeks a mandatory injunction. The DEC-approved work plan provides that, consistent with prior investigations at the Park, soil excavated during test-pitting will be "backfilled" into the test pits pending further analysis and a final determination by EPA as to whether cleanup standards require removal. By asking this Court to, instead, require that Northrop Grumman immediately and permanently remove any excavated soil from the Park, the

---

[5] Nowhere does the Town explain why it did not directly involve DEC in its request for the Court to override DEC's decision.

Town seeks a "*mandatory* preliminary injunction (as opposed to seeking a *prohibitory* preliminary injunction to maintain the status quo)" that will also "provide the [the Town] with substantially all the relief sought[.]"  *Yang v. Kosinski*, 960 F.3d 119, 127-28 (2d Cir. 2020) (internal quotations and citations omitted).[6]

 A movant may not, as the Town claims, obtain such relief by showing a mere "likelihood of success" or "sufficiently serious questions" as to the merits.  Rather, an injunction seeking to modify the status quo issues only if the movant establishes a "*clear*" or "*substantial*" likelihood of success.  *See Tom Doherty Assocs., Inc. v. Saban Ent., Inc*., 60 F.3d 27, 33-34 (2d Cir. 1995) (mandatory injunction requires "a clear showing that the moving party is entitled to the relief requested"); *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 90 (2d Cir. 2006) ("A heightened 'substantial likelihood' standard may also be required when the requested injunction" (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." ).  The Town cannot meet this heavy burden.[7]

---

[6] The Town seeks to avoid having its putative relief being properly characterized as a mandatory injunction by asserting—disingenuously—that it does not object to the test-pitting but only to the disposal of the excavated soil.  Mot. at 5.  Of course, by seeking removal of soil now the Town obviously is seeking a permanent remedy.  Maintaining the status quo is to do exactly what DEC directed, which is to put the soil back for now.

[7] The Town's Motion cites to inapposite RCRA cases finding that the relevant status quo is not a "condition of rest," but one "of action which, if allowed to continue or proceed unchecked and unrestrained, will inflict serious irreparable injury."  *United States v. Price*, 688 F.2d 204, 212 (3d Cir.1982).  But in such RCRA cases, unlike here, "plaintiffs want to force site owners and operators to *begin* a cleanup (or stop dumping and begin a cleanup)," which requires courts to "look at the level of environmental damage and the impact of waiting to begin a cleanup." *Christie-Spencer Corp. v. Hausman Realty Co*., 118 F. Supp. 2d 408, 420 (S.D.N.Y. 2000).  By contrast, here, as in *Christie-Spencer*, the Town "wants [this Court] to declare that the clean-up mechanism chosen by [the parties] and approved by the DEC for use at the Site poses an imminent and substantial danger because it will not adequately clean the remaining soil."  *Id.* When a plaintiff like the Town seeks that kind of relief, it is subject to a higher bar of proving the DEC-approved measure *itself* "poses an imminent and substantial endangerment."  *Id.*

In addition to its burden to show (*i*) a *clear* or *substantial* likelihood of success on the merits, the Town also must establish that (*ii*) it is "likely to suffer irreparable harm in the absence of preliminary relief," (*iii*) the "balance of equities tips in its favor," and (*iv*) "an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (quoting *Winter*, 555 U.S. at 20. And, to be clear, even if the Town were truly seeking a prohibitive preliminary injunction (as opposed to a mandatory one) it still would lose. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Such relief, therefore, should "not be granted absent a clear showing that the moving party has met its burden of proof." *Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc*., 823 F. Supp. 1077, 1082 (S.D.N.Y. 1993). The Town fails to carry its burden to obtain this extraordinary relief.

### A. The Town Cannot Establish Any Likelihood of Prevailing on Its RCRA Claim.

As set forth in Northrop Grumman's pending Motion to Dismiss, because the Town fails to assert any ongoing violations or a likelihood of a future violation of either TSCA, 15 U.S.C. § 2601 *et seq.* or RCRA, 42 U.S.C. § 6972(a)(1)(A), the Town's chance of prevailing on those claims is remote or non-existent. *See* ECF No. 31-1 (Mot. to Dismiss) at Part I, II; ECF No. 33 (Mot. to Dismiss Repl.) at Part I, II. The Town's Motion seeks the requested preliminary injunction under RCRA, 42 U.S.C. § 6972(a)(1)(B). But that claim fails as a matter of law too.

### 1. The Town Ignores Its Burden to Prove Imminent and Substantial Endangerment.

To successfully prosecute a claim under RCRA § 6972(a)(1)(B), the Town must demonstrate, among other things, that the "solid or hazardous waste" at issue "may present an imminent and substantial endangerment to health or the environment." The Town focuses on the statute's use of the term "may" to suggest that the burden of proof to secure an injunction is negligible. *See* Mot. at 19. But "[n]otwithstanding the broad powers of RCRA's citizen suit

provision, the commencement of a RCRA suit does not automatically warrant entry of an injunction." *Christie-Spencer*, 118 F. Supp. 2d at 420.

Indeed, "[n]o matter how broadly read . . . the text of 42 U.S.C. § 6972 requires the presence of solid or hazardous waste that may present an 'endangerment' that is 'imminent' and 'substantial.'" *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 210 (2d Cir. 2009). Accordingly, "[o]nly if the injury is 'sufficiently likely' will the balance of harm tilt in favor of injunctive relief." *Christie-Spencer*, 118 F. Supp. 2d at 420 (quoting *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987)). Courts "will not find that an imminent and substantial endangerment exists 'if the risk of harm is remote in time, completely speculative in nature, or de minimis in degree.'" *Id.* The Town's claims that executing on the DEC-approved work plan for test-pitting at the Park presents an imminent risk rests on pure conjecture, have been refuted by the regulators, and make no logical sense.

### 2. The Town's Claims of "Endangerment" Are Speculative and Nonsensical.

Regulatory authorities repeatedly have rebutted the Town's allegations, for instance, that "[l]ogically, any hazardous substances remaining now in the soil [at the Park] portend some chan[c]es of further contaminating the groundwater or exposing nearby residents to highly toxic substances" in the imminent future. Mot. at 16. As explained in the Motion to Dismiss, Northrop Grumman implemented the first phase of Volatile Organic Compound remediation in the Park, and the second phase is underway. ECF No. 31-1 (Mot. to Dismiss) at 5. Northrop Grumman constructed and continues to operate a groundwater extraction system that has intercepted and treated over 1.4 billion gallons of groundwater that might otherwise migrate from the Park, and residents are served by public water supplies treated to remove contamination. *See id.* at 2–6, 19. It is also undisputed that the relevant area of the Park is closed to the public and, regardless, "people will not come into contact with site-related contaminants in soil unless they

dig below the surface." ECF No. 31-3 (ROD), at 13; *see* ECF No. 31-1 (Mot. to Dismiss) at 19-20.  Indeed, the Town's argument, in practice, is untenable:  were the presence of "any hazardous substances" at an active remediation site under DEC management enough to show "imminent and substantial endangerment," then injunctions would be the norm at *every* such site, where at least some hazardous substances can be found until remediation is complete (which they are not).

The Town further misleads the Court when it claims the test-pitting will present new risks to human health.  The DEC-approved work plan provides that, "consistent with procedures previously used for [] test pit investigations" at the Park, the excavated soil will be "backfilled in the reverse order it was removed from the test pit and a final gravel surface cover will be added if originally present."  *See* ECF No. 40-4 (Pilot Survey Work Plan) at 2.  This means that the excavated soil will be returned to the depth it was originally found and not, as the Town repeatedly claims, "reburied in shallower (or even surface) soil."  Mot. at 19.  Additionally, as DEC explained in its October 11, 2024 letter approving this "backfilling" process, "[i]mportantly, the area also is restricted to prevent any public access or exposure to the contaminated soil while it temporarily remains on site and will be managed appropriately before being placed back into the shallow test pit where the soil originated from."  Chertok Decl., Ex. 3 (Oct. 11, 2024 LaClair Letter) at 2.  In other words, because no one is presently exposed to any potential contaminants in the soil, there will be no risk of exposure when the excavated soil is later returned to its original location in the test pits in compliance with the work plan.[8]

_____

[8] Similarly disingenuous is the Town's speculation that Northrop Grumman would "exploit 'temporary storage'" to leave potentially contaminated soil in the Park indefinitely.  Mot. at 5.  As noted by DEC, it is the Town that has delayed progress in the further remediation of the Park.  *See* Chertok Decl., Ex. 2 (Sept. 26, 2024 Maher Letter) at 1, 3.  And it is the Town that has refused to meet with Northrop Grumman with regard to the Company's proposed sampling plan that is a prerequisite for submission of an RBDA application to EPA.  *See* Chertok Decl., Ex. 1 (Sept. 25, 2024 Chertok Letter ) at 2, Ex. 6 (Nov. 25, 2024 Hannon Letter).  Furthermore, the

Faced with these realties, the Town vacillates between claiming that there is no "guarantee" there will not be potential public access and that there might be exposure "3, 5, 10, or 20 years into the future." Mot. at 19. But rank speculation does not qualify as "imminent or substantial harm." *See, e.g.*, *Phoenix Beverages, Inc v. Exxon Mobil Corp*., No. 12-CV-3771 PKC JO, 2015 WL 588826, at *6 (E.D.N.Y. Feb. 11, 2015) (holding that "unsupported conjectures plainly fall short of Plaintiffs' heavy burden of showing that a reasonable prospect of future serious harm exists" for an RCRA preliminary injunction and noting "it is not enough for a plaintiff to face the mere 'possibility' of irreparable harm"); *Vernon Vill., Inc. v. Gottier*, 755 F. Supp. 1142, 1155 (D. Conn. 1990) (finding "in the absence of any suggestion beyond the mere allegation of 'imminent and substantial endangerment,'" no genuine issue of material fact as to whether the alleged harm posed by the waste is "imminent and substantial"). Here, of course, the Town's pure conjecture is contrary to the fact that the backfilling DEC approved (and EPA endorsed as well) does not risk public exposure.

Next, the Town's claim that because of DEC's purported "decades-long" lack of enforcement, Northrop Grumman will not remediate the Park unless this Court grants an injunction, is irrelevant to the request that the Court overrule DEC, because it is nothing more than an *ad hominin* attack on DEC. The fact remains that there is no "imminent and substantial" threat that Northrop Grumman will fail to comply with the DEC-approved work plan. *See, e.g.*, *Christie-Spencer*, 118 F. Supp. 2d at 420-21 (S.D.N.Y. 2000) (declining to issue a RCRA preliminary injunction requesting measures beyond those required by DEC because

---

Town's complaint that Northrop Grumman has never provided a schedule for the remaining remediation in the Park (Mot. at 10) is wrong; a detailed schedule was provided to DEC, EPA and the Town. *See* Chertok Decl., Ex. 1 (Sept. 25, 2024 Chertok Letter) at 2. The Town's professed concern about Northrop Grumman's "exploitation" is meritless.

"[n]otwithstanding the 'voluntary' nature of this cleanup, [the defendant] is required to reduce the contamination to a level that the DEC believes is safe" and there was "no evidence that [the defendant] is refusing or will refuse to comply with these objectives. On the contrary, it is being extraordinarily pro-active and cooperating fully with state environmental authorities.").  The hold-up is the instant and frivolous motion filed by the Town, compounded by the Town's lack of cooperation with DEC and EPA to move the remedial process forward.

### 3.  The Town Misrepresents the Record Regarding Hexavalent Chromium.

The Town's latest attempt to derail the State-ordered remediation also adds misguided arguments regarding the Town's alleged "fear" that a different substance, hexavalent chromium, might be uncovered in test-pitting soil.  Mot. at 4.  But what the Town cites is at best misleading and not relevant to its request for injunctive relief.

*First*, the Town attempts to revise history, incorrectly claiming that the Park land historically was used for hexavalent chromium disposal.  *Id.* at 7.  Tellingly, the Town offers no support for its claim.  The facts are not in dispute.  Around the time of the 1962 donation of the Park land to the Town, regulators approved Grumman's historical practice of drying relatively non-toxic trivalent chromium (not hexavalent chromium) in drying beds, a standard industry practice of which the Town was aware prior to taking possession of the Park land.  *See* Chertok Decl., Ex. 7 (Dec. 19, 1963 Letter from Francis J. Flood, Engineer at Nassau Cty. Dep't. of Health to James Gildersleeve, Superintendent at the Town) ("chromium [] in the less toxic trivalent state . . . has been deposited with this department's knowledge and consent on the existing site").

The only document the Town provides to substantiate its false claims about historical chromium disposal practices is a selective excerpt of Grumman's application for a hazardous waste management permit that DEC issued to Grumman in 1992, which identifies Grumman's

regulator-approved waste treatment practices nearly *thirty years after* the Town took possession

of the Park land. Mot. at 7 (citing ECF No. 40-7, Shea Decl. Ex. D (excerpted pages)). In fact,

the full document states that chromium in the form of "paint dust, chips, and sludge" from

Grumman operations at the Navy/Bethpage Facility (not at the Park) was drummed and removed

by licensed vendors for offsite disposal at authorized facilities elsewhere, and not disposed at the

Park. Chertok Decl. Ex. 8 (Hazardous Waste Permit Application) at 3-21.

*Second*, and most importantly, the Town omits that testing during excavation of drums

found in the Park showed neither total chromium nor hexavalent chromium exceeding the State's

current soil cleanup objectives ("SCO") that apply to the Park. *See* ECF No. 40-3 (Shea Decl.)

¶ 20 (providing only the highest detection of 33.4 mg/kg in one sample, which is still below

current regulatory standards); Chertok Decl. Ex. 5 (Nov. 8, 2024 Letter from Mr. Hannon to Ms.

LaClair). Even the highest hexavalent chromium concentration in the Town's sampling

represents only a tiny fraction (less than 0.2%) of the total chromium in the sample. *Id.*[9]

In any event, to the extent that further subsurface investigations might find chromium, the

Town's argument is not that chromium risks "imminent and substantial endangerment" to the

public, but instead that the Town's own speculation about chromium might result in "fear and

---

[9] The Town conveniently omits the fact that all detections of total and hexavalent chromium found in its recent sampling showed levels within current regulatory limits. Instead, the Town argues that the low levels of detected hexavalent chromium would exceed a "*proposed* cleanup objective for hexavalent chromium of 1 mg/kg," (Mot. at 7 (emphasis added)). *See generally* ECF No. 38 (NG Resp. to Town's Not. of Supp. Auth.). Even if the State does adopt amendments to the hexavalent chromium SCO, the current proposal would grandfather sites like the Park with DEC-approved remediation—indicating that DEC views the extant limits as adequate to protect public health and the environmental. *See id.* at 1. Moreover, any Park soil that exceeds an applicable regulatory limit either would be excavated from the top two feet or capped by two feet of cover soil—that is, assuming any hexavalent chromium-containing soil is not removed already when PCB-containing soil is excavated—and would not pose any risk of exposure. *See* ECF No. 31-3 (ROD) at 2-3, 9, 13.

impact to the Town's residents."  Mot. at 4.  Of course, fear, even if well-founded—and here it is

not—is not grounds for an extraordinary injunction to wrest control from the regulators.  And

there is no impact, as the relevant areas of the Park are closed to the public, so there is no

potential exposure to the Town's conjured risks.

### B.  The Town Has Not Shown an Irreparable Injury.

The Town cannot show that its residents will likely face irreparable injury absent its

requested preliminary injunction for the same reasons its RCRA § 6972(a)(1)(B) claim fails:

The current state of the Park and Northrop Grumman's planned investigation present no

imminent risk of any harm, much less irreparable harm, to the public.

"The threat of irreparable harm is a sine qua non for granting preliminary injunctive

relief."  *Christie-Spencer*, 118 F. Supp. 2d at 423.  "[I]f there is no irreparable injury, there can be

no preliminary injunction."  *Markowitz Jewelry Co. v. Chapal/Zenray, Inc*., 988 F. Supp. 404,

406 (S.D.N.Y. 1997).  Where a case is "brought pursuant to an environmental or health statute,

the focus of the irreparable harm inquiry shifts to concern for the public interest."  *Christie-*

*Spencer*, 118 F. Supp. 2d at 423.  To show irreparable harm, plaintiffs must demonstrate that

"absent a preliminary injunction [the public] will suffer an injury that is neither remote nor

speculative, but actual and imminent, and one that cannot be remedied if a court waits until the

end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66

(2d Cir. 2007) (internal quotation marks and citation omitted); *see also City of N.Y. v.*

*Anglebrook Ltd. P'ship*, 891 F. Supp. 908, 925 (S.D.N.Y. 1995) (holding that "there must be

some actual, viable, presently-existing threat of serious harm").

In a RCRA case, the irreparable injury prong of the inquiry thus "effectively merges with

the court's analysis of plaintiff's likelihood of success on the merits."  *Christie-Spencer*, 118 F.

Supp. 2d at 423; *Phoenix Beverages*, 2015 WL 588826, at *4 n.4 (finding, conversely, that

"deficiencies that resulted in a failure to demonstrate irreparable harm also call into doubt whether Plaintiffs can show likelihood of success on the merits of their claim of 'imminent and substantial endangerment to health or the environment' under RCRA").  Where, as here, the danger to public health "is de minimis or non-existent, there is [thus] no danger to the public interest for the purposes of irreparable injury." *Christie-Spencer*, 118 F. Supp. 2d at 423.  The Town's speculation about "potential" exposure to alleged contaminants in the subsurface of the Park does not satisfy its burden to prove an imminent danger to the public.  *See, e.g.*, *Phoenix Beverages*, 2015 WL 588826, at *5 ("The facts presented, however, do not support a finding that the presence of gas in the sub-slab of the Property poses an actual and imminent threat of explosion so as to warrant the extraordinary relief requested.  Because the record does not clearly establish a risk of explosion, there is no danger to the public interest for the purposes of irreparable injury.").  This failure further warrants denying the Town's requested injunction.

Nonetheless, the Town seeks to evade its burden of showing some meaningful irreparable injury by claiming that "hazardous waste will remain in the Park soils and the full extent of the contamination will remain unknown."  Mot. at 14.  It is undisputed, however, that there will be further sampling to identify the full extent of any Park contamination and remediation of the Park pursuant to the DEC ROD and EPA's PCB decision.  *See* ECF No. 31-1 (Mot. to Dismiss) at 6, 12; ECF No. 32 (Town's Opp. to Mot. to Dismiss) at 6-7.  And as explained above, there is no risk from the DEC-allowed backfilling.  To the contrary, the Town's requested relief presents *greater* risk because (*i*) a substantially larger number of trucks will have to carry soil to and from the Park through residential streets, and (*ii*) when the full remediation is undertaken, contractors would have to excavate much greater volumes of soil, given that any new fill from the Town's test-pitting proposal would be intermixed with potentially contaminated soil around it.  *See*

Chertok Decl., Ex. 3 (Oct. 11, 2024 LaClair Letter) at 1-2.  In short, the Town's position would create the very risks that it professes to want to avoid.

**C. The Balance of Equities Does Not Weigh in the Town's Favor.**

The balance of equities weighs in favor of following the work plan that DEC approved after consideration of the Town's comments, and that Northrop Grumman was prepared to execute absent the Town's meritless motion.  The Town has needlessly delayed this process, which benefits no one.  And the Town's actions have delayed Northrop Grumman from obtaining the information from the pilot study needed to inform the report for the geophysical survey of the entire Park. *See* Chertok Decl., Ex. 4 (Oct. 14, 2024 Letter from Mr. Hannon to Mr. Russo ("Oct. 14, 2024 Hannon Letter") at 1.

Putting aside that the Town's purported "estimates" of the incremental costs to Northrop Grumman of complying with the proposed injunction are baseless and inaccurate, there is no justification for requiring unnecessary and duplicative costs when the status quo will not endanger human health.  *See* Chertok Decl., Ex. 3 (Oct. 11, 2024 LaClair Letter) at 2 (describing the Town's sought-after relief as "inefficient, wasteful, and incompatible with the State's policy").  The balance of hardships warrants denying the Town's preliminary injunction.[10]

**D. The Town's Requested Injunction Does Not Serve the Public's Interest.**

Finally, the Town is incorrect that the public will benefit from the delay its proposed preliminary injunction causes.  The Town is doing a tremendous *disservice* to the public by

---

[10] As noted earlier, if the Court required all soil to be removed, that ruling presumably would apply to the test-pitting for the larger-scale geophysical survey as well—or otherwise tee up serial requests by the Town for similar relief any time DEC asks Northrop Grumman to dig another hole.  The result would be extensive stockpiling of soils, sampling to determine proper disposal locations, and far more truck traffic to remove the excavated soil and bring in new fill. This would delay the contemplated site-wide sampling and thus the overall remediation under the ROD and RBDA.  *See* Oct. 11, 2024 Hannon Letter, at 1.

wasting its taxpayers' money on frivolous litigation every time the regulators and Northrop Grumman do not simply acquiesce to the Town's demands that are both unsupported and contrary to law. This latest salvo, as DEC previously stated with respect to the Town's conduct, has "set[] back cleanup actions and [extended] the timeline for restoration of the park, contrary to [the parties'] mutual goals." Chertok Decl., Ex. 2 (Sept. 26, 2024 Maher Letter) at 1. The Town's requested preliminary injunction is not in the public's interest and must fail.

## IV.    BY NOT MOVING EARLIER, THE TOWN HAS CONCEDED THERE IS NO RUSH, AND NO IMMINENT HARM.

The Town's months-long delay in filing its Motion undercuts its claim of imminent and irreparable harm and, for this reason alone, favors denial of its Motion. "Preliminary injunctions are generally granted under the theory that there is an *urgent* need for *speedy* action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (emphasis added). Accordingly, "[l]ack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm." *Majorica, S.A. v. R.H. Macy & Co*., Inc., 762 F.2d 7, 8 (2d Cir. 1985); *see Tough Traveler, Ltd. v. Outbound Prods*., 60 F.3d 964, 968 (2d Cir. 1995) ("[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.") (citation omitted). In fact, "months-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief." *Silber v. Barbara's Bakery, Inc*., 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013).[11]

---

[11] *See, e.g.*, *Weight Watchers Int'l, Inc. v. Luigino's Inc*., 423 F.3d 137, 144 (2d Cir.2005) (noting "delays of as little as ten weeks" have been found "sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction"); *Life Techs. Corp.*

The Town has been aware that the pilot survey work plan provides for the backfilling of excavated soil since at least August 1, 2024. *See* ECF No. 40-4 (Pilot Survey Work Plan). This methodology should have come as no surprise given that this was "the procedure[] previously used for the test pit investigations at anomalies 1, 2, 3 and 4 in the ballfield." *Id.* at 2; *see* Chertok Decl., Ex. 4 (Oct. 14, 2024 Hannon Letter) at 1. The Town also knew for at least a month that DEC rejected its demands regarding backfilling and that the DEC-approved work plan was set to begin on November 12, 2024. *See* Chertok Decl., Ex. 3 (Oct. 11, 2024 LaClair Letter). Nonetheless, it did not file its Motion until *the night before* the work was to begin.

The Town's delay in seeking this piecemeal injunctive relief compels the conclusion that the Town is not facing imminent harm. Moreover, it reveals the true purpose of its Motion: to sow chaos hours before the test-pitting was to begin in hopes that the regulators and Northrop Grumman capitulate to the Town' unreasonable demands. The result of the Town's frivolous action has already imposed those consequences on Northrop Grumman and the State, and the resulting delay of rescheduling the State-ordered cleanup is now unknown. Plainly, the Town has shown that it is not interested in respecting existing law and regulations, or in meaningfully discussing the relief it seeks with Northrop Grumman before burdening this Court. The Town's unreasonable delay reveals that its Motion is, instead, a political maneuver not borne out of a legitimate goal to prevent any real threat of imminent harm.

## CONCLUSION

For the foregoing reasons, the Town's motion for a preliminary injunction should be denied.

---

*v. AB Sciex Pte. Ltd*, No. 11 Civ. 325, 2011 WL 1419612, at *7–8 (S.D.N.Y. Apr. 11, 2011) ("[U]nexplained delays of more than two months" typically warrant denial of injunctive relief).

Respectfully submitted,

*/s/ Mark A. Chertok*

Mark A. Chertok
Amy Cassidy
Daniel Goldberg-Gradess
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th floor
New York, New York 10022
(212) 421-2150
mchertok@sprlaw.com
acassidy@sprlaw.com
dgoldberg-gradess@sprlaw.com

            and

Grant J. Esposito
Robert J. Baehr
Claire N. Abrahamson
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
(212)969-3010
gesposito@proskauer.com
rbaehr@proskauer.com
cabrahamson@proskauer.com

*Attorneys for Defendant Northrop Grumman Systems Corporation*

## APPENDIX A: ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| DEC | New York State Department of Environmental Conservation |
| ECL | New York State Environmental Conservation Law, Ch. 43-B of the Consolidated Laws of New York |
| EPA | U.S. Environmental Protection Agency |
| Navy/Bethpage Facility | U.S. Navy/Grumman Bethpage Facility |
| OU3 | Operable Unit 3 |
| The Park | Bethpage Community Park |
| PCBs | Polychlorinated biphenyls |
| RBDA | Risk-Based Disposal Approval |
| RCRA | Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*. (1976) |
| ROD | Record of Decision |
| Town | Town of Oyster Bay |
| TSCA | Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* (1976) |