**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Town of Oyster Bay,<br><br>               Plaintiff,<br><br>       -v-<br><br>Northrop Grumman Systems Corporation,<br><br>            Defendant. | 2:23-cv-7146<br>(NJC) (AYS) |

**<u>OPINION AND ORDER</u>**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

JURISDICTION ......................................................................................................................... 8

FACTUAL BACKGROUND......................................................................................................... 9

   I.    Facts Alleged in the Amended Complaint ....................................................................... 10

      A.    Northrop Grumman's Historical Use of the Bethpage Community Park Property and Conveyance to the Town ................................................................................................. 11

      B.    Northrop Grumman's Early Investigations into Contamination at the Park................ 12

      C.    The Current State of the Park and Cleanup Status........................................................ 20

   II.    Additional Facts Alleged in Northrop Grumman's Motion to Dismiss Declarations ...... 21

      A.    First Hannon Declaration ............................................................................................. 22

      B.    First Shea Declaration .................................................................................................. 25

      C.    Second Hannon Declaration ......................................................................................... 26

   III.    Facts Alleged in PI Motion Submissions......................................................................... 27

      A.    Initial Search for and Discovery of Hazardous Waste Barrels .................................... 28

      B.    The Anomaly Workplan ............................................................................................... 29

      C.    The Presence of Hexavalent Chromium and Other Contaminants in Park Soil Surrounding the Barrels ............................................................................................... 29

      D.    The Town's Objections to the Anomaly Workplan....................................................... 32

      E.    January 16, 2025 Motion Hearing and Subsequent Developments ............................. 36

PROCEDURAL HISTORY............................................................................................................ 37

   I.    Northrop Grumman's Motion to Dismiss ....................................................................... 38

   II.    The Town's PI Motion ...................................................................................................... 39

   III.    Oral Argument and Supplemental Briefing ................................................................... 40

DISCUSSION: MOTION TO DISMISS ........................................................................................ 43

   I.    Legal Standards................................................................................................................ 43

      A.    Lack of Subject Matter Jurisdiction Under Rule 12(b)(1) ........................................... 43

      B.    Failure to State a Claim Under Rule 12(b)(6) .............................................................. 44

   II.    Analysis............................................................................................................................ 45

      A.    Primary Jurisdiction .................................................................................................... 49

      B.    The Parties' Factual Declarations ............................................................................... 51

      C.    RCRA Section 7002(a)(1)(B) ....................................................................................... 53

      D.    TSCA Section 20(a)(1) ................................................................................................. 60

      E.    RCRA Section 7002(a)(1)(A) ....................................................................................... 71

F.  Public Nuisance ............................................................................................. 73

G.  Promissory Estoppel .................................................................................... 76

DISCUSSION: MOTION FOR A PRELIMINARY INJUNCTION ......................................... 79

I.  Legal Standards ................................................................................................. 79

II.  Analysis ............................................................................................................. 81

A.  Irreparable Harm ......................................................................................... 83

B.  Success on the Merits .................................................................................. 90

C.  Public Interest and Balance of the Equities ................................................ 94

III.  Amendment ...................................................................................................... 96

CONCLUSION ............................................................................................................ 99

NUSRAT J. CHOUDHURY, United States District Judge:

## INTRODUCTION

This case concerns claims by Plaintiff the Town of Oyster Bay (the "Town") against Defendant Northrop Grumman Systems Corporation ("Northrop Grumman") for its alleged failure to address the release and threatened release of hazardous materials in an 18-acre property, which now comprises Bethpage Community Park (the "Park"), located within the Town. (Am. Compl. ¶ 1, ECF No. 22.) Before me are two motions: (1) Northrop Grumman's Motion to Dismiss the Amended Complaint under Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") (Mot. Dismiss ("MTD Mot."), ECF No. 31; Mem. Supp. Mot. Dismiss ("MTD Mem."), ECF No. 31-1), and (2) the Town's Motion for a Preliminary Injunction ("PI Motion") (Mot. Prelim. Injunction ("PI Mot."), ECF No. 40; Mem. Supp. Mot. Prelim. Injunction ("PI Mem."), ECF No. 40-1).

The release and threatened release of hazardous materials at issue stem from Northrop Grumman's use of the 18-acre property between 1949 and 1962 to deposit wastes and chemicals, leaving behind materials defined as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")—namely polychlorinated biphenyls ("PCBs"), volatile organic compounds ("VOCs"), and semi-volatile organic compounds ("SVOCs"). (Am. Compl. ¶ 15.) In 1962, Northrop Grumman conveyed the property to the Town under the express condition that it be used as a community park, and the Town subsequently developed the Park, building a swimming pool, an ice-skating rink, basketball courts, a baseball field, a playground, tennis courts, and other recreational amenities on the property. (*Id.* ¶¶ 47–48.) Since 2002, Northrop Grumman has been involved in efforts to remedy the release of hazardous materials in the Park (*Id.* ¶¶ 52–53), but the Town contends that

Northrop Grumman's efforts fall short of what is legally required under various federal statutes and New York common law.

In the Amended Complaint, the Town brings claims against Northrop Grumman under Sections 7002(a)(1)(A) and (a)(1)(B) of the Resource Conservation & Recovery Act ("RCRA Section 7002(a)(1)(A)" and "RCRA Section 7002(a)(1)(B)"), 42 U.S.C. § 6972(a)(1)(A)–(B), and Section 20(a)(1) of the Toxic Substances Control Act ("TSCA Section 20(a)(1)"), 15 U.S.C. § 2619(a)(1), and brings public nuisance and promissory estoppel claims under New York common law. (Am. Compl. ¶¶ 132–74.) First, the Town alleges that Northrop Grumman violated RCRA Section 7002(a)(1)(B) by "handl[ing], stor[ing], treat[ing], and/or dispos[ing]" of "solid and hazardous wastes" at the Park "in a manner that may present an imminent and substantial endangerment to health or the environment." (*Id.* ¶¶ 132–44.) Second, the Town alleges that Northrop Grumman violated TSCA Section 20(a)(1) by sampling and planning to dispose of PCB waste in a manner that requires approval from the Environmental Protection Agency ("EPA") and a deed restriction from the Town, but without having received such approval or deed restriction.[1] (*Id.* ¶¶ 145–54.) Third, in the alternative to the TSCA Section 20(a)(1) claim, the Town alleges that Northrop Grumman violated RCRA Section 7002(a)(1)(A) by dumping PCB waste in the Park in previous decades and by now planning to dispose of that PCB waste in a manner that would violate underlying federal and state regulations.[2] (*Id.* ¶¶ 155–61.) Fourth,

---

[1] As noted in Discussion: Motion to Dismiss § II.D.i below, at the January 16, 2025 hearing on Northrop Grumman's Motion to Dismiss and the Town's PI Motion, the Town's counsel stated, contrary to the allegations in the Amended Complaint, that it would be premature and inappropriate for Northrop Grumman to seek a deed restriction at this time. (Jan. 16, 2025 Hr'g Tr. 48:20–52:15.)

[2] As discussed below at Discussion: Motion to Dismiss § III.E, at the January 16, 2025 hearing, the Town represented that it no longer intends to assert RCRA Section 7002(a)(1)(A) claims on

the Town alleges that Northrop Grumman's delay in cleaning up the hazardous materials in the Park constitutes a public nuisance under New York law. (*Id.* ¶¶ 162–66.) Fifth, the Town alleges that Northrop Grumman's conveyance of property to the Town to develop the Park and various representations made by Northrop Grumman regarding its waste remediation plans give rise to a promissory estoppel claim. (*Id.* ¶¶ 167–74.) Sixth, the Town also argues that, in the event I find it has failed to plead a promissory estoppel claim, I should instead allow that claim to proceed under an implied breach of contract theory, even though the Amended Complaint does not bring an implied breach of contract claim. (MTD Opp'n at 24 n.11.)

On May 13, 2024, Northrop Grumman filed a Motion to Dismiss the Amended Complaint, seeking dismissal under Rule 12(b)(1) and (b)(6). The Motion to Dismiss also asks me to abstain from hearing this case under the primary jurisdiction doctrine. The Town has opposed the Motion to Dismiss.

On November 11, 2024, the Town filed the PI Motion. (PI Mot.) It argues that, in March 2024, after the Town filed the Amended Complaint, Northrop Grumman discovered concrete-encased metal barrels containing hazardous materials that it had buried beneath the Park sometime between 1949 and 1962. (Apr. 25, 2024 Shea Decl. ¶¶ 57–59, ECF No. 32-1; Nov. 11, 2024 Shea Decl. ¶¶ 17–24, ECF No. 40-3.) The Town's investigation of the soil near the barrels revealed the presence of hexavalent chromium, a carcinogenic heavy metal. (Nov. 11, 2024 Shea Decl. ¶ 20.) Following this discovery, Northrop Grumman submitted, and the New York State Department of Environmental Conservation ("DEC") approved, an investigation plan known as the "Anomaly Workplan." (Anomaly Workplan ¶ 1.6, ECF No. 40-4.) The Anomaly Workplan

---

the basis that Northrop Grumman allegedly violated state regulations. (Jan. 16, 2025 Hr'g Tr. 52:23–53:2.)

authorizes Northrop Grumman to dig "open test pits" in areas of the Park where it suspects additional barrels might be buried. (*Id.*) Under the Anomaly Workplan, if no additional barrels, encasements, or "grossly contaminated media" are found in a given open test pit, Northrop Grumman will temporarily backfill the open test pit with the same soil, generally in reverse order from which it was excavated, with the understanding that all of this soil will eventually be excavated—and, in large part, removed—as part of the anticipated ultimate EPA-approved plan to remedy all contamination in the Park. (*Id.*) If, on the other hand, the investigation of an open test pit reveals additional barrels, encasements, or "grossly contaminated media," Northrop Grumman will sample the soil excavated from that test pit and, depending on the results of the sampling, dispose of the soil off-site. (*Id.*; Eichler Decl. ¶ 22, ECF No. 47-1.)

The Town seeks a preliminary injunction ordering Northrop Grumman to proceed with digging open test pits as provided in the Anomaly Workplan, but to dispose of *all* excavated soil off-site, *regardless* of whether a barrel, an encasement, or "grossly contaminated media" is found in the open test pit from which that soil was excavated, and to fill all open test pits with new, clean soil. (Proposed Order Granting Mot. Prelim. Injunction, ECF No. 40-2.) Northrop Grumman has opposed the PI Motion, arguing, among other reasons, inefficiency and waste. According to Northrop Grumman, using clean soil to temporarily backfill open test pits at the Park, which will need to undergo large-scale soil excavation and disposal in the coming years anyway, would result in the unnecessary contamination of clean soil and further complicate the remediation efforts.

For the following reasons, I grant Northrop Grumman's Motion to Dismiss in part and deny it in part as follows:

4

**1. Primary Jurisdiction.** As a preliminary matter, I deny Northrop Grumman's request that this Court abstain from hearing this case under the primary jurisdiction doctrine. The Supreme Court has made clear that federal courts have an "unflagging" responsibility to exercise jurisdiction that is conferred by Congress. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Congress specifically authorized private lawsuits under the RCRA, like this action brought by the Town. Northrop Grumman has not shown sufficient management by the regulatory agencies or other exceptional circumstances that would justify the Court derogating its duty prescribed by Congress to adjudicate the claims that survive Northrop Grumman's Motion to Dismiss.

**2. RCRA Section 7002(a)(1)(B).** I deny Northrop Grumman's Motion to Dismiss the Town's RCRA Section 7002(a)(1)(B) claim under Rule 12(b)(6). The Amended Complaint plausibly alleges that the hazardous materials Northrop Grumman deposited at the Park constitute an "imminent and substantial endangerment" under the RCRA. Further, I decline Northrop Grumman's request to dismiss this claim on the ground that there is no practicable injunctive relief I could order, particularly at this early stage in the litigation where the parties have not yet conducted discovery.

**3. TSCA Section 20(a)(1) and RCRA Section 7002(a)(1)(A).** I analyze separately the Town's two distinct theories for liability under TSCA Section 20(a)(1): (1) that Northrop Grumman has thus far failed to submit its PCB cleanup plan for EPA approval (which is required before Northrop Grumman may implement a PCB cleanup plan) and (2) that Northrop Grumman conducted PCB sampling activities of the Park soil, dating back to 2014, without requisite EPA approval. As to the first theory, I dismiss this TSCA Section 20(a)(1) claim under Rule 12(b)(1) for lack of subject matter jurisdiction. This claim is not ripe because the Amended Complaint

does not allege that Northrop Grumman will begin implementing its PCB cleanup plan prior to receiving EPA approval. Thus, at this point, any TSCA claim under this theory is speculative. As to the second theory, I deny dismissal under Rule 12(b)(1) because Northrop Grumman has not shown that TSCA Section 20(a)(1)'s language limiting liability to ongoing violations is a jurisdictional bar and because, in any event, the record shows that Northrop Grumman's PCB sampling activity is ongoing. Nevertheless, I grant dismissal under Rule 12(b)(6) for failure to state a claim because I find that the preliminary PCB sampling activity alleged in the Amended Complaint does not require prior EPA approval under TSCA. For substantially the same reasons, I deny dismissal of the Town's alternative RCRA Section 7002(a)(1)(A) claim under Rule 12(b)(1) but grant dismissal of this claim under Rule 12(b)(6).

**4. Promissory Estoppel.** I dismiss the Town's promissory estoppel claim for failure to state a claim under Rule 12(b)(6) because the Amended Complaint fails to allege a sufficiently clear and unambiguous promise made by Northrop Grumman to the Town, as required to state a promissory estoppel claim under New York law. For the same reason, I also deny the Town's request that I allow this claim to proceed as a breach of implied contract claim as an alternative to promissory estoppel.

**5. Public Nuisance.** I deny Northrop Grumman's motion to dismiss the Town's public nuisance claim under Rule 12(b)(1), finding that this claim is justiciable. Unlike the TSCA Section 20(a)(1) and RCRA Section 7002(a)(1)(A) claims, which are premised on Northrop Grumman *potentially* taking remedial action without the required approval from EPA and the Town, the Town's public nuisance claim is premised on nuisances alleged to be *actually ongoing* at the Park. Under Rule 12(b)(6), I deny Northrop Grumman's motion to dismiss the Town's public nuisance claim for injunctive relief because, under the "continuing injury" theory, the

6

statute of limitations has not run on this claim. The Town's public nuisance claim for damages, however, is time-barred under N.Y. C.P.L.R. § 214–c, and thus I dismiss that claim.

Finally, I deny the Town's PI Motion. The Town asks for a court order requiring a specific modification to the Anomaly Workplan, which was approved by state regulators to investigate whether additional drums containing toxic materials are buried in the Park. This is an issue of tremendous public concern. The law requires that the Town meet a high standard to secure a preliminary injunction from a federal court that would alter how the Anomaly Workplan is carried out after it has begun.

Specifically, the Town fails to show: (1) that there is a clear likelihood of success on its claim that reburying soil that is removed during the open pit testing process back in the Park on a temporary basis pending further remediation violates RCRA Section 7002(a)(1)(B); (2) that this temporary reburial plan would result in irreparable harm; and (3) that its proposed alternative solution (off-site removal of all soil from the test pits) would serve the public interest or is favored by the balance of equities. As to likelihood of success on the merits, the claims in the Amended Complaint are based solely on allegations of PCB and VOC contamination—not any allegation of hexavalent chromium contamination, which is the focus of the PI Motion. The lack of any allegations concerning hexavalent chromium in the Amended Complaint is understandable, since the Town only discovered the hexavalent chromium in Park soil after the Amended Complaint was filed. Nevertheless, the current operative pleading does not bring RCRA Section 7002(a)(1)(B) and public nuisance claims arising from the presence of hexavalent chromium in the Park. Even if the Amended Complaint did bring such claims, the Town has not shown that the specific activity they seek to enjoin (the temporary reburial of certain soil pending the Park's ultimate cleanup) is a cognizable harm under the RCRA. As to irreparable harm, the

Town has not shown why the Anomaly Workplan's procedure (unearthing potentially contaminated soil and reburying some of that soil after testing pending the ultimate remediation of the Park) has a greater potential to expose the public to contaminants or complicate the Town's efforts to effectively collect soil samples, as opposed to the Town's proposed procedure (unearthing potentially contaminated soil from the test pits and carting that soil away). As to the public interest and the balance of equities, again, the Town has not shown why its plan, which would result in introducing uncontaminated soil into a highly contaminated Park on a temporary basis pending the ultimate remediation of the Park's contamination, would favor the public's interest in avoiding the further spread of contamination or in cleaning up the Park on the most efficient timeline possible.

Although the Amended Complaint does not plead RCRA Section 7002(a)(1)(B) and public nuisance claims concerning hexavalent chromium contamination in the Park, the Court grants Plaintiffs leave under Rule 15(a)(2) of the Federal Rules of Civil Procedure to file a second amended complaint that includes such allegations.

Accordingly, as explained in further detail below, the Town's RCRA Section 7002(a)(1)(B) claim and public nuisance claim for injunctive relief survive Defendants' Motion to Dismiss the Amended Complaint and will move forward in this action. However, the Court denies the Town's requested preliminary injunction. Finally, the Town may file a second amended complaint bringing RCRA Section 7002(a)(1)(B) and public nuisance claims based on alleged hexavalent chromium contamination in the Park.

## JURISDICTION

The Amended Complaint asserts that this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over the Town's federal claims under RCRA Section 7002(a)(1)(A) and

(a)(1)(B) and TSCA Section 20(a)(1). (Am. Compl. ¶ 11.) It asserts that the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the Town's public nuisance and promissory estoppel claims because these New York common law claims are part of the same case or controversy and arise out of the same common nucleus of operative facts as the federal claims. (*Id.*) As addressed below, however, Northrop Grumman challenges the Town's standing to bring several claims under Article III of the U.S. Constitution. (*See generally* MTD Mem. at 7–22.) "If [a] plaintiff[] lack[s] Article III standing, a court has no subject matter jurisdiction to hear their claim." *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 283 (2d Cir. 2023).

Northrop Grumman does not raise personal jurisdiction or insufficient service of process defenses under Rule 12(b)(2) and (b)(5), and such defenses are therefore waived. *See* Fed. R. Civ. P. 12(b) ("A motion asserting [a Rule 12(b)(2) or (b)(5) defense] must be made before pleading if a responsive pleading is allowed."); Fed. R. Civ. P. 12(h)(1)(B) ("A party waives any defense listed in Rule 12(b)(2)–(5) by . . . failing to . . . make it by motion under this rule.").

Venue is proper under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events . . . giving rise to the claim occurred" in this judicial district. (*See, e.g.*, Am. Compl. ¶ 13 (alleging relevant events occurred in Bethpage, New York); *id.* ¶ 14 (alleging "Northrop Grumman used a portion of the Bethpage Facility, the Community Park Property, as an earthen dumping ground for toxic chemicals from the 1930s until 1962, when it conveyed the Community Park Property to the Town [of Oyster Bay] with an express condition that the property be used as a park").)

## FACTUAL BACKGROUND

For the purpose of evaluating Northrop Grumman's Motion to Dismiss the Amended Complaint under Rule 12(b)(6), I assume as true all well-pled allegations in the Town's

Amended Complaint and draw all reasonable inferences in the Town's favor. *See Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020). As discussed in the Legal Standards section below, for the purpose of evaluating Northrop Grumman's Motion to Dismiss under Rule 12(b)(1), I accept the Amended Complaint's factual allegations as true except where evidence in the record directly contradicts a specific factual allegation; where there is such a contradiction, I consider whether the Town has proven the alleged facts to support standing by a preponderance of the evidence. *See infra*, Discussion: Motion to Dismiss § I.A; *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 442 (2d Cir. 2022).[3] In evaluating the Town's PI Motion, I "need not accept as true the well-pleaded allegations" in the Town's Complaint, but rather must consider the parties' factual submissions. *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020). I therefore first describe the facts alleged in the Amended Complaint in support of the Town's claims and then describe the parties' factual submissions on Northrop Grumman's Rule 12(b)(1) Motion to Dismiss and the Town's PI Motion.

## I.    Facts Alleged in the Amended Complaint

The Town is a municipal corporation organized under the laws of New York. (Am. Compl. ¶ 9.) Northrop Grumman is a corporation that, among other things, has historically manufactured and tested aerospace and defense equipment for use by the United States Government. (*See id.* ¶¶ 13, 37.) The facts underlying this action, summarized in detail below, are complex, spanning decades and involving governmental and private actors, as well as numerous agreements among the parties and state and federal regulators.

---

[3] *See also Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024); *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014); *Katz v. Donna Karan Co.*, 872 F.3d 114, 120 (2d Cir. 2017).

A.  <u>Northrop Grumman's Historical Use of the Bethpage Community Park Property and Conveyance to the Town</u>

Dating back to the 1930s, Northrop Grumman, through predecessor entities Grumman Engineering Corporation and Grumman Corporation, used an approximately 600-acre site in Bethpage, New York to develop, test, and manufacture military aircraft for use in World War II and subsequent conflicts. (*Id.* ¶ 13.) This site was known as the Grumman Aerospace-Bethpage Facility (the "Bethpage Facility"). (*Id.*) The Bethpage Facility was home to facilities owned and operated by Northrop Grumman (the "Northrop Grumman Facilities"), as well as a U.S. Navy-owned plant operated by Northrop Grumman (the "Naval Weapons Industry Reserve Plant"). (*Id.* ¶ 37.) Northrop Grumman began its activities at the Northrop Grumman Facilities in 1937 and at the Naval Weapons Industry Reserve Plant in 1942. (*Id.* ¶ 37.) Northrop Grumman concluded the last of its operations at the Bethpage Facility in 1996. (*Id.* ¶ 38.)

From approximately 1949 until 1962, Northrop Grumman used an 18-acre portion of the Bethpage Facility to "dump wastes containing hazardous substances" generated by both the Northrop Grumman Facilities and the Naval Industry Reserve Plant. (*Id.* ¶ 42.) These substances included: paint, coating materials, oily wastes, chromium laden sludge, cadmium, arsenic, chlorinated and non-chlorinated solvents, drying beds for wastewater treatment sludge, and other refuse. (*Id.* ¶ 43a–e.) "A portion of the [property] was used by Northrop Grumman as a fire training area where oil and fuel were ignited and extinguished." (*Id.* ¶ 43f.) Around 1960 or 1961, following a leak of therminol at one of the Bethpage Facility's plants, Northrop Grumman deposited the therminol-contaminated soil on various parts of the 18-acre property. (*Id.* ¶¶ 44–46.) Relevant to this lawsuit, Northrop Grumman's dumping activities left behind materials defined as hazardous substances under the CERCLA—namely PCBs, VOCs, and SVOCs. (*Id.* ¶ 15.)

11

On or about October 17, 1962, Northrop Grumman conveyed this 18-acre portion of the Bethpage Facility property to the Town, under the express condition that it be used as a community park. (*Id.* ¶ 47.) The Town subsequently turned the property into the Park, building "a swimming pool, an ice-skating rink, basketball courts, a baseball field, playground, tennis courts," and other recreational amenities. (*Id.* ¶ 48.)

B.  Northrop Grumman's Early Investigations into Contamination at the Park

Dating back to the 1980s, Northrop Grumman, the U.S. Navy, and the New York State Department of Environmental Conservation ("DEC") worked to investigate the contamination at the former Bethpage Facility, including at the Park. (*Id.* ¶¶ 50–55.) In 1983, DEC placed the Northrop Grumman Facility and the Naval Weapons Industry Reserve Plant on its "Registry of Inactive Hazardous Waste Disposal Sites" in New York and divided it into four Operable Units for the purpose of remediation. (*Id.* ¶¶ 50–51.) Relevant here is Operable Unit 3—"the former Northrop Grumman Settling Ponds, which includes the [] Park, the Northrop Grumman Access Road immediately south of the Community Park, and soil and groundwater at and migrating away from the [] Park []." (*Id.* ¶ 51.) The Amended Complaint thus alleges that Northrop Grumman "knew or should have known that it had caused significant contamination at the [Park] by at least the early-1980s, when it began investigating and remediating PCB, heavy metal, VOC, and SVOC contamination." (*Id.* ¶ 20.)

In 2002, Northrop Grumman found PCB contamination in soil samples from the access road adjacent to the Park's south end. (*Id.* ¶ 52.) Subsequently, DEC ordered Northrop Grumman to conduct soil sampling within the Park, which revealed PCBs and hazardous metals at concentrations exceeding New York State's standards. (*Id.* ¶ 52.) As a result, the Town closed the Park in May 2002 and, following the installation of fences, partially reopened it in November

12

2002. (*Id.* ¶ 53.) The Park's baseball field (the site of Northrop Grumman's former rag disposal pit and sludge settling pond) has remained closed since May 2002. (*Id.* ¶ 53.) A subsequent 2003 investigation into groundwater underneath the Park revealed "VOCs consistent with residual chlorinated solvents" in the groundwater and concluded that "the baseball field area may be an historic source of these VOC concentrations." (*Id.* ¶ 54.)

 C. <u>Northrop Grumman's Coordination with Regulators and Remediation Attempts</u>

  The Amended Complaint details a number of agreements and orders involving Northrop Grumman, the Town, and state and federal regulators and discusses the actions taken pursuant to those agreements and orders. The relevant documents[4] are:

(1) an administrative order on consent between Northrop Grumman and DEC, executed on July 4, 2005 ("2005 Northrop Grumman Administrative Order on Consent");

(2) an administrative order on consent between the Town and DEC, executed in March 2005 ("2005 Town Administrative Order on Consent");

(3) the Town's remedial action plan, released in November 2005 ("2005 Town Remedial Action Plan");

(4) the Town's revised remedial action plan, released in 2006 ("2006 Town Remedial Action Plan");

(5) DEC's record of decision, issued in March 2013 ("2013 DEC ROD," ECF No. 31-3);

(6) an order on consent and administrative settlement between Northrop Grumman and DEC, entered in 2014 ("2014 Northrop Grumman Administrative Order on Consent," ECF No. 32-5);

(7) DEC's amended record of decision, issued in December 2019 ("2019 DEC Amended ROD");

(8) a current conditions report outline provided by EPA to Northrop Grumman in June 2022 ("2022 EPA Current Conditions Report Outline," ECF No. 32-2);

---

[4] Only those documents in the foregoing list containing an ECF citation are in the record currently before the Court.

(9)   a consent decree entered between Northrop Grumman and DEC in June 2022 ("2022 Northrop Grumman Consent Decree," ECF No. 31-8); and

(10)  a current conditions report submitted by Northrop Grumman to EPA in February 2023 ("2023 Northrop Grumman Current Conditions Report").

I address each of these documents below.

>    i.    *2005 Northrop Grumman Administrative Order on Consent*

On July 4, 2005, Northrop Grumman and DEC executed the 2005 Northrop Grumman Administrative Order on Consent, which required, among other things, that Northrop Grumman conduct a "remedial investigation" of the Park property and the migrating groundwater underneath it. (Am. Compl. ¶ 56.) Northrop Grumman conducted this investigation between 2004 and 2007 and submitted the results to DEC in February 2011. (*Id.* ¶¶ 56–57.) The investigation revealed "extensive contamination of soil, groundwater, and soil gas" at the Park, as well as in the groundwater migrating south and southeast of the Park. (*Id.* ¶¶ 57a–c, 58a–c.)

The 2005 Northrop Grumman Administrative Order on Consent also required Northrop Grumman to implement two so-called "interim remedial measures" to address the migration of soil vapor and groundwater outside of the Park. (*Id.* ¶ 60.) The first was a "soil gas containment system," whose purpose was to mitigate the migration of VOCs from the vapors emanating from the Park. (*Id.* ¶ 61.) Northrop Grumman installed this interim remedial measure in February 2008. (*Id.*) The second was a "groundwater extraction and treatment system," whose purpose was to mitigate the migration of VOCs in the groundwater emanating from the Park. (*Id.* ¶ 62.) Northrop Grumman installed this interim remedial measure in July 2009. (*Id.*)

The Amended Complaint alleges two main deficiencies with Northrop Grumman's actions taken pursuant to the 2005 Northrop Grumman Administrative Order on Consent. First, the Amended Complaint alleges that the groundwater extraction treatment system Northrop Grumman installed and operated was insufficient because it "was designed to capture

groundwater that had total VOC concentrations greater than 5 micrograms per liter ('ug/L') in the upper 20 feet of the surficial aquifer, and to capture groundwater below the upper 20 feet of the surficial aquifer that had total VOC concentrations greater than 50 ug/L." (*Id.* ¶ 63.) According to the Town, these filtering levels are "arbitrary" and do not reflect relevant standards for acceptable levels of VOCs. (*Id.* ¶ 64.) Second, the Amended Complaint alleges that the remedial investigation pursuant to the 2005 Northrop Grumman Administrative Order on Consent was insufficient, evidenced by the fact that "a significant portion of the VOC Source Area at the Community Park was not found until about 10 years after the submittal of the Remedial Investigation reports to DEC." (*Id.* ¶ 59.)

  ii. *2005 Town Administrative Order on Consent, 2005 Town Remedial Action Plan, and 2006 Town Remedial Action Plan*

  In March 2005, the Town and DEC entered into the 2005 Town Administrative Order on Consent, wherein the Town committed to investigate and remediate soil contamination in a seven-acre area of the Park. (*Id.* ¶¶ 65–66.) The 2005 Town Administrative Order on Consent required the Town (1) to develop an interim remedial measure to address soil contamination in the seven-acre area, (2) to secure DEC approval for all actions taken by the Town under the 2005 Town Administrative Order on Consent, and (3) to ensure that the Town's actions are consistent with applicable federal laws and regulations. (*Id.* ¶¶ 65–66.) In November 2005, the Town submitted to DEC the 2005 Town Remedial Action Plan, which detailed the extent of the contamination that the Town found in the seven-acre investigation area and presented the Town's plan to "remediate Northrop Grumman's soil contaminants to a depth that would allow for unrestricted use, consistent with DEC's Unrestricted Use soil cleanup standards" in effect at that time. (*Id.* ¶¶ 67–68.)

15

The following year, the Town submitted another remedial action plan (the 2006 Town Remedial Action Plan), which presented five potential remedial options to address the soil contamination in the seven-acre investigation area. (*Id.* ¶ 69.) DEC ultimately approved the plan titled "Remedial Alternative IV," which provided for "excavation and off-site disposal of all contaminated soil throughout the Construction Area to a depth of at least ten feet, with some additional deeper contaminant removal to 20 feet in certain areas to meet the recommended Unrestricted Use soil cleanup levels." (*Id.*) The Town completed Remedial Alternative IV by June 2007, at a cost of over $22 million. (*Id.* ¶¶ 71–72.)[5]

    *iii.*    *2013 DEC Record of Decision*

In March 2013, DEC issued the 2013 DEC ROD concerning the investigation and remediation of contamination in Operable Unit 3, which includes the Park. (*Id.* ¶ 77.) The 2013 DEC ROD found that the majority of the PCB and VOC soil contamination was located in the area of Northrop Grumman's former sludge settling ponds and rag disposal pit area, currently the Park's baseball field. (*Id.* ¶¶ 78, 98.) The 2013 DEC ROD also found that the rag disposal pit and a larger "Low Permeability Zone" area were the primary sources of groundwater contaminated with VOCs. (*Id.* ¶ 79.) The 2013 DEC ROD ordered Northrop Grumman to execute an $81 million remedial plan to address PCB and VOC contamination. (*Id.* ¶ 80.)

---

[5] In November 2005, the Town sued Northrop Grumman and the federal government under CERCLA, 42 U.S.C. §§ 9607 and 9613, and New York State common law to recover money spent on remediation pursuant to the 2005 Town Administrative Order on Consent. *Town of Oyster Bay v. Northrop Grumman Systems Corp.*, No. 05-cv-1945 (E.D.N.Y.); Am. Compl. ¶ 73. Northrop Grumman brought counterclaims under CERCLA, alleging that it had incurred costs cleaning up contamination caused by the Town. (Am. Compl. ¶ 74.) The district court in that case ultimately granted summary judgment in favor of Northrop Grumman and the federal government, and dismissed the Town's CERCLA and state law claims. (*Id.* ¶ 75.) Northrop Grumman's CERCLA counterclaims against the Town remain pending in that action. (*Id.* ¶ 76.)

The Amended Complaint alleges various reasons why the 2013 DEC ROD and Northrop Grumman's actions taken pursuant to it failed to meaningfully address the PCB contamination at the Park. (*Id.* ¶ 82.) First, the 2013 DEC ROD sets "unclear and inconsistent" PCB soil cleanup requirements for different areas of the Park, for example requiring excavation of contaminated soil to a depth of 10 feet in the ballfield area but only two feet in other areas of the Park. (*Id.* ¶ 82a.) The Town argues that there is "no rational basis" for the differing cleanup levels. (*Id.* ¶ 82a.) Second, the 2013 DEC ROD allows excavated soil containing PCBs at concentrations less than 50 ppm to be used as backfill for excavated areas below a depth of 10 feet, which the Town contends will allow the Park to "continue to be used as a PCB landfill without adhering to the applicable or relevant and appropriate federal and state requirements for siting, designing, constructing, or operating a landfill." (*Id.* ¶ 82b.) Third, the 2013 DEC ROD's PCB cleanup requirements were not prepared with EPA's consultation or approval, despite the fact that EPA has "primary authority for review and approval of the cleanup of PCB remediation waste under 40 CFR 761.61." (*Id.* ¶ 82c.) According to the Town, EPA rules required Northrop Grumman to consult with the Town, as the owner of the relevant land, and prepare a "Risk Based Cleanup and Disposal" application for EPA's approval, neither of which it did. (*Id.*)

The Amended Complaint also alleges that the 2013 DEC ROD established, and Northrop Grumman has taken, a deficient approach to VOC cleanup. Northrop Grumman initiated its VOC cleanup project in June 2016 by submitting a remedial workplan to DEC, and DEC approved the workplan in August 2016. (*Id.* ¶ 95.) The Town alleges that it was not consulted in connection with the preparation of this workplan. (*Id.* ¶ 96.) The workplan provided for a groundwater cleanup project that would lower VOC levels in the groundwater to under 10 PPM, a level more than ten times higher than the level stipulated in the 2013 DEC ROD. (*Id.* ¶¶ 96, 106–08.) The

17

Amended Complaint alleges that "[n]either Northrop Grumman nor the DEC has provided a technical justification for why a concentration of 10 PPM of total VOCs was an acceptable cleanup goal given that any remaining VOCs in soil have the potential to leach into groundwater and continue to feed the plume." (*Id.* ¶ 97.) Further, in implementing the groundwater cleanup project, Northrop Grumman discovered that the area of VOC contamination exceeding 10 PPM was four times larger than previously thought (and, accordingly, four times larger than what the remedial workplan was designed to address). (*Id.* ¶ 99.) Consequently, in June 2023, Northrop Grumman submitted a proposal to address a portion of the larger area of VOC contamination, which, if timely approved and implemented, would run from September 2023 to August 2025. (*Id.* ¶ 101.)

The Amended Complaint also alleges that the studies commissioned by Northrop Grumman, which concluded that the groundwater VOC extraction system was effective, were based on insufficient data. (*Id.* ¶¶ 109–10.) Given the 10 PPM cleanup standard, the subsequent discovery that the groundwater contamination area is larger than initially thought, and the lack of reliable studies concerning the effectiveness of the groundwater extraction system, the Town claims that VOC contaminants "may continue to be leaving the Community Park, contaminating the Sole Source Aquifer system that provides drinking water to hundreds of thousands of people and causing imminent and substantial endangerment to human health and the environment." (*Id.* ¶ 111.)

      *iv.*    *2014 Northrop Grumman Administrative Order on Consent*

In 2014, Northrop Grumman entered into the 2014 Administrative Order on Consent with DEC, a further step in implementing the 2013 DEC ROD. (*Id.* ¶ 83.) Under the 2014 Administrative Order on Consent, Northrop Grumman sampled soils to determine the extent of

PCB contamination in Operable Unit 3, including in the Park. (*Id.*) Northrop Grumman conducted the sampling without EPA review and approval, even though, the Town contends, such review and approval were required. (*Id.* ¶¶ 84–87.)

       v.    *2019 DEC Amended Record of Decision and 2022 Northrop Grumman Consent Decree*

In December 2019, DEC issued its 2019 DEC Amended ROD, after finding that the "data show[ed] that the existing remedies are not fully effective at achieving remedial action objectives." (*Id.* ¶¶ 112–13 (quoting 2019 DEC Amended ROD).) The 2019 DEC Amended ROD ordered Northrop Grumman to construct 24 groundwater extraction wells and five treatment plants, at an estimated present cost of $585 million. (*Id.* ¶ 115.)

In July 2022, Northrop Grumman and DEC entered into a consent decree (the 2022 Northrop Grumman & DEC Consent Decree), stipulating that Northrop Grumman assumes responsibility for implementing certain remedial measures set forth in the 2019 DEC Amended ROD. (*Id.* ¶¶ 117–18.) The 2022 Northrop Consent Decree provided that Northrop Grumman shall implement the prescribed remedial elements within five years from its effective date but did not otherwise set out a completion schedule. (*Id.* ¶¶ 118–19.)

       vi.   *2022 EPA Current Conditions Report Outline and 2023 Northrop Grumman Current Conditions Report*

In June 2022, EPA informed the Town that Northrop Grumman had contacted EPA about enacting a PCB cleanup plan for Operable Unit 3 (including the Park), and that EPA had directed Northrop Grumman to prepare a "current conditions report" of the area. (*Id.* ¶ 88.) In September 2022, EPA provided Northrop Grumman with the 2022 EPA Current Conditions Report Outline, which gave Northrop Grumman instructions for preparing its forthcoming current conditions report. (*Id.*) The 2022 EPA Current Conditions Report Outline required, among other things, that Northrop Grumman consult with the Town on the Park's "current and proposed future land uses"

19

and that it conduct an analysis to fill gaps in its data concerning the location and extent of PCB contamination at the Park. (*Id.* ¶¶ 88–89.)

In February 2023, Northrop Grumman submitted the 2023 Northrop Grumman Current Conditions Report, which it prepared without consulting the Town. (*Id.* ¶¶ 90.) Notably, the Current Conditions Report proposes excavating and re-burying much of the PCB-contaminated soil at lower depths within the Park, as outlined in the 2013 DEC ROD, to which the Town objects. (*Id.* ¶ 91.) Additionally, according to the Town, 40 C.F.R. § 761.61(a) requires that the Town provide a deed restriction and certification to EPA in order for Northrop Grumman to proceed with this PCB cleanup plan, but Northrop Grumman has not sought any deed restriction or certification from the Town as of the filing of the Amended Complaint. (*Id.* ¶¶ 92–93.) Moreover, as of the Amended Complaint's filing, Northrop Grumman likewise has not set a schedule to conduct the PCB data gap analysis (including additional sampling) required by EPA under the 2022 EPA Current Conditions Report Outline. (*Id.* ¶ 94.)

C. <u>The Current State of the Park and Cleanup Status</u>

The Amended Complaint alleges that ten years after the issuance of the 2013 DEC ROD and nine years after the issuance of the 2014 Northrop Grumman Administrative Order on Consent, Northrop Grumman still has not committed to a timeline to finish its cleanup of the Park, pointing to alleged failures by both Northrop Grumman and DEC. (*Id.* ¶ 121.)

With respect to Northrop Grumman, the Amended Complaint alleges that Northrop Grumman's approach to the cleanup has been to submit task-specific schedules and workplans to DEC; however, Northrop Grumman consistently misses its self-imposed deadlines with no consequence from DEC. (*Id.* ¶ 124.) Additionally, Northrop Grumman allegedly intends to re-bury PCB-contaminated soil in the Park, "in effect creating a PCB remediation waste landfill

[allegedly] in violation of federal and state law that may present a threat to public health and the

environment." (*Id.* ¶ 129.)

With respect to DEC, the Amended Complaint alleges seven examples of action and

inaction by the DEC that have hindered the cleanup of the Park's soil and groundwater:

(1) DEC allegedly set an "arbitrary, less stringent" standard for the VOC cleanup goal
stipulated in the 2013 DEC ROD;

(2) DEC allegedly failed to set a timeline for Northrop Grumman to finish its VOC
cleanup;

(3) DEC allegedly failed to ensure that the groundwater extraction system installed by
Northrop Grumman captures the full depth and area of contaminated groundwater
leaving the Park;

(4) DEC allegedly stipulated with Northrop Grumman to set PCB cleanup goals without
consulting EPA;

(5) DEC allegedly failed to establish a "time is of the essence provision in the 2014
[Northrop Grumman Administrative Order on Consent] and to enforce a full cleanup
schedule";

(6) DEC allegedly entered no enforceable cleanup schedule with Northrop Grumman
and, accordingly, issued no penalties for Northrop Grumman's failure to timely
remediate the contamination problems; and

(7) DEC allegedly failed to act despite the fact that portions of the Park (e.g., the baseball
field) have now been closed to the public for more than 20 years.

(*Id.* ¶ 131.) The Amended Complaint thus alleges that, as a result of Northrop Grumman's failure

to stick to a cleanup schedule and DEC's failure to enforce one, PBCs, VOCs, and other

hazardous substances continue to contaminate the Park's soil and groundwater underneath the

Park. (*Id.* ¶ 125.)

## II.    Additional Facts Alleged in Northrop Grumman's Motion to Dismiss Declarations

In support of its Motion to Dismiss, Northrop Grumman filed a declaration by Edward J.

Hannon ("First Hannon Declaration"), Northrop Grumman's Manager of Environmental Health

and Safety and Medical. (First Hannon Decl., ECF No. 31-2.) In opposition, the Town filed a

declaration by David Shea ("First Shea Declaration"), an environmental engineer and Senior

Vice President at Sanborn, Head Engineering, P.C. whom the Town retained as an expert for this

litigation. (First Shea Decl., ECF No. 32-1.) On reply, Northrop Grumman filed another

declaration from Hannon ("Second Hannon Declaration"). (Second Hannon Decl., ECF No. 33-

1.) I address below the additional facts set forth in each declaration.

    A.  <u>First Hannon Declaration</u>

      The First Hannon Declaration recites many of the facts alleged in the Amended

Complaint, including facts relating to the following issues: (1) Northrop Grumman's historical

use of the Park property as a dumping site for hazardous waste; (2) its subsequent conveyance to

the Town; and (3) the numerous consent orders and communications between Northrop

Grumman, the Town, and regulators. (*See generally*, First Hannon Decl.). As summarized below,

it also provides supplemental facts concerning the following: (1) the 2013 DEC ROD's

requirements; (2) Northrop Grumman's remedial efforts to date; (3) the current risks associated

with the contamination; and (4) Northrop Grumman's engagement with the Town, regulators,

and the public.

        *i.*     *The 2013 DEC ROD's Requirements*

      Concerning VOC contamination, the First Hannon Declaration explains that VOCs are in

Park soil between 40 and 60 feet below the surface. (First Hannon Decl. ¶ 18.) The groundwater

interim remedial measure Northrop Grumman implemented under the 2013 DEC ROD is an "in

situ thermal remediation" system, which "uses well points to generate heat that volatizes the

VOCs and then captures and treats the resulting vapors." (*Id.* ¶ 20 (citing 2013 DEC ROD at 3,

9–10).) While the 2013 DEC ROD initially set a more stringent target for VOC cleanup, in 2016,

22

DEC updated the cleanup level to 10 ppm for total VOCs, based on DEC's understanding that the groundwater extraction system Northrop Grumman had previously installed in 2009 was effectively stopping additional VOC-contaminated groundwater from leaving the Park. (*Id.* ¶ 21; Aug. 18, 2016 DEC Ltr.to Northrop Grumman, ECF No. 32-4.)

Concerning PCB contamination, the First Hannon Declaration explains that the 2013 DEC ROD provides for the excavation and removal of PCB-contaminated Park soil, with different PCB thresholds at different depths: (1) removal of all soil containing greater than 1 ppm of PCBs at the top two feet; (2) removal of all soil containing greater than 10 ppm of PCBs between two and ten feet; and (3) removal of all soil containing greater than 50 ppm of PCBs below ten feet. (First Hannon Decl. ¶ 22.) The First Hannon Declaration states that this scheme is consistent with DEC policy. (*Id.* ¶ 22–23.)

        *ii.*    *Remediation Efforts to Date*

With respect to VOC contamination, in 2014, Northrop Grumman sampled the yards at 38 private residences south of the Park and ultimately determined that 24 of those yards needed soil remediation, which Northrop Grumman completed in 2016. (*Id.* ¶ 34.) "As part of this work, [Northrop Grumman] replaced any trees and shrubbery that had to be removed, and repaired patios and other structures that were affected." (*Id.*) In 2019, Northrop Grumman installed at the ballfield the in situ thermal remediation system contemplated in the 2013 DEC ROD. (*Id.* ¶ 40.) Phase 1 of the VOC remediation process took place between 2020 and 2022, resulting in the removal of nearly 1,400 pounds of VOCs from the soil. (*Id.* ¶ 41.) The First Hannon Declaration represents that, since 2009, Northrop Grumman has operated a remediation system that captures and treats groundwater migrating from the Park, as well as an above-ground extraction system that prevents VOC vapors from emanating from the Park. (*Id.* ¶¶ 50–53.) In 2016, Northrop

Grumman began installation of another groundwater remediation system, which has treated approximately 350 million gallons of groundwater since it became operational in May 2023. (*Id.* ¶¶ 54–56.)

With respect to PCB contamination, also in 2014, Northrop Grumman undertook broader sampling of the baseball field area at the Park, pursuant to the 2013 DEC ROD and 2022 Northrop Grumman Consent Decree. (*Id.* ¶ 35.) In 2016 and 2017, Northrop Grumman submitted the soil samples to DEC and EPA, and EPA informed Northrop Grumman that it would need to prepare and submit a "Risk Based Disposal Approval Application" to EPA. (*Id.* ¶¶ 37–38.) The First Hannon Declaration represents that PCB cleanup is "proceeding under EPA's [Risk Based Disposal Approval Application] procedure." (*Id.* ¶ 45.)

### iii. Engagement Efforts

In the First Hannon Declaration, Hannon attests that Northrop Grumman has engaged with the relevant stakeholders, including through "frequent meetings" with DEC and the Town and "public meetings to discuss aspects of work that might affect specific neighborhoods." (*Id.* ¶¶ 30–31.) According to Hannon, Northrop Grumman "has sent out over a hundred mailings or emails to inform the public of the status of remediation activities" and "maintains a public repository of remedial documents at the local library." (*Id.* ¶ 32.)

### iv. Current Risks

With respect to soil contamination, the First Hannon Declaration represents that "the ballfield area has been fenced off, thus preventing public access since the contamination area was discovered in 2002." (*Id.* ¶ 57.) "The New York State Department of Health found that the use of the playground and grassy area south of the Town pool posed no risk." (*Id.* ¶ 57 (citing

May 13, 2015 email from N.Y. State Dep't of Health, ECF No. 41-3.) Further, the 2013 DEC

ROD states:

> Since the site is fenced and/or covered by asphalt, concrete or clean fill, people
> will not come into contact with site-related contaminants in soil unless they dig
> below the surface. The potential exists for contact with contaminants in soil in
> limited off-site residential areas.

(*Id.* ¶ 57 (citing 2013 DEC ROD at 13).) In the First Hannon Declaration, Hannon represents that

Northrop Grumman has since remedied the off-site residential contamination identified in the

above passage of the 2013 DEC ROD. (*Id.* ¶ 34.) Hannon also represents that the remedial plan

in place "does not imperil workers, as utilities under the ballfield are above the ten foot depth,

and deeper soils are very unlikely to be disturbed." (*Id.* ¶ 58.)

Concerning groundwater contamination, Hannon again points to the 2013 DEC ROD,

which states that "[p]eople are not drinking the contaminated groundwater because the area is

served by a public water supply that is treated to remove this contamination." (*Id.* ¶ 57 (quoting

2013 DEC ROD at 13).) He also attests that the groundwater extraction system Northrop

Grumman installed in 2009 has been successful and that, as stated in the 2022 Consent Decree,

"this system has created a clean waterfront south of the Park." ((*Id.* (citing 2022 Consent Decree

at 8).) Finally, Hannon acknowledges that there may be groundwater contamination that

migrated south prior to Northrop Grumman's installation of its extraction system but asserts that

the 2022 Consent Decree commits Northrop Grumman to remedying any of these migrated

contaminants, to the extent that they exist. (*Id.* ¶ 62.)

B. <u>First Shea Declaration</u>

The First Shea Declaration, in addition to reciting many of the facts previously alleged in

the Amended Complaint, proffers supplemental facts regarding the recent discovery of barrels

(also referred to as "drums") containing hazardous waste buried below the Park. (*See generally*,

First Shea Decl.) Shea attests that in March 2024, days after the Town filed the Amended

Complaint, Northrop Grumman unearthed six barrels of "highly flammable toxic waste buried

below the ballfield encased in concrete vaults." (*Id.* ¶ 8.) Northrop Grumman discovered the

barrels in the course of installing its in situ thermal remediation system in that area. (*Id.* ¶ 11.)

According to Shea, the heat generated by the remediation system could cause leaks in any barrels

buried under the soil. (*Id.*)

Shea also disputes certain of Hannon's characterizations of the current status of Northrop

Grumman's remedial efforts and Hannon's claim that no imminent and substantial endangerment

exists. In particular, Shea claims that Northrop Grumman has thus far only addressed

approximately 22% of the area requiring VOC cleanup and *none* of the area requiring PCB and

hazardous metal cleanup. (*Id.* ¶ 13.) While the ballfield is fenced off, Shea attests that it "remains

an attractive risk to children and teenagers." (*Id.* ¶ 15.) Further, Shea notes that digging beneath

the surface of the Park is necessary from time to time for repair activities, which poses a danger

to workers and the public. (*Id.* ¶ 16.) Finally, Shea disagrees with Hannon concerning the

effectiveness of the groundwater remediation systems in place, noting that "VOC contamination

has been found . . . at drinking water wells of the Bethpage Water District." (*Id.* ¶ 31.)

C.  Second Hannon Declaration

In the Second Hannon Declaration, Hannon disputes many of Shea's characterizations of

Northrop Grumman's conduct and specifically addresses the discovery of the buried barrels. (*See

generally*, Second Hannon Decl.) Hannon asserts that "it is not unusual to find buried drums on

former industrial sites." (*Id.* ¶ 5.) Hannon argues that the Town's claim in its Motion to Dismiss

opposition brief that "at least some of the drums were leaking highly toxic contamination" is

untrue and unsupported by the portion of the First Shea Declaration to which it cites. (*Id.* ¶ 11.)

Hannon also asserts that "[t]he drums were sealed and not leaking" because "the concrete vault protected the drums and prevented any puncture of the drums from inadvertent activity." (*Id.* ¶ 10.) Thus, in Hannon's view, "[t]here was no potential for the drums to cause endangerment to public health or the environment because they were encapsulated in concrete, they did not leak, and . . . have been removed." (*Id.* ¶ 18.)

### III.    Facts Alleged in PI Motion Submissions

In support of its PI Motion, the Town submitted another factual declaration from Shea ("Second Shea Declaration") and accompanying exhibits. (Second Shea Decl., ECF No. 40-3.) In connection with its opposition to the PI Motion, Northrop Grumman submitted a declaration from its counsel Mark A. Chertok ("Chertok Declaration"), attaching exhibits. (Chertok Decl., ECF No. 41-1.) On reply, the Town submitted a supplemental declaration from Shea ("Third Shea Declaration") and additional exhibits. (Third Shea Decl., ECF No. 42-1.)

On January 16, 2025, the Court held oral argument on the PI Motion, during which counsel for both parties made additional factual representations on the record. (Jan. 16, 2025 Hr'g Tr.) Following the hearing, the parties filed a series of supplemental letters, along with accompanying additional factual submissions. (Northrop Grumman Suppl. Ltr., ECF No. 47; Northrop Grumman Suppl. Opp'n Ltr., ECF No. 53; Northrop Grumman Suppl. Reply Ltr., ECF No. 56; Town Suppl. Ltr., ECF No. 48; Town Suppl. Opp'n Ltr., ECF No. 54; Town Suppl. Sur-Reply Ltr., ECF No. 58.) Relevant here, Northrop Grumman submitted a declaration by John Eichler ("Eichler Declaration"), a geologist and Senior Project Manager at Verdantas LLC, an environmental consulting firm engaged by Northrop Grumman to assist in Park remediation efforts (Eichler Decl., ECF No. 47-1), and the Town submitted two declarations by Matthew DeVinney ("First DeVinney Declaration" and "Second DeVinney Declaration"), an engineer and Vice President of D&B Engineers and Architects, D.P.C., whom the Town engaged to conduct

27

onsite observation of Northrop Grumman's Park remediation activities (First DeVinney Decl., ECF No. 54-3; Second DeVinney Decl., ECF No. 58-1). Northrop Grumman also submitted voluminous records of sampling data and other related records. (ECF Nos. 47-4–47-13, 49-1.)

Below, I summarize the relevant facts proffered, noting where factual disputes exist.

A.  <u>Initial Search for and Discovery of Hazardous Waste Barrels</u>

As previously noted, in March 2024, Northrop Grumman discovered six barrels containing "highly flammable toxic waste buried below the ballfield encased in concrete vaults" while conducting excavations in connection with its VOC remedy implementation.[6] DEC inspected the six barrels unearthed in March 2024 and concluded that they contained benzene, trichloroethene, and other hazardous liquids consistent with industrial waste solvents known to have been dumped at the Park.[7] In April 2024, Northrop Grumman discovered an additional 10 barrels containing hazardous materials.[8] As part of this barrel extraction process, Northrop Grumman disposed of contaminated soil off-site using ten "roll-off trucks" and 36 "dump trucks." (Eichler Decl. ¶ 6.) Northrop Grumman backfilled the excavated areas with "imported dense graded aggregate [] (a form of clean fill)." (*Id.* ¶ 7.)

---

[6] Second Shea Decl. ¶ 15 (citing Joseph Ostapluk, *Chemical Drums Buried in Bethpage Park Raise New Pollution Concerns*, Newsday, Apr. 2, 2024); Eichler Declaration ¶ 5.

[7] Second Shea Decl. ¶ 16 (citing New York Department of Environmental Conservation, *Update: Discovery of Underground Drums at Former Grumman Settling Ponds (Present-Day Bethpage Community Park)* (April 2024), https://dec.ny.gov/environmental-protection/site-cleanup/regional-remediation-project-information/region-1/environmental-investigation-cleanup-activities-bethpage-facility-sites#april17).

[8] *Id.* ¶ 15 (citing Joseph Ostapluk, *4 More Chemical Drums Removed from Bethpage Park Pit, with New Layer Found that Could Have More*, Newsday, Apr. 16, 2024).

Northrop Grumman then conducted searches using ground-penetrating radar, which uncovered no additional barrels, and aerial imaging, which uncovered six more barrels containing hazardous materials—bringing the total to 22 barrels. (Second Shea Decl. ¶ 18.)

B. The Anomaly Workplan

Given that the ground-penetrating radar failed to identify the six additional barrels that were only identified through aerial imaging, in June and July 2024, Northrop Grumman drafted a plan to conduct electromagnetic and additional ground-penetrating radar scans to find any additional barrels containing hazardous materials potentially buried under the Park. (*Id.* ¶ 19.) Initial scans of a test area identified 31 "anomalies," thirteen of which warranted further investigation to determine whether they were barrels containing hazardous materials. (*Id.*; Geophysical Pilot Survey Results, ECF No. 40-10.)

Based on the scan results, Northrop Grumman developed the "Anomaly Workplan" to investigate the thirteen suspicious areas. (Second Shea Decl. ¶ 19; Anomaly Workplan, ECF No. 40-4.) Relevant to the Town's PI Motion, the Anomaly Workplan sets out the following procedures:

(1) Digging thirteen "test pits," each "no deeper than 10 feet," to excavate the thirteen anomalies requiring further investigation (Anomaly Workplan ¶ 2);

(2) In the event additional barrels are discovered, ceasing work around the test pit and covering the excavated soil pending further investigation and remediation (*id.* ¶ 2); and

(3) In the event no barrels are discovered, backfilling the excavated soil into the test pit "in the reverse order it was removed from the test pit" (*id.* ¶ 3).

C. The Presence of Hexavalent Chromium and Other Contaminants in Park Soil Surrounding the Barrels

Around June 2024, the Town tested samples of soil collected in connection with the barrel excavation and found cadmium and chromium levels that exceeded the acceptable limits

29

prescribed by EPA in 40 C.F.R. § 261.24. (Second Shea Decl. ¶ 17 (citing Laboratory Report, ECF No. 40-9).) The samples specifically showed the presence of hexavalent chromium, which the Occupational Safety and Health Administration ("OSHA") and EPA have found to be carcinogenic to humans via inhalation exposure. (*Id.* ¶¶ 13, 20.) The parties dispute the relevant facts concerning the presence of hexavalent chromium in the Park soil that would be excavated pursuant to the Anomaly Workplan, as well as the risks associated with implementing the Anomaly Workplan.

Shea explains that there are two types of chromium relevant to the dispute here: (1) hexavalent chromium, a known carcinogen, and (2) trivalent chromium, which Shea characterizes as "less toxic." (Second Shea Decl. ¶¶ 13, 20.) To date, Northrop Grumman has "primarily tested" for "total chromium," not hexavalent chromium specifically, and thus "there is little to no data indicating the extent of hexavalent chromium . . . contamination at the Park." (*Id.* ¶ 20.) Shea notes that "[Northrop] Grumman . . . has refused to conduct testing" for hexavalent chromium because it maintains that hexavalent chromium does not exist at the Park. (*Id.* ¶ 20.) Nevertheless, Shea reports that "the Town's soil testing . . . found the presence of . . . hexavalent chromium at concentrations up to 33.4 mg/kg in the soil adjacent to the drums." (Second Shea Decl. ¶ 20.) Shea also points to excerpts of an RCRA Hazardous Waste Management Permit that Northrop Grumman submitted to DEC in 1992—30 years after Northrop Grumman conveyed the Park to the Town—which discloses that, as of that time, Northrop Grumman's industrial activities generated wastewater with two to 12 milligrams per liter of hexavalent chromium and sludge containing zero to 415 milligrams per kilogram of hexavalent chromium. (Second Shea Decl. ¶ 12; 1992 RCRA Hazardous Waste Management Permit (Excerpt I), ECF No. 40-7.) Shea

also asserts that "hazardous levels of hexavalent chromium were documented in Grumman's paint dust, chips, and sludge at concentrations of 40 to 156 mg/L." (Second Shea Decl. ¶ 12.)

Finally, Shea cites a November 28, 2024 letter from DEC to Northrop Grumman, in which DEC acknowledged the presence of hexavalent chromium in Park soil and the need for additional sampling:

> [DEC] also recognizes that there is significantly less existing hexavalent chromium data than total chromium data, and the presence of hexavalent chromium was confirmed during the recent drum removals. Therefore, the distribution of the two chromium species (trivalent and hexavalent) also needs to be better understood as part of this sampling program. As such, a minimum of 25 percent of the metals samples should also be analyzed for hexavalent chromium.

(Nov. 28, 2024 DEC Ltr. to Northrop Grumman at 2, ECF No. 42-2.)

In the First DeVinney Declaration, submitted on behalf of the Town following oral argument on the PI Motion, DeVinney attests that the current regulatory thresholds for total chromium set by DEC are 30 mg/kg for an "unrestricted use" cleanup level and 180 mg/kg for a "restricted-residential use" cleanup level. (First DeVinney Decl. ¶ 5.) He also attests that DEC's current thresholds for hexavalent chromium are 1 mg/kg for unrestricted use and 110 mg/kg for restricted-residential use, although DEC is currently proposing to reduce its restricted-residential use threshold to 1 mg/kg as well. (*Id.*) According to DeVinney, one sample of soil taken from the excavated area immediately surrounding the unearthed barrels revealed a total chromium level of 33,000 mg/kg and a hexavalent chromium level of 33 mg/kg. (*Id.* ¶¶ 5–6.) One sample also contained a PBC level of 43.1 mg/kg, in excess of DEC's 0.1 mg/kg unrestricted use and 1 mg/kg restricted-residential use standards. (*Id.* ¶ 5.)

Through documents attached to the Chertok Declaration, Northrop Grumman disputes that it dumped hexavalent chromium in the Park, as well as the dangers associated with the concentrations of hexavalent chromium that the Town found in soil samples near the unearthed

drums. First, in a November 8, 2024 letter to DEC, Northrop Grumman asserted that hexavalent chromium is not a risk at the Park and thus sampling is unnecessary, stating:

> There is no technically justified reason to sample hexavalent chromium during the data gap investigation. It is accepted science that hexavalent chromium is reduced over time to trivalent chromium from exposure to environmental conditions that would be present in Park soil. This is evidenced by the fact that the highest concentration of hexavalent chromium found in the samples in the drum removal area was only 0.2 percent of the total chromium.

(Nov. 8, 2024 Northrop Grumman Ltr. to DEC at 2.) Second, Northrop Grumman has submitted a 1963 Letter from the Nassau County Department of Health to the Town, which, it argues, gives rise to the factual inference that it dumped only trivalent chromium, not hexavalent chromium, at the Park. (Dec. 19, 1963 Nassau Cnty. Dep't of Health Ltr. to Town, ECF No. 41-8 (stating that "chromium [] in the less toxic trivalent state . . . has been deposited with this department's knowledge and consent on the existing site"). Third, Northrop Grumman asserts that 1992 RCRA Hazardous Waste Management Permit cited by Shea refers to activities 30 years after its conveyance of the Park and thus is not probative of what waste exists at the Park. (*Id.*) It also points to a passage in the Permit that states that the hexavalent chromium-containing "paint dust [and] chips" referenced by Shea were "swept into 55 gallon drums and stored at the Main Drum Marshalling Area," and that the "paint sludge" "is collected in 55 gallon drums and transported to the Main Drum Marshalling Area for storage prior to off-site disposal by a licensed vendor." (1992 RCRA Hazardous Waste Management Permit (Excerpt II) at 3–21, ECF No. 41-9.)

### D. The Town's Objections to the Anomaly Workplan

Given its concerns over potential hexavalent chromium contamination around the locations of the barrels, the Town has sought to modify the Anomaly Workplan to require that any soil excavated in connection with the investigation be disposed of off-site. (Second Shea Decl. ¶ 21.) The Second Shea Declaration outlines the Town's primary concerns. Shea asserts

that "it is both more efficient and more protective to remove and dispose of hazardous waste soil

once it is excavated, as opposed to reburying it for removal at an uncertain future date." (*Id.*

¶ 22.) Shea also raises the concern that contamination that "used to exist at depth could be used

as surface-level fill, thus increasing the risk of exposure to Town residents." (*Id.* ¶ 23.)

According to Shea, the Anomaly Workplan's plan to backfill soil "in reverse order" is

impracticable and will inevitably result in the inter-mixing of soil. (Third Shea Decl. ¶¶ 4, 6–7.)

Based on his estimate that the Anomaly Workplan will require the exaction of approximately 600

cubic feet of soil, Shea expects that the cost of off-site disposal would be "less than $250,000."[9]

(Second Shea Decl. ¶ 25 and n.16.) Further, while the Anomaly Workplan contemplates

reburying the excavated soil as a temporary measure pending other remedial measures at the

Park, Shea notes that there are currently no remedial plans in place to address hexavalent

chromium contamination in the Park. (*Id.* ¶ 23.) Thus, under the contemplated remedial plans,

"soil containing hexavalent chromium would only be removed if the soil also contained PCBs."

(*Id.* ¶ 23.)

On September 13, 2024, the Town sent a letter to Northrop Grumman (copying DEC),

objecting to the Anomaly Workplan's reburial provision on the ground that it is unlawful under

the land disposal restrictions set forth in the RCRA and demanding that the soil excavated in

connection with the investigation be disposed of off-site. (Sept. 13, 2024 Town Ltr. to Northrop

Grumman, ECF No. 40-5.) Further, on September 27, 2024, the Town submitted to DEC its data

gap sampling plan. (*See* Nov. 27, 2024 DEC Ltr. to Town, ECF No. 45; ECF No. 42-2 (DEC

letter noting date of receipt of data gap sampling plan).)

---

[9] Northrop Grumman disputes this cost but does not provide the basis for its dispute, or an estimate of how much it thinks off-site disposal would cost. (PI Opp'n at 23, ECF No. 41.)

On October 11, 2024, DEC responded in a letter disagreeing with the Town's contention that the reburial plan violates the RCRA. (Sept. 13, 2024 Town Ltr. to Northrop Grumman, ECF No. 40-5.) DEC also expressed its view that the Town's proposed off-site disposal plan would be "inefficient, wasteful, and incompatible with the State's policy . . . to reduce greenhouse gas emissions during remedy implementation" because it would "requir[e] Northrop Grumman to transport and dispose of test pit soils, backfill with clean soil, and subsequently remov[e] that same soil . . . a second time" during the next phases of the ongoing PCB remediation project. (Oct. 11, 2024 DEC Ltr. to Town, ECF No. 40-5.)

On October 14, 2024, Northrop Grumman sent a letter to the Town, echoing DEC's position as stated in the October 11, 2024 letter. (Oct. 14, 2024 Northrop Grumman Ltr. to Town, ECF No. 40-5.) On October 22, 2024, the Town sent a letter response to Northrop Grumman, stating its belief that off-site disposal of the excavated soil is necessary and feasible. (Oct. 18, 2024 Town Ltr. to Northrop Grumman, ECF No. 40-5.)

In their correspondence with the Town, DEC and Northrop Grumman have consistently cited the Town's refusal to participate in discussions to reach an agreement on the best path forward. (Sept. 25, 2024 Northrop Grumman Ltr. to Town, ECF No. 41-2 ("It is unfortunate that the Town chose not to attend DEC-scheduled September 20, 2024 meeting, at which Northrop Grumman's proposed sampling plan could have been discussed and the sampling advanced."); Sept. 26, 2024 DEC Ltr. to Town, ECF No. 41-3 ("The clear impasse is the result of the Town refusing to meet with the parties to engage in a meaningful discussion."); Oct. 14, 2024 Northrop Grumman Ltr. to Town, ECF No. 40-5 (asserting that the Town's "unproductive threats to deny access that serve only to delay the remedial effort"); Nov. 25, 2024 Northrop Grumman Ltr. to

Town, ECF No. 41-7 ("The Town's refusal to accept the decision of the regulatory agencies thwarts, not advances, the remediation of the Bethpage Community Park it purports to seek.").

Over the Town's objections, on October 30, 2024, DEC approved the Anomaly Workplan to begin on November 12, 2024. (Second Shea Decl. ¶ 24.; Oct. 30, 2024 DEC Ltr., ECF No. 40-5.) The Town filed the instant PI Motion on November 11, 2024—the day before the Anomaly Workplan was to begin. (PI Mot.) As a result of the PI Motion, Northrop Grumman has paused the start of the Anomaly Workplan altogether. (Nov. 18, 2024 Northrop Grumman Ltr. to Town, ECF No. 41-7.)

On November 27, 2024, DEC sent a letter to Northrop Grumman. (Nov. 27, 2024 DEC Ltr. to Town, ECF No. 42-2). In the letter, DEC states that Northrop Grumman's sampling proposal "meets the minimum requirements" set forth in the 2013 DEC ROD. (*Id.*) DEC, however, also notes that the proposal "supports a delineation to be able to evaluate a more stringent cleanup than required" under the 2013 DEC ROD and that "enhancements to the sampling plan are necessary . . . to make more substantial progress in the remediation of the [Park]." (*Id.*) Specifically, DEC states that it expected "a more robust sampling plan . . . that described delineations to multiple PCB soil cleanup objectives . . . including [DEC's] unrestricted use [soil cleanup objective] of 0.1 ppm for PCBs." (*Id.*) DEC stresses the need for the Town and Northrop Grumman "to agree on the PCB cleanup standard for the [P]ark in order to jointly submit the risk-based disposal application to EPA for its review and approval." (*Id.* at 7.) Concerning hexavalent chromium contamination, DEC states that while the areas of heavy metals contamination at the Park significantly overlap with the areas of PCB contamination, "there are locations where further metals delineation is needed." (*Id.* at 8.) Notably, "there is significantly less hexavalent chromium than was confirmed during the recent drum removals,"

and thus there is a need for testing to understand the "distribution" of hexavalent chromium versus trivalent chromium. (*Id.*)

E. <u>January 16, 2025 Motion Hearing and Subsequent Developments</u>

On January 16, 2025, the Court held a hearing on Northrop Grumman's Motion to Dismiss and the Town's PI Motion. (Min. Entry, Jan. 16, 2025.) At the hearing, Northrop Grumman represented that the soil sampling protocol set forth in the Anomaly Workplan represents the "same approach that had been used previously" when the first set of drums were discovered, to which the Town did not previously object. (Jan. 16, 2025 Hr'g Tr. 137:9–14.) Further, Northrop Grumman explained that the Anomaly Workplan would not entail the reburial of *all* soil because, to the extent that any contaminated soil is discovered in the course of carrying out the Anomaly Workplan, that soil would be removed for off-site disposal. (*Id.* 133:8–12 ("If it's a drum or a concrete encasement, the soil that's been removed and the sidewalls, the bottom of the walls, are sampled. If the sampling reveals gross contamination that warrants disposal, it's carted off-site."). The Town expressed that it was "surpris[ed]" and "relie[ved]" to hear these representations, as it has been the Town's "understanding, even from reading the briefs, . . . that [Northrop] Grumman was opposed to be doing what they had done before when the barrels were first discovered and was opposed to doing any roll off boxes at all." (*Id.* 128:6–15.)

In light of these statements made by the parties on the record at the January 16, 2025 hearing, I ordered Northrop Grumman to provide a letter and sworn declaration attesting to the exact procedure employed when excavating, sampling, and disposing of the previously discovered barrels (i.e., the same procedure that Northrop Grumman represents will be employed during the Anomaly Workplan). (Min. Entry, Jan. 16, 2025.) I ordered the Town to respond to "address whether it would like to withdraw or modify its PI Motion in light of the representations

36

made by Northrop Grumman at the January 16, 2025 hearing regarding the soil testing that it will perform pursuant to the Anomaly Workplan." (*Id.*)

In its submission, Northrop Grumman again represented that the Anomaly Workplan's procedure is "the same as the one used for the last anomaly investigation" and that, "if drums are found . . . Northrop Grumman will, consistent with past practice, place any soil excavated after the discovery of the encasement or drum in a covered roll-off and profile it for off-site disposal." (Northrop Grumman Suppl. Ltr. at 1–2.) In response, the Town did not move to withdraw or modify its PI Motion but nevertheless raised three new objections to the Anomaly Workplan: (1) that it would require the sampling of "soil only from the test pits that contain encasements, drums, or 'grossly contaminated media'"; (2) that Northrop Grumman's interpretation of "grossly contaminated media" is too narrow; and (3) that Northrop Grumman's sampling plan would only test for total chromium (not hexavalent chromium). (Town Suppl. Opp'n Ltr. at 1.) With this Court's leave, Northrop Grumman filed a reply letter, arguing that the Town's objections to the Anomaly Workplan exceed the scope of the specific issue raised in its PI Motion—i.e., "whether excavated soil should be redeposited" or taken off-site. (Northrop Grumman Suppl. Reply Ltr. at 1.) Also with this Court's leave, the Town filed a sur-reply, requesting that the Anomaly Workplan require, among other things, the placement of soil in metal containers rather than beneath tarps during the excavation process, and the Town's "independent collection and laboratory analysis" of excavated soil. (Town Suppl. Sur-Reply Ltr. at 1.)

## PROCEDURAL HISTORY

The Town filed this action against Northrop Grumman on September 26, 2023, bringing claims under RCRA Section 7002(a)(1)(A), RCRA Section 7002(a)(1)(B), TSCA Section

20(a)(1), and the Clean Water Act ("CWA"). (Compl. ¶¶ 111–45, ECF No. 1.) On February 13, 2024, the Town filed its Amended Complaint, which eliminates the CWA claim and adds state law public nuisance and promissory estoppel claims. (Am. Compl. ¶¶ 162–74.) The Amended Complaint is the operative complaint in this action. On February 27, 2024, the parties jointly submitted a schedule for briefing Northrop Grumman's anticipated motion to dismiss the Amended Complaint, which the Court granted. (Ltr. Mot., ECF No. 23; Elec. Order, Feb. 29, 2024.)

## I.  Northrop Grumman's Motion to Dismiss

On March 22, 2024, Northrop Grumman served on the Town its Motion to Dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) and (6) (the "Motion to Dismiss"). (MTD Mot.). In support of its Motion to Dismiss, it submitted a memorandum of law (MTD Mem.), a declaration by Edward J. Hannon, Manager of Environmental Health and Safety and Medical for Northrop Grumman (First Hannon Decl.), and the following exhibits:

(1) the 2013 DEC ROD (ECF No. 31-3);
(2) an August 18, 2016 letter from DEC to Hannon (ECF No. 31-4);
(3) the Town's Notice of Claim letter (ECF No. 31-5);
(4) a February 21, 2023 letter from DEC to the Town's counsel (ECF No. 31-6);
(5) a May 13, 2015 email from the New York Department of Health to an employee at the Town of Oyster Bay (ECF No. 31-7); and
(6) the 2022 Northrop Grumman Consent Decree (ECF No. 31-8).

On April 26, 2024, the Town served on Northrop Grumman its memorandum of law in opposition. (MTD Opp'n.) In support of its Motion to Dismiss opposition, it submitted a declaration by David Shea, an environmental engineer retained by the Town (First Shea Decl.), attaching the following exhibits:

(1) the 2022 EPA Current Conditions Report Outline (ECF No. 32-2);
(2) an August 11, 2021 letter from Hannon to DEC (ECF No. 32-3);
(3) a March 23, 2023 email from Shea to an employee at EPA (ECF No. 32-4); and
(4) the 2014 Northrop Grumman Administrative Order on Consent (ECF No. 32-5).

It also submitted a declaration by the Town's counsel, J. Michael Showalter (Showalter Decl., ECF No. 32-6), attaching the following exhibits:

    (1) a February 18, 2020 Newsday article titled "Decades of Deceit" (ECF No. 32-7);

    (2) an April 3, 2024 Newsday article titled "Chemical Drums Unearthed in Bethpage Park where Grumman Aerospace Dumped Toxins Decades Ago" (ECF No. 32-8);

    (3) an April 17, 2024 Newsday article titled "Six More Chemical Drums Pulled from Pit at Bethpage Community Park" (ECF No. 32-9);

    (4) an April 2, 2024 Newsday article also titled "Chemical Drums Unearthed in Bethpage Park where Grumman Aerospace Dumped Toxins Decades Ago" (ECF No. 32-10); and

    (5) an April 16, 2024 Newsday article titled "DEC: More Chemical Drums Found at Bethpage Park Site" (ECF No. 32-11).

On May 10, 2024, Northrop Grumman served on the Town its reply memorandum of law. (MTD Reply.) In support of its Motion to Dismiss reply brief, it submitted a second declaration by Hannon (Second Hannon Decl.), attaching the following exhibits:

    (1) an April 12, 2024 letter from Hannon to DEC (ECF No. 33-2);

    (2) an April 2024 publication from DEC titled "Northrop Grumman Bethpage Facility: Site Update" (ECF No. 33-3);

    (3) a May 8, 2024 DEC-published document titled "DEC's Latest Bethpage Community Park Cleanup Updates" (ECF No. 33-4);

    (4) a May 6, 2024 DEC-published document titled "Week of May 6, 2024" (ECF No. 33-5); and

    (5) Northrop Grumman's "Remedial Action Work Plan Addendum Phase 2 In-Situ Thermal Remedy" (ECF No. 33-6).

Pursuant to the Court's recommended bundling procedure, all motion papers were filed on the docket on May 13, 2024. (Ltr. to Judge Choudhury re: Defendants' Mot. to Dismiss Am. Compl., ECF No. 30; Judge Choudhury Individual Rule 5.2.6.) The Motion to Dismiss is now fully briefed.

## II.    The Town's PI Motion

On November 11, 2024, the Town filed its PI Motion against Northrop Grumman. (PI Mot.) In support, the Town filed a second declaration from Shea (Second Shea Decl.) and the following exhibits:

(1) the Anomaly Workplan (Anomaly Workplan);
(2) various letters between DEC, Northrop Grumman, and the Town (ECF No. 40-5);
(3) a May 26, 2010 cover letter from Northrop Grumman enclosing its investigation report of the Park property (ECF No. 40-6);
(4) an excerpt of the 1992 RCRA Hazardous Waste Management Permit (1992 RCRA Hazardous Waste Management Permit (Excerpt I));
(5) the Town's August 2024 "Metals Data Gaps Investigation Work Plan Summary" (ECF No. 40-8);
(6) the Town's soil sampling lab reports (ECF No. 40-9); and
(7) the results of Northrop Grumman's Spring 2024 surveying of the Park for anomalies (Geophysical Pilot Survey Results).

On November 25, 2024, Northrop Grumman opposed. (PI Opp'n, ECF No. 41.) In

support of its opposition, Northrop Grumman submitted a declaration from its counsel Mark

Chertok (Chertok Decl., ECF No. 41-1), attaching the following exhibits:

(1) a September 25, 2024 letter from Northrop Grumman's counsel to the Town's counsel (ECF No. 41-2);
(2) a September 26, 2024 letter from DEC to the Town (ECF No. 41-3);
(3) an October 11, 2025 letter from DEC to the Town (ECF No. 41-4);
(4) an October 14, 2024 letter from Northop Grumman to the Town (ECF No. 41-5);
(5) a November 8, 2024 letter from Northrop Grumman to DEC (ECF No. 41-6);
(6) A November 25, 2024 letter from Northrop Grumman to the Town (ECF No. 41-7);
(7) a December 19, 1963 letter from the Nassau County Department of Health to the Town (ECF No. 41-8); and
(8) another excerpt of the 1992 RCRA Hazardous Waste Management Permit (1992 RCRA Hazardous Waste Management Permit (Excerpt II), ECF No. 41-9).

On December 2, 2024, the Town replied (PI Reply, ECF No. 42), submitting another

declaration from Shea (Third Shea Decl.) and two additional exhibits:

(1) a November 18, 2024 letter from the Town to Northrop Grumman (ECF No. 42-2); and
(2) additional lab report summarizing the findings of the Town's 2024 chromium sampling (Laboratory Reports II, ECF No. 43).

The PI Motion is therefore fully briefed.

### III.    Oral Argument and Supplemental Briefing

As noted, on January 16, 2025, I heard oral argument on the Town's Motion to Dismiss

and PI Motion. (*See* Min. Entry, Jan. 16, 2025.) Based on the parties' arguments at the hearing, I

ordered supplemental submissions on a variety of issues. First, I ordered Northrop Grumman to submit a letter and sworn declaration "describing in detail the process Northrop Grumman undertook in excavating, investigating, and removing the 22 barrels that it previously identified buried in the soil of Bethpage Community Park." (*Id.*) Second, I ordered the Town to respond to Northrop Grumman's letter and declaration in order to "specifically address whether it would like to withdraw or modify its PI Motion in light of the representations made by Northrop Grumman" at the hearing and in its supplemental submission. (*Id.*) Third, I ordered the Town to submit a letter identifying the supplemental authority it referenced at the hearing, which purportedly supports its arguments that a TSCA claim may survive a Rule 12(b)(1) and (b)(6) motion because DEC's 2013 ROD is not final and is subject to change, and that, as a matter of course, DEC reviews records of decision every five years to determine whether their provisions still serve the public interest. (*Id.*) Fourth, I ordered Northrop Grumman to provide a response to the Town's supplemental authority letter. (*Id.*)

Based on my January 16, 2025 Order and my subsequent allowance of extensions and additional responses from both sides (*see* ECF Nos. 50, 55, 57; Elec. Order, Feb. 13, 2025; Elec. Order, Feb. 22, 2025), the parties provided the following supplemental submissions.

On January 23, 2025, Northrop Grumman filed a supplemental letter (Northrop Grumman Suppl. Ltr.) and a declaration from John Eichler, a senior project manager at Verdantas LLC, an environmental consulting firm retained by Northrop Grumman to assist in the cleanup of the park (Eichler Decl., ECF No. 47-1). The Eichler Declaration attaches as exhibits the following documents:

(1) Eichler's resume (ECF No. 47-3);
(2) an EPA-published summary of the hazards posed by chromium compounds (ECF No. 47-4);

(3) a sampling report of the soil removed from the park from March 22, 2024 to April 19, 2024 (ECF No. 47-5);

(4) a map of off-site disposal sites (ECF No. 47-6);

(5) a report of the sampling conducted on the side walls and bottom areas of the excavated park sites (ECF No. 47-7);

(6) the April 16, 2024 version of the Anomaly Workplan along with subsequent April 16, 2024 and April 29, 2024 addenda (ECF No. 47-8);

(7) sampling results from the drums excavated in April 2024 (ECF No. 47-9);

(8) sampling results of two anomalies identified underneath the park (ECF No. 47-10);

(9) sampling results from park excavations conducted in May 2024 (ECF No. 47-11);

(10) a park remediation workplan dated June 18, 2024 (ECF No. 47-12); and

(11) the October 23, 2024 Anomaly Workplan (ECF No. 47-13).

Northrop Grumman also submitted via email Microsoft Excel spreadsheets containing additional Park sampling results and noted this submission on the docket. (*See* ECF No. 52.)

Also on January 23, 2025, the Town submitted its letter of supplemental authority (Town Suppl. Ltr.), attaching as an exhibit a January 22, 2025 letter from DEC to Northrop Grumman (ECF No. 48-1).

On February 6, 2025, Northrop Grumman submitted its response letter to the Town's letter of supplemental authority. (Northrop Grumman Suppl. Opp'n Ltr.) Along with its response, Northrop Grumman also submitted the following: (1) a January 28, 2025 letter from the Town's counsel to Northrop Grumman's counsel (ECF No. 54-1); (2) a January 31, 2025 letter from Northrop Grumman's counsel to the Town's counsel (ECF No. 54-2); and (3) a declaration from Matthew DeVinney, a vice president at D&B Engineers and Architects, P.C. ("D&B"), the engineering firm the Town retained to provide technical assistance and observation at the park (First DeVinney Decl.). The First DeVinney Declaration attaches as exhibits DeVinney's CV (*Id.* at 8) and an April 25, 2024 technical report by D&B (*Id.* at 12).

On February 20, 2025, with the Court's permission, Northrop Grumman filed a reply in further support of its January 23, 2025 letter submission. (Northrop Grumman Suppl. Reply Ltr..)

On February 27, 2025, also with the Court's permission, the Town filed a sur-reply, attaching another declaration from DeVinney. (Town Suppl. Sur-Reply Ltr.; Second DeVinney Decl.)

## DISCUSSION: MOTION TO DISMISS

### I.    Legal Standards

#### A.  Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Russo v. United States*, No. 22-cv-1869, 2024 WL 726884, at *1 (2d Cir. Feb. 22, 2024); *see also Green v. Dep't of Educ. of the City of New York*, 16 F.4th 1070, 1075 (2d Cir. 2021).[10] "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). A court considers a Rule 12(b)(1) challenge before other arguments for dismissal because dismissal for lack of subject matter jurisdiction renders other arguments for dismissal moot. *Daly v. Citigroup Inc.*, 939 F.3d 415, 426 (2d Cir. 2019); *see also Pressley v. City of New York*, No. 11-cv-3234, 2013 WL 145747, at *5 (E.D.N.Y. Jan. 14, 2013) ("A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction.").

When a party raises a facial challenge to the court's subject matter jurisdiction, "the plaintiff has no evidentiary burden"; the district court need only "determine whether the [p]leading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016); *see also Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024). In assessing a facial challenge to standing, a court "must

---

[10] Unless otherwise indicated, case quotations omit all internal quotation marks, brackets alterations, and citations.

take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).

When a party has placed jurisdictional facts into dispute by "offer[ing] extrinsic evidence that contradicts the material allegations of the complaint," however, "the court has the obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Harty v. W. Point Realty, Inc.*, 28 F.4th at 442. When the extrinsic evidence "reveals the existence of factual problems," the plaintiff "will need to come forward with evidence controverting that presented by the defendant" regarding standing. *Lugo*, 114 F.4th at 87. "In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon*, 752 F.3d at 243; *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 120 (2d Cir. 2017) (same). "[I]f the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing," the plaintiffs "are entitled to rely" on the complaint's allegations. *Carter*, 822 F.3d at 57.

### B. Failure to State a Claim Under Rule 12(b)(6)

A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Green*, 16 F.4th at 1076–77 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accepts all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs . . . ." *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021). Nevertheless, a court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *accord We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 144 (2d Cir. 2023). While "detailed factual allegations" are not required, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. A complaint fails to state a claim "if it tenders naked assertions devoid of further factual enhancement." *Id.*

## II.    Analysis

The Town brings five claims against Northrop Grumman. First, the Town alleges that Northrop Grumman violated RCRA Section 7002(a)(1)(B) by generating "solid waste" and "hazardous waste" and "contribut[ing] [to] the handling, storage, treatment, and/or disposal" of such waste in a manner that poses an "imminent and substantial endangerment to health or the environment" under the statute. (Am. Compl. ¶¶ 132–44.).

Second, the Town alleges that Northrop Grumman violated TSCA Section 20(a)(1) by failing to comply with requirements set forth in the TSCA's implementing regulations. Specifically, it alleges that Northrop Grumman (1) conducted PCB sampling activities from 2014 to 2017 without required EPA approval and (2) has thus far failed to secure EPA approval or a deed restriction from the Town, both of which are required for it to proceed with its proposed PCB remediation plan. (*Id.* ¶¶ 145–54.)

Third, and in the alternative to its TSCA Section 20(a)(1) claim, the Town alleges that Northrop Grumman violated RCRA Section 7002(a)(1)(A) because its historical PCB dumping and planned PCB remediation, which involves the reburial of PCB-contaminated soil, constitute violations of underlying laws and regulations actionable under the RCRA. The Town points to

45

three provisions: (1) the prohibitions set forth in RCRA Section 4005, 42 U.S.C. § 6945, and implementing regulation 40 C.F.R. § 257.2 on operating a non-compliant "open dump"; (2) 6 N.Y.C.R.R. § 360.1, which sets forth permitting and operating requirements for landfills; and (3) N.Y. E.C.L. § 27-0704, which prohibits the creation of any new landfill on Long Island. (*Id.* ¶¶ 155–61.)

Fourth, the Town brings a public nuisance claim under New York law, arguing that Northrop Grumman's dumping activities and delay in remediation have interfered with the public's use of the Park and endangered the drinking water supply. (*Id.* ¶¶ 162–66.)

Fifth, the Town also brings a promissory estoppel claim under New York law. Specifically, the Town alleges that Northrop Grumman's conveyance of the property at issue here under the "express condition" that it be turned into a park "induced the Town to expend significant public resources developing the property into [the Park]." (*Id.* ¶¶ 168.) The Town further alleges that, since its discovery of contamination in 2002, the Town has relied on Northrop Grumman's "repeated promises" to remediate the contamination, including "forgo[ing] or delay[ing] pursuing legal action against Northrop Grumman, conducting its own investigation and remediation activities, or otherwise working to expedite the remediation of the [Park]." (*Id.* ¶ 170.) The alleged "promises" by Northrop Grumman include: (1) "multiple voluntary agreements with DEC to investigate and remediate the [Park]"; (2) "repeated[] assert[ions] on [Northrop Grumman's] public website that it is working with the Town and DEC" to remediate the contamination issues; (3) statements in "phone calls with Town officials that it is working diligently to remediate the [Park]"; and (4) repeated arguments and representations in this Court "that legal action by the Town is not necessary because Northrop Grumman is already diligently working to remediate the [Park]." (*Id.* ¶ 169a–d.) The Town asks that I allow the substance of its

promissory estoppel claim to proceed under an implied breach of contract theory, in the event that I find the Amended Complaint fails to plead a promissory estoppel claim, even though the Amended Complaint does not actually bring an implied breach of contract claim. (MTD Opp'n at 24 n.11.)

The Town seeks the following relief:

(1) declaratory relief for all five claims (Am. Compl. at 44–45 ¶¶ b, d, f);

(2) an injunction pursuant to RCRA Section 7002(a)(1)(B) ordering Northrop Grumman to "immediately investigate and remediate" the hazardous waste issues at the Park (*Id.* at 44–45 ¶¶ c, g, h);

(3) an injunction pursuant to TSCA Section 20(a)(1) stopping Northrop Grumman from "creating and maintaining a PCB landfill" at the Park (Am. Compl. at 44 ¶ e);

(4) an injunction establishing an "enforceable schedule" for cleanup (*Id.* at 45 ¶ i);

(5) indemnification of the Town against any third-party claims concerning issues arising out of the Park's contamination (*Id.* at 45 ¶ j); and

(6) damages (*Id.* at 45 ¶ k).

Northrop Grumman moves to dismiss the Amended Complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. First, Northrop Grumman argues that I should invoke the "primary jurisdiction" doctrine and decline to exercise jurisdiction to hear this case, in favor of allowing EPA and DEC to handle remediation without court intervention. Second, concerning the Town's RCRA Section 7002(a)(1)(B) claim, Northrop Grumman moves to dismiss under Rule 12(b)(6) on the grounds that the Amended Complaint does not plead an "imminent and substantial endangerment" as required by the statute and that the requested injunctive relief is not available. Third, concerning the Town's TSCA Section 20(a)(1) claim, Northrop Grumman moves to dismiss under Rule 12(b)(1), arguing that the claim is (1) not ripe insofar as it relates to Northrop Grumman's

alleged failures to seek and secure EPA approval and a deed restriction from the Town for its contemplated PCB removal plan and (2) moot insofar as it relates to Northrop Grumman's alleged past PCB soil sampling studies. It also moves under Rule 12(b)(6) to dismiss the claim to the extent it is premised on Northrop Grumman's past sampling activities, since, it argues, EPA approval is not required to conduct PCB sampling. Fourth, concerning the Town's RCRA Section 7002(a)(1)(A) claim, Northrop Grumman moves to dismiss under Rule 12(b)(1), similarly arguing that claims premised on past PCB dumping practices do not establish a currently actionable controversy, and under Rule 12(b)(6), arguing that Northrop Grumman's past dumping and planned remediation do not violate the underlying laws and regulations the Town cites. Fifth, concerning the Town's public nuisance claim, Northrop Grumman moves to dismiss under Rule 12(b)(1), again arguing that the claim is moot because the nuisance is already being remedied, and under Rule 12(b)(6), arguing that the claim is time-barred. Sixth, concerning the Town's promissory estoppel claim, Northrop Grumman moves to dismiss under Rule 12(b)(6) because the Town has failed to allege a sufficiently clear and unambiguous promise and because the claim is time-barred. It also argues that Rule 9(b)'s heightened pleading standard for claims alleging "fraud or mistake" should apply.

For the reasons set forth below, I grant in part and deny in part Northrop Grumman's Motion to Dismiss. First, I decline to invoke the "primary jurisdiction" doctrine and abstain from hearing this action. Second, I find that the Town has plausibly stated a claim under RCRA Section 7002(a)(1)(B). Third, I dismiss the Town's TSCA Section 20(a)(1) claim over Northrop Grumman's alleged future PCB remediation plan as not ripe under Rule 12(b)(1). Concerning the Town's TSCA Section 20(a)(1) claim over Northrop Grumman's alleged preliminary PCB sampling practices in anticipation of a Risk Based Disposal Approval Application, I deny

dismissal of this claim as moot under Rule 12(b)(1) but nevertheless dismiss it for failure to state

a claim under Rule 12(b)(6). Fourth, I likewise deny dismissal of the Town's alternative RCRA

Section 7002(a)(1)(A) claim under Rule 12(b)(1) but grant dismissal under Rule 12(b)(6). Fifth, I

find that the Town's public nuisance claim is justiciable and that the Town has plausibly stated a

claim. However, insofar as the Town seeks damages, I dismiss the public nuisance claim as time-

barred, leaving only a claim for injunctive and declaratory relief. Sixth, I dismiss the Town's

promissory estoppel claim for failure to state a claim.

A. Primary Jurisdiction

As a preliminary matter, I deny Northrop Grumman's request that I abstain from

exercising jurisdiction over the Town's claims for injunctive relief pursuant to the "primary

jurisdiction doctrine." (MTD Mem. at 24.)

Northrop Grumman argues that DEC has the authority and expertise to oversee the Park

remediation with respect to the VOC groundwater cleanup and that EPA is currently supervising

the PCB cleanup. (*Id.*) Thus, "the Court should allow the remedial process to continue under the

auspices of DEC and EPA—two agencies with 'specialized technical knowledge' needed to

ensure it is done properly." (*Id.* (citing *Read v. Corning Inc.*, 351 F. Supp. 3d 342, 351

(W.D.N.Y. 2018)).)

"The federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction

given them." *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 504 (2d Cir. 2022). The primary

jurisdiction doctrine is a "relatively narrow" exception "concerned with promoting proper

relationships between the courts and administrative agencies charged with particular regulatory

duties by allocating initial decisionmaking responsibility between courts and agencies." *White v.*

*Beech-Nut Nutrition Co.*, No. 23-cv-220, 2024 WL 194699, at *1 (Jan. 18, 2024) (citing *Goya*

*Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988); *Ellis v. Trib. Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006)). Although "no fixed formula exists for applying the doctrine of primary jurisdiction," courts in the Second Circuit consider:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.

*Ellis*, 443 F.3d at 82–83. Courts have generally been hesitant to apply the primary jurisdiction doctrine in RCRA cases, where Congress specifically delegated enforcement power to the courts through citizen suits. *See Inc. Village of Garden City v. Genesco, Inc.*, 2009 WL 3081724, at *9 (E.D.N.Y. Sept. 23, 2009) ("[T]his Court's decision to divest itself of jurisdiction is not one to be taken lightly and, in fact, is unwarranted at this point in time."); *DMJ Assocs., L.L .C. v. Capasso*, 228 F. Supp. 2d 223, 229–30 (E.D.N.Y.2002) ("By authorizing citizens to file private lawsuits under RCRA and narrowly defining the conditions under which state or federal action can circumscribe that right, Congress clearly signaled that the federal courts have a duty to hear and decide these claims and carefully limited the deference courts should pay to the expertise of an administrative agency."). While the Second Circuit has yet to rule on the applicability of the primary jurisdiction doctrine to RCRA citizen suits, the Seventh Circuit held in an RCRA case that abstention "would be an end run around [the] RCRA. Congress has specified the conditions under which the pendency of other proceedings bars suit under RCRA . . . ." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998).

I decline to apply the primary jurisdiction doctrine and abstain from hearing the Town's RCRA Section 7002(a)(1)(B) substantial endangerment claim and New York common law public nuisance claim for injunctive relief—the two claims that, as set forth below, survive

Northrop Grumman's Motion to Dismiss. In its briefing, Northrop Grumman does not show that such an extraordinary move would be appropriate here, aside from its general claims that the four *Ellis* factors are met and that DEC and EPA have "specialized, technical knowledge" relevant to the subject matter of this action. (MTD Mem. at 24–25 and n.18). Further, I find persuasive the Seventh Circuit's reasoning that abstention here would be an "end run" around the RCRA. *PMC, Inc.*, 151 F.3d at 619. Indeed, the RCRA specifically provides the precise situation in which federal courts may not hear a citizen suit. *See, e.g.*, 42 U.S.C. § 6972(b)(1)(B) (barring civilian suits where "the Administrator or State has commenced and is diligently prosecuting a civil or criminal action"). No such situation exists here. Accordingly, abstaining from exercising jurisdiction would be a derogation of the Court's duty prescribed by Congress, particularly at this early stage where the scope of the facts underlying this action have not been established through discovery. *See Inc. Village of Garden City*, 2009 WL 3081724, at *9 (declining request for abstention where "without the benefit of factual discovery, it is yet unclear to the Court whether . . . the RCRA bars plaintiff's claim for injunctive relief").

B. The Parties' Factual Declarations

The Town argues that the First Hannon Declaration should be stricken. (MTD Opp'n at 25; First Hannon Decl.) With respect to Northrop Grumman's Motion under Rule 12(b)(6), the Town argues that such factual declarations are impermissible because the Court is required to take as true all allegations in the pleadings. (MTD Opp'n at 25 (citing *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)).) With respect to its Motion under Rule 12(b)(1), the Town argues that I may not consider many of the facts presented because Hannon was not employed by Northrop Grumman at all relevant times and thus lacks "personal knowledge." (*Id.* (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)).)

Notwithstanding its position, the Town "fe[lt] compelled to 'set the record straight' by filing its own declaration in response" and submitted a factual declaration from its consultant David Shea. (*Id.*; First Shea Decl.) Northrop Grumman does not dispute that a court may not rely on factual declarations in resolving a Rule 12(b)(6) motion but argues that his employment overseeing the Park's remediation for the last 15 years provides him sufficient personal knowledge. (MTD Reply at 10 (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998)).)

I take all well-pled allegations in the Amended Complaint as true on a Rule 12(b)(6) motion. *See Melendez*, 16 F.4th at 1010. Accordingly, I do not consider either party's factual declarations in the context of assessing Northrop Grumman's arguments under Rule 12(b)(6). As set forth above in the Factual Background Section, with respect to Northrop Grumman's factual challenge under Rule 12(b)(1), I may consider evidence submitted by the parties outside of the pleadings, but only insofar as the evidence concerns jurisdictional facts that are in dispute. *Tandon*, 752 F.3d at 243. Accordingly, I consider the parties' supplemental factual submissions only to the extent that they controvert any facts material to subject matter jurisdiction alleged in the Amended Complaint.

Finally, I find Hannon's representations in his declaration sufficient to establish that he has personal knowledge. Indeed, Hannon attests that he "started working for [Northrop Grumman] in 2009" and that he is "primarily responsible for, and [has] full knowledge of, the remedial activities that [Northrop Grumman] has taken in Oyster Bay, including those that are the subject of this litigation." (First Hannon Decl. ¶¶ 2, 4.) *Kamen*, the case on which the Town relies, concerned a declaration by the defendant's counsel with no direct involvement in the underlying facts of the case. 791 F.2d at 1011. The Town does not provide authority supporting its apparent position that Hannon would have to have worked at Northrop Grumman for the

entire duration of the relevant facts of this case in order to have sufficient personal knowledge. *See U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Local Union*, 2006 WL 2136249, at *11 (S.D.N.Y. Aug. 1, 2006) ("Although first-hand observation is obviously the most common form of personal knowledge, that is not the only basis for it.").

C. RCRA Section 7002(a)(1)(B)

Northrop Grumman moves to dismiss the Town's RCRA Section 7002(a)(1)(B) claim under Rule 12(b)(6), presenting two main arguments. (MTD Mem. at 17–20.) First, Northrop Grumman argues that the Town has failed to plead an "imminent and substantial endangerment" under the RCRA. (*Id.* at 19.) It points to statements by DEC in the 2013 DEC ROD purportedly indicating that people are protected from the contaminated soil and that any contaminated groundwater is sufficiently treated, as well as statements by Hannon and public water suppliers that public drinking water remains safe. (*Id.* at 19.)[11] Second, it argues that the Town cannot bring an RCRA claim for declaratory and injunctive relief where DEC is already "taking the needed steps to address the issue." (*Id.* at 17–18.)

"[The] RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Talarico Bros. Building Corp. v. Union Carbide Corp.*, 73 F.4th 126 at 136 (2d Cir. 2023). Although EPA is the chief enforcement authority, Section 7002(a)(1)(B) of the RCRA authorizes private entities to bring civil suits "against . . . any past or present generator . . . or past or present owner or operator of a treatment,

---

[11] *See also* 2013 DEC ROD at 13; First Hannon Decl. ¶¶ 6, 43, 50–52, 54–56; 2022 Drinking Water Quality Report, Bethpage Water District, available at https://bethpagewater.com/Portals/0/Content/Bethpage%20WD_2022%20Water%20Quality%20 Report_web%20pages.pdf; 2022 Drinking Water Quality Report, South Farmingdale Water District, available at https://sfwater.com/wordpress/wp-content/uploads/2023/05/SFWD-2022-ADWQR.pdf.

storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). The RCRA grants courts broad equitable powers, both to "restrain" violators and to "order [violators] to take such other action as may be necessary." 42 U.S.C. § 6972(a); *see also Talarico Bros.*, 73 F.4th at 138 (holding that district courts may "grant affirmative equitable relief to the extent necessary to eliminate *any* risk posed by toxic wastes") (citing *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 210 (2d Cir. 2009)). Some district courts have dismissed RCRA Section 7002(a)(1)(B) claims for equitable relief to remediate an endangerment where the plaintiff has not identified specific remedial injunctive relief or where a government agency has determined that no further remediation is necessary. *See, e.g.*, *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d. 1215, 1219–20, 1222 (S.D.N.Y. 2002) (dismissing claim without prejudice on summary judgment where plaintiff had failed "to identify some action that defendant could be ordered to take that is not already in place thanks to the action of the state agency and that would improve the situation in some way," but noting the permissibility of a future action if the a needed injunction was identified); *see also Rococo Assocs., Inc. v. Award Packaging Corp.*, 803 F. Supp. 2d 184, 192 (E.D.N.Y. 2011) (granting summary judgment for former polluting landowner where DEC had taken over vacated premises to conduct hazardous waste cleanup); *Kara Holding Corp. v. Getty Petroleum Mkt'g, Inc.*, 2004 WL 1811427, at *11 (S.D.N.Y. Aug. 12, 2004) (granting summary judgment where the oversight agency determined that remediation efforts were sufficient to abate the danger).

The "RCRA permits a private party to bring suit only upon a showing that the solid or hazardous waste at issue *may* present an *imminent and substantial endangerment to health or the*

environment." *Talarico Bros.*, 73 F.4th at 138 (citing *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996)) (emphasis added). The Second Circuit has given an expansive construction to the RCRA, recognizing that Congress used the word "may" to preface the standard of liability, and that such "expansive language . . . is intended to confer upon the courts the authority to grant affirmative equitable relief to eliminate *any risk* posed by toxic wastes." *Brod v. Omya, Inc.*, 653 F.3d 156, 161 (2d Cir. 2011) (quoting *Dague v. City of Burlington*, 935 F.2d 1343, 1355–56 (2d Cir. 1991)).

"An endangerment is 'imminent' if there is a threat which is present now, although the impact of the threat may not be felt until later." *Talarico Bros.*, 73 F.4th at 139 (citing *Meghrig*, 516 U.S. at 486). Accordingly, a plaintiff is not required to "show[] that actual harm will occur immediately so long as the risk of threatened harm is present." *Id.* (citing *Dague*, 935 F.2d at 1356 (2d Cir. 1991)). The standard "does not require proof of actual harm"; rather, the analysis is "probabilistic" and "a reasonable prospect of future harm is adequate . . . so long as the threat is near-term." *Id.* (citing *Simsbury-Avon*, 575 F.3d at 211). In other words, "a showing that a risk of threatened harm remains present at the time of the filing of the complaint" will suffice to establish imminency. *Id.* at 140 (citing *Simsbury-Avon*, 575 F.3d at 210). A claim of imminency will fail, however, "if the waste no longer presents a danger that threatens to occur immediately." *Id.* at 139 (citing *Meghrig*, 516 U.S. at 485–86). The bar for showing that an endangerment is "substantial" is "not particularly high." *Id.* at 140. Rather, "[t]here must be reasonable cause for concern that someone or something may be exposed to risk of harm in the event remedial action is not taken." *Id.* At the motion to dismiss stage, a plaintiff need not plead "factual allegations sufficient to assess the severity of any harm that might occur." *Id.* Still, the complaint must plausibly allege more than "the mere presence" of harmful substances. *Id.*

The Amended Complaint plausibly alleges that Northrop Grumman generated "solid waste" and/or "hazardous waste" as defined in the RCRA, 42 U.S.C. § 6903(27) and (5),[12] and "contributed to the handling, storage, treatment, and/or disposal" of such waste. (Am. Compl. ¶¶ 140–43.) It alleges the presence of VOCs, PCBs, and SVOCs—all classified as hazardous substances under CERCLA—in the Park land donated by Northrop Grumman to the Town in 1962. (Am. Compl. ¶ 15.) Specifically, the Amended Complaint catalogs the various substances dumped by Northrop Grumman into the land that is now the Park, including: paint coating materials and oily wastes; chromium laden sludge; cadmium and arsenic; chlorinated and non-chlorinated solvents; wastewater treatment sludge; used paint rags; used paint, coating materials, waste rags, and machine oil housed in a rag pit; burned waste oil and jet fuel; and therminol. (Am. Compl. ¶¶ 42–45.)

Further, the Amended Complaint plausibly alleges that at least some of this solid waste and/or hazardous waste may pose an imminent and substantial endangerment to health or the environment under RCRA Section 7002(a)(1)(B). Concerning the alleged PCB soil contamination and Northrop Grumman's reburial proposal, the Amended Complaint alleges that the 2013 DEC ROD's plan to excavate contaminated soil to a depth of only two feet in certain areas of the Park "will expose workers" engaged in Park maintenance activities (which may

---

[12] The RCRA defines "solid waste" as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities . . ." 42 U.S.C. § 6903(27). It defines "hazardous waste" as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may--(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5). Northrop Grumman does not dispute that the materials at issue here fit both of these definitions.

involve digging to a depth greater than two feet) "to the hazards of any of Northrop Grumman's soil contamination left behind." (Am. Compl. ¶ 82a.) Concerning the alleged groundwater contamination, the Amended Complaint alleges that the 2013 DEC ROD and Northrop Grumman's groundwater extraction system implemented pursuant to the 2013 DEC ROD set a standard of 10 ppm total VOCs, which it alleges is an "arbitrary" and "less stringent" standard than that set forth in the applicable New York State regulations. (*Id.* ¶¶ 96, 108.) It also alleges that Northrop Grumman's discovery that the source area of the VOC contamination is actually four times larger than was initially known (and thus four times larger than what Northrop Grumman's groundwater extraction system was designed to remediate). (*Id.* ¶ 99.) Based on these allegations, the Amended Complaint claims that VOCs are "contaminating the Sole Source Aquifer system that provides drinking water to hundreds of thousands of people and causing an imminent and substantial endangerment to human health and the environment." (*Id.* ¶ 111.) These factual allegations demonstrate a current threat that presents a reasonable prospect of future harm. *Talarico Bros.*, 73 F.4th at 139–40.

I find unpersuasive Northrop Grumman's argument that language from the 2013 DEC ROD and representations from Northrop Grumman's Manager of Environmental Health and Safety and Medical Hannon demonstrate that the Amended Complaint has not sufficiently pled an "imminent and substantial endangerment." Northrop Grumman relies on Section 6.3 of the 2013 DEC ROD, which states in relevant part:

> Since the site is fenced and/or covered by asphalt, concrete or clean fill, people will not come into contact with site-related contaminants in soil unless they dig below the surface. The potential exists for contact with contaminants in soil in limited off-site residential areas. People are not drinking the contaminated groundwater because the area is served by a public water supply that is treated to remove this contamination.

(MTD Mem. at 19; 2013 DEC ROD § 6.3.) On a Rule 12(b)(6) motion, I must take as true all well-pled allegations in the Amended Complaint. *Melendez*, 16 F.4th at 1010. This includes the Amended Complaint's allegation that the VOC groundwater contamination "may present an imminent and substantial endangerment to the Sole Source Aquifer system that provides drinking water to Town residents." (Am. Compl. ¶¶ 105, 111.) Although discovery may ultimately confirm the truth of statements by Hannon and DEC that the drinking water is safe, I cannot assume the truth of such statements for the purpose of evaluating Northrop Grumman's Rule 12(b)(6) motion to dismiss the RCRA Section 7002(a)(1)(B) claim.[13]

Northrop Grumman's argument that the injunctive and declaratory relief that the Town seeks here is not available because DEC and EPA are already taking remedial steps is likewise unavailing, and the cases it relies on are distinguishable. In *87th Street Owners Corporation*, the court dismissed the RCRA Section 7002(a)(1)(B) claim without prejudice on summary judgment where the plaintiff vaguely sought an injunction directing the defendant to take over DEC's management of a cleanup project. 251 F. Supp. 2d at 1219–20. The court held that the plaintiff "identified nothing whatsoever that this Court could order defendant to do to supplement the DEC's efforts" and reasoned that it could not grant injunctive relief unless the plaintiff could "identify some action that defendant could be ordered to take that is not already in place thanks to the action of the state agency and that would improve the situation in some way." *Id.* at 1220–21. Similarly, in *Rococo Associates*, the court granted summary judgment for the defendant where the record "amply demonstrate[d] that the NYDEC, together with [the] [p]laintiff, ha[d] acted and is still acting to remediate the hazardous conditions at the [p]remises" and that, at

---

[13] Regardless, as discussed above at Discussion: Motion to Dismiss § II.B, I may not consider factual declarations outside the pleadings in resolving a Rule 12(b)(6) motion to dismiss.

bottom, the plaintiff's claims actually "concern[ed] determining blame for the contaminated environmental conditions," not remediating them. 803 F. Supp. 2d at 192. Finally, in *Kara Holding Corporation*, the court granted partial summary judgment for the defendant because the plaintiffs had "not shown that the remediation plan proposed by the plaintiffs is necessary to insure [*sic*] that the petroleum contamination is no longer an imminent and substantial endangerment in light of the considerable remediation that has already taken place." 2004 WL 1811427, at *11. These cases are distinguishable because they all arose in the summary judgment context—not a Rule 12(b)(6) motion to dismiss—and because the plaintiffs in those cases ultimately failed, after discovery, to identify specific and necessary remedial relief that the courts could grant to address an imminent and substantial harm. Here, by contrast, the Amended Complaint alleges significant deficiencies in Northrop Grumman's and the regulators' actions and proposes injunctive relief that I could order, including ordering Northrop Grumman to conduct sampling and timely submit a Risk Based Disposal Approval Application for EPA approval.

For example, the Amended Complaint alleges, and Northrop Grumman admits, that Northrop Grumman has not yet submitted a Risk Based Disposal Approval Application for EPA approval. (Am. Compl. ¶ 36 ("As of February 2024, Northrop Grumman has not submitted any [Risk Based Disposal Approval] [A]pplication to EPA . . . ."); MTD Mem. at 18 (claiming that Northrop Grumman "will be conducting sampling to supply additional information under EPA auspices, and then will be submitting an [Risk Based Disposal Approval] [A]pplication to EPA").) The Amended Complaint also alleges specific deficiencies in Northrop Grumman's cleanup efforts pursuant to the 2013 DEC ROD, including: (1) that DEC set "arbitrary" and "less stringent" standards for Northrop Grumman's PCB and VOC cleanup goals, (2) that Northrop

Grumman's groundwater extraction system does not reach the full depth needed to capture all contaminated groundwater, and (3) that Northrop Grumman has been proceeding slowly with no enforceable cleanup schedule. (Am. Compl. ¶ 131.) To address these deficiencies, the Town seeks to "enjoin [] Northrop Grumman to immediately investigate and remediate the Community Park Property in order to take all actions necessary to address imminent and substantial endangerment that may be presented by the solid and hazardous wastes at [the] Community Park Property." (Am. Compl. at 44 ¶ c.) Discovery may very well show that there is no practicable injunctive relief I could order here. Nevertheless, taking the Amended Complaint's well-pled allegations to be true, I find that, at this stage, the Town has stated a claim under RCRA Section 7002(a)(1)(B).

D. TSCA Section 20(a)(1)

The Town alleges violations under TSCA Section 20(a)(1) arising from both Northrop Grumman's past and anticipated future activities. Concerning its past activities, the Town alleges that Northrop Grumman conducted a PCB sampling study between 2014 and 2017 without seeking EPA approval, which the Town claims is required under 40 C.F.R. § 761.61(c). Am. Compl. ¶¶ 87, 128; 40 C.F.R. § 761.61(c)(1). Concerning its anticipated activities, the Amended Complaint alleges that Northrop Grumman is in violation of 40 C.F.R. § 761.61(c)(1) because it has not submitted a Risk Based Disposal Approval Application, much less received approval, for the PCB remediation plans that it devised with DEC, as set forth in the 2013 DEC ROD and the 2023 Northrop Grumman Current Conditions Report. Am. Compl. ¶¶ 92–93, 94, 151–54; 40 C.F.R. § 761.61(c). It alleges that Northrop Grumman is also in violation of 40 C.F.R. § 761.61(a)(7)–(8), which requires entities engaged in PCB remediation to secure a deed

restriction from the landowner (i.e., the Town) where, as here, the level of PCBs exceeds 1 ppm. Am. Compl. ¶¶ 92–93, 94, 151–54; 40 C.F.R. § 761.61(a)(7)–(8).

Northrop Grumman makes three arguments to support its position that the Town's TSCA Section 20(a)(1) claims are not justiciable and thus must be dismissed under Rule 12(b)(1). (MTD Mem. at 7–11.) First, Northrop Grumman argues that the Town's request for a declaration that its DEC-approved PCB remediation plans violate TSCA Section 20(a)(1) is not ripe because EPA has not yet approved the plans and the time has not yet come for Northrop Grumman to seek a deed restriction from the Town. (*Id.* at 8–9.) Accordingly, it would be "premature" for the Court to address these alleged violations. (*Id.* at 9.) Second, Northrop Grumman argues that the Town's request for injunctive relief requiring it to seek EPA approval for its PCB remediation plan is moot because it is currently seeking such approval (although it has not yet submitted a Risk Based Disposal Approval Application). (*Id.* at 9–10.) According to Northrop Grumman, TSCA Section 20(a)(1) only permits injunctive relief for *ongoing violations*; as Northrop Grumman is already working with EPA to secure cleanup approval, there is no ongoing violation to address. (*Id.* at 9–10; Am. Compl. ¶¶ 90–91 (discussing EPA's preparation of its 2022 Current Conditions Report Outline for Northrop Grumman and Northrop Grumman's preparation and submission of a 2023 Current Conditions Report to EPA).) Third, Northrop Grumman argues that the Town's TSCA claim is likewise moot as to its 2014 to 2017 sampling activities because this activity has concluded and the Amended Complaint "does not establish the likelihood of any continuing violation." (MTD Mem. at 10–11.)

With respect the 2014 to 2017 PCB sampling activities, Northrop Grumman also moves to dismiss the Town's TSCA claim under Rule 12(b)(6) for failure to state a claim. (*Id.* at 11–13.) First, Northrop Grumman argues that the TSCA's implementing regulations permitted, and

even required, the sampling. (*Id.* at 12.) Under Northrop Grumman's reading, 40 C.F.R. §§ 761.61(a)(3)(i)(B) and 761.61(c)(1) require parties submitting a Risk Based Disposal Approval Application for EPA approval (as Northrop Grumman expects to do here) to include in the application "a table or cleanup site map showing PCB concentrations measured in all pre-cleanup characterization samples." (*Id.* at 12 (quoting 40 C.F.R. § 761.61(a)(3)(i)(B).) In other words, "EPA approval is not required for this sample, rather the sampling results are a required part of the application for EPA's approval." (*Id.* at 12.) Second, Northrop Grumman argues that the Town's general allegations that it did not receive proper communications regarding Northrop Grumman's PCB remediation plan developments are not actionable, since the cited TSCA regulations contain no such communication requirement. (*Id.* at 12–13.)

### i.    Rule 12(b)(1) Justiciability

I first address Northrop Grumman's arguments for dismissal of the TSCA Section 20(a)(1) claim under Rule 12(b)(1). *See Bohnak*, 79 F.4th at 283 ("If [a] plaintiff[] lack[s] Article III standing, a court has no subject matter jurisdiction to hear their claim.").

"Ripeness is a constitutional prerequisite to the exercise of jurisdiction" which "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *U.S. v. Traficante*, 966 F.3d 99, 106 (2d Cir. 2020). In determining whether a controversy is ripe, the court must determine "whether (1) the issues are fit for judicial consideration, and (2) withholding of consideration will cause substantial hardship to the parties." *Id.* "[A] claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Antonyuk v. James*, 120 F.4th 941, 1014 (2d Cir.

2024). "It remains live if a court can fashion *some* form of meaningful relief to award the complaining party." *Id.* (emphasis in original).

TSCA Section 20(a)(1) provides, in relevant part, that an entity "may commence a civil action . . . against any person . . . who is alleged to be in violation of . . . section . . . 2605 of this title . . . *to restrain such violation*" 15 U.S.C. § 2619 (a)(1) (emphasis added). By its terms, TSCA Section 20(a)(1) only permits parties to bring suits to "restrain" a violation of other TSCA provisions or implementing regulations. 15 U.S.C. § 2619(a)(1). However, while it is clear that TSCA provides that "a citizen suit may seek 'to restrain' something that is ongoing or continuous, and that may continue in the future" and not to remedy past violations, it does not necessarily follow that these statutory limitations in TSCA are jurisdictional. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany, N.Y.*, 250 F. Supp. 2d 48, 59–60 (N.D.N.Y. 2003). For example, in *Arbor Hill*, a TSCA suit brought by a group of individuals alleging lead contamination by the City of Albany, the district court held that TSCA did not authorize the court to order medical monitoring of plaintiffs for potential harms from past lead exposure because such relief would be a "remedy" for past violations and not a "restraint" on ongoing violations. *Id.* In reaching its conclusion, however, the court analyzed the scope of the TSCA's statutory language under Rule 12(b)(6) for failure to state a claim, not under Rule 12(b)(1) for lack of subject matter jurisdiction. *Id.* at 52. Likewise, while the Second Circuit has not expressly ruled on whether TSCA Section 20(a)(1)'s authorization for courts to "restrain" violations of the TSCA and implementing regulations should be treated as a jurisdictional bar, I note that the Second Circuit has treated similar temporal limitations on claims as a merits issue. For example, in *South Road Associates v. International Business Machines Corporation*, the Second Circuit applied Rule 12(b)(6)—not Rule 12(b)(1)—to hold that RCRA implementing

regulations prohibiting an individual from "introducing" contaminants meant that plaintiffs could only sue under the RCRA for ongoing introduction (i.e., not past introduction) of contaminants. 216 F.3d 251, 253 (2d Cir. 2000).

Under 15 U.S.C. § 2605, EPA promulgated regulation 40 C.F.R. Part 761, which addresses protocols governing the disposal of PCB-contaminated material. 40 C.F.R. § 761.61(c) ("Section 761.61(c)") provides that "[a]ny person wishing to sample, extract, analyze, cleanup, or dispose of PCB remediation waste" pursuant to a "risk-based" disposal method[14] "must apply in writing to the Regional Administrator [of EPA] in the Region where the sampling, extraction, analysis, cleanup, disposal, or storage site is located." 40 C.F.R. § 761.61(c)(1). This application is called a Risk Based Disposal Approval Application. "No person may conduct cleanup activities under this paragraph prior to obtaining written approval by EPA." 40 C.F.R. § 761.61(c)(1). The rule further provides that the Risk Based Disposal Approval Application "must include information described in the notification required by paragraph (a)(3) of this section." *Id.* 40 C.F.R. § 761.61(a) ("Section 761.61(a)"), in turn, provides procedures for "[s]elf-implementing on-site cleanup and disposal of PCB remediation waste" and requires that the application to EPA include, among other things: (1) "a summary of the procedures used to sample contaminated and adjacent areas" including "sample collection and analysis dates"; (2) "a table or cleanup site map showing PCB concentrations measured in all pre-cleanup characterization samples"; and (3) "[t]he location and extent of the identified contaminated area, including topographic maps with sample collection sites cross referenced to the sample

---

[14] Northrop Grumman does not dispute that it is seeking to engage in "risk-based" disposal of PCB-contaminated material at the Park. (*See* MTD Mem. at 8 (addressing rules for risk-based PCB disposal).)

identification numbers in the [accompanying] data summary." 40 C.F.R. § 761.61(a)(3)(i)(B)–(C). This subsection also provides that EPA "may require more detailed information including, but not limited to, additional characterization sampling." 40 C.F.R. § 761.61(a)(3)(i)(B).

An entity pursuing a Risk Based Disposal Approval Application under Section 761.61(c) may not "conduct cleanup activities . . . prior to obtaining written approval by EPA," 40 C.F.R. § 761.61(c)(1), whereas an entity pursuing self-implementing on-site cleanup of PCB waste under Section 761.61(a) must submit only a notification to the EPA Regional Administrator and may proceed with the cleanup if EPA does not respond within 30 calendar days, 40 C.F.R. § 761.61(a)(3)(ii).

Here, I find that the Town's TSCA Section 20(a)(1) claim is not ripe with respect to Northrop Grumman's alleged failures to submit to EPA a Risk Based Disposal Approval Application and obtain approval for the PCB remedial plan set forth in the 2013 DEC ROD and 2023 Northrop Grumman Current Conditions Report.[15] The Amended Complaint alleges significant deficiencies in the 2013 DEC ROD and 2023 Northrop Grumman Current Conditions Report with respect to DEC-approved PCB reburial plan to remedy PCB contamination at the Park. (Am. Compl. ¶ 82.) The Amended Complaint also alleges that Northrop Grumman has not

---

[15] Based on representations made by the Town's counsel at the January 16, 2025 hearing, I understand that the Town is no longer asserting a TSCA claim based on the allegation that Northrop Grumman has failed to seek a deed restriction from the Town. (*Cf.* Am. Compl. ¶ 92 ("Northrop Grumman has never approached the Town, nor executed an agreement with the Town, to establish a deed restriction for the Community Park Property and to submit a certification of such deed restriction to EPA."); Jan. 16, 2025 Hr'g Tr. 49:13–14 ("They can't do a deed restriction."), 49:21–22 ("They can't get a deed restriction from us now."), 50:8–10 ("We are asking [Northrop] Grumman simply, come to us for a deed restriction after we know what's at the park."), 51:4–6 ("So after we know what's there . . . then we can evaluate what kind of land use restriction is appropriate.").) To the extent that the Town continues to assert this claim, I find that it is also not ripe, for substantially the same reasons that its claim based on the allegation that Northrop Grumman has failed to seek EPA approval is not ripe.

yet submitted a Risk Based Disposal Approval Application. (*Id.* ¶¶ 36.) Despite this, the

Amended Complaint makes no allegations that Northrop Grumman has enacted, or will enact,

the PCB reburial plan *before* it submits a Risk Based Disposal Approval Application and obtains

EPA approval. Put another way, the Town does not explain how Northrop Grumman is currently

in violation of TSCA regulations for having *not yet* submitted a Risk Based Disposal Approval

Application. As such, the Town's TSCA Section 20(a)(1) claim "depends upon contingent future

events that may not occur as anticipated, or indeed may not occur at all." *Traficante,* 966 F.3d at

106.[16] Northrop Grumman may very well decide to conduct a risk-based disposal without EPA

approval, and such actions may indeed give rise to a ripe controversy under TSCA Section

20(a)(1). But these are possibilities that have not yet materialized.

The Town's arguments in opposition are unavailing. The Town first argues that its

request for declaratory relief is ripe because "[Northrop] Grumman was in violation of TSCA

when it began to carry out the 2013 [DEC] ROD's PCB remedy while initiating PCB

investigations without EPA approval, and it remains in violation as it continues to rely on and

advocate for the 2013 DEC ROD, still with no EPA approval more than a decade later." (MTD

Opp'n at 14 (citing Am. Compl. ¶¶ 151–54).) The Town also points to Northrop Grumman's

alleged failures to follow in its 2023 Northrop Grumman Current Conditions Report the

instructions provided by EPA in their 2022 EPA Current Conditions Report Outline—including

---

[16] As the Town correctly points out, Northrop Grumman's arguments concerning ripeness and mootness with respect to the Town's TSCA claim concerning its alleged failure to obtain EPA approval for contemplated future PCB remediation are contradictory. (MTD Opp'n at 8.) In effect, Northrop Grumman argues that the TSCA claim is not ripe because Northrop Grumman has not yet received approval and moot because it is taking steps to seek approval. (MTD Mem. at 8–10.) I hold that the Town's TSCA claim with respect to future EPA approval is not moot because Northrop Grumman has not yet *received* approval, which would moot the claim. However, for the reasons stated above, it is not ripe.

failures to "meaningfully include the Town in discussions," "take the Town's intended future use of the Park into account," and "complete[] additional sampling." (MTD Opp'n at 14.) However, as discussed further below, I find that TSCA's implementing regulations do not require a party to secure EPA approval of a Risk-Based Disposal Approval Application prior to conducting the preliminary steps needed in order to seek that very same approval. *See* Discussion: Motion to Dismiss § II.D.ii. Moreover, even if Northrop Grumman failed to timely seek EPA approval or to include the Town in discussions, the underlying regulatory provision on which the Town relies, 40 C.F.R. § 761.61(c), does not prescribe a time limitation or even affirmatively require communication with the landowner. As such, these failures are not the basis for a TSCA Section 20(a)(1) claim.

By contrast, I find that the Town's TSCA Section 20(a)(1) claim with respect to Northrop Grumman's alleged failure to submit a Risk Based Disposal Approval Application and secure EPA approval to conduct sampling is justiciable. As an initial matter, I agree with other district courts in this Circuit that have analyzed the scope of TSCA's statutory language under Rule 12(b)(6) and not Rule 12(b)(1), and I again note that the Second Circuit has treated similar questions in the RCRA context under Rule 12(b)(6). *See Arbor Hill*, 250 F. Supp. 2d at 53, 59–60; *S. Rd. Assocs.*, 216 F.3d at 253.

Regardless, the record shows that Northrop Grumman's PCB sampling activity is not an alleged past violation, but rather an alleged ongoing violation with a likelihood of continuing, which the Court can "restrain" under TSCA Section 20(a)(1). *See Arbor Hill*, 250 F. Supp. 2d at 59–60 ("[A] citizen suit may seek 'to restrain' something that is ongoing or continuous, and that may continue in the future."). First, as the Town noted at the January 16, 2025 hearing and further explained in its supplemental letters, the 2013 DEC ROD, though final, is subject to

ongoing review, meaning that the PCB sampling conducted pursuant to the 2013 DEC ROD is not necessarily complete. (*See* Town Suppl. Ltr. at 1–2.) Federal regulations provide for five-year reviews of hazardous waste sites such as the Park, 40 C.F.R. § 300.430(f)(4)(ii), and EPA has provided the guidance that "although [selected remedies in an ROD] generally are 'frozen' at the time of ROD signature, in conducting a five-year review, [parties] should determine the effect of a newly promulgated or modified standard or the protectiveness of the remedy originally selected in the ROD." U.S. EPA, Comprehensive Five-Year Review Guidance, OSWER Directive 9355.7-03B-P at 1–3.[17] Indeed, the 2013 DEC ROD was already amended once in 2019, after DEC found that the "data show[ed] that the existing remedies are not fully effective at achieving remedial action objectives." (Am. Compl. ¶¶ 112–13 (quoting 2019 DEC Amended ROD).) Thus, Northrop Grumman's contention that there is no "likelihood of any continuing violation" is incorrect. (*See* MTD Mem. at 10.) Second, record evidence indicates that Northrop Grumman has, in fact, continued to conduct PCB sampling, most recently in April 2024 when it sampled soil surrounding the unearthed concrete encased drums. (*See* First DeVinney Decl. ¶ 6 (finding 43.1 mg/kg PCB concentration in sample collected from drum investigation in April 2024).) Accordingly, I deny dismissal of this claim on mootness grounds.

### ii.    *Rule 12(b)(6) Failure to State a Claim*

Having denied dismissal of the Town's TSCA Section 20(a)(1) claim over Northrop Grumman's PCB sampling activities on Rule 12(b)(1) justiciability grounds, I now analyze this claim under Rule 12(b)(6) for failure to state a claim. Northrop Grumman argues that EPA approval was not required prior to its 2014 to 2017 sampling activities and that therefore the Amended Complaint fails to state a TSCA Section 20(a)(1) claim under Rule 12(b)(6). The

---

[17] Available at https://semspub.epa.gv/work/02/562810.pdf.

Town does not directly address this argument in its opposition brief. (*See generally* MTD Opp'n.) In any event, I agree with Northrop Grumman's analysis: the Town's allegations concerning Northrop Grumman's 2014 to 2017 sampling to determine the scope of PCB contamination at the Park do not state a TSCA Section 20(a)(1) claim to remedy an underlying violation of 40 C.F.R. § 761.61(c).

As an initial matter, I note that the relevant regulation, 40 C.F.R. § 761.61, is internally inconsistent. As explained above, Section 761.61(c)(1) requires "[a]ny person wishing to *sample*, extract, analyze, cleanup, or dispose of PCB remediation waste" in a risk-based cleanup such as this one to submit a Risk Based Disposal Approval Application to EPA and receive EPA approval prior to "conduct[ing] [risk-based] cleanup activities." 40 C.F.R. § 761.61(c)(1) (emphasis added). Section 761.61(c)(1) also requires that the Risk Based Disposal Approval Application *itself* include the components set forth in Section 761.61(a)(3), which in turn requires all Risk Based Disposal Approval Applications to include data concerning "all pre-cleanup characterization samples." 40 C.F.R. § 761.61(a)(3)(i)(B). This requirement is in tension with Section 761.61(c)(1)'s requirement for the submission of a Risk Based Disposal Approval Application in order to "sample . . . PCB remediation waste." 40 C.F.R. § 761.61(c)(1).

Despite the circularity of the requirements set forth in Section 761.61, it is clear that some sampling results must be included in a Risk Based Disposal Approval Application. Section 761.61(c)(1) mandates that such applications meet all of the requirements set forth in Section 761.61(a)(3)(i), which explicitly requires such applications to include "[a] summary of the *procedures used to sample contaminated and adjacent areas*," "a table or cleanup site map showing *PCB concentrations measured in all pre-cleanup characterization samples*," a "summary . . . [of] *sample collection and analysis dates*," and "topographic maps with *sample*

69

*collection sites cross referenced to the sample identification number*s." 40 C.F.R.

§ 761.61(a)(3)(i)(B)–(C) (emphasis added).[18] Poorly drafted as the regulation may be, it would

be impossible for an entity to seek approval for preliminary PCB sampling under

Section 761.61(c)(1) when PCB samples are themselves required for the application to seek such

approval under Sections 761.61(c)(1) and 761.61(a)(3)(i)(B)–(C). The more logical reading of

the Section 761.61 as a whole is that Risk Based Disposal Approval Applications and EPA

approval are required for "cleanup" activities, not the preliminary activities required before a

cleanup. *See* 40 C.F.R. § 761.61(c)(1) ("No person may conduct *cleanup* activities under this

paragraph prior to obtaining written approval by EPA." (emphasis added)).

To the extent that the Town argues that TSCA implementing regulations require EPA

approval of a Risk Based Disposal Approval Application in order to conduct *any* PCB sampling,

such a holding would not only be contrary to the text of the regulation but would also likely be

impracticable. In fact, according to the Town's consultant, DeVinney, Northrop Grumman has

conducted PCB sampling in connection with its excavation of the drums recently found at the

Park, and the Town does not argue that Northrop Grumman should have paused this excavation

and sampling activity in order to file a Risk Based Disposal Approval Application in order to

excavate these drums. (*See* First DeVinney Decl. ¶ 6 ("A sample collected from the black stained

soil on April 22, 2024 from EX-01 contained total polychlorinated biphenyls (PCBs) at a

concentration of 43.1 mg/kg.").)

---

[18] Section 761.61(a)(3)(i)(B) also provides that EPA may request "*additional* characterization sampling" on top of what has been provided in the Risk Based Disposal Approval Application, further underscoring that a Risk Based Disposal Approval Application must include some initial PCB sampling results. 40 C.F.R. § 761.61(a)(3)(i)(B) (emphasis added).

Accordingly, the Town's Section 20(a)(1) claim with respect to Northrop Grumman's PCB sampling activities is also dismissed for failure to state a claim.

E.  RCRA Section 7002(a)(1)(A)

In the alternative to its TSCA Section 20(a)(1) claim, the Town alleges that Northrop Grumman's historical disposal of PCB material at the Park and cleanup plans, which involve reburying PCB material in the Park at a depth of greater than 10 feet without the inclusion of an impermeable liner, are actionable under RCRA Section 7002(a)(1)(A). This RCRA provision permits citizen suits against violators of "any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A); Am. Compl. ¶¶ 155–57. Specifically, the Town alleges that Northrop Grumman's past PCB disposal and contemplated reburial plans are actionable under RCRA Section 7002(a)(1)(A) because they constitute violations of the prohibition on "open dumping" of "solid waste or hazardous waste" set forth in RCRA Section 4005, 42 U.S.C. § 6945, and its implementing regulation 40 C.F.R. § 257.2. (Am. Compl. ¶ 159.)[19]

---

[19] The Amended Complaint also alleges that the RCRA authorizes courts to restrain violations of state regulations—specifically 6 N.Y.C.R.R. § 360.1, which sets forth permitting and operating requirements for landfills, and N.Y. E.C.L. § 27-0704, which prohibits the creation of any new landfill on Long Island. (Am. Compl. ¶¶ 160–61.) At the January 16, 2025 hearing, however, when questioned about whether the Town sought to enforce state regulations through the RCRA Section 7002(a)(1)(A) claim, counsel responded that the Town's "focus is on enforcing the federal regulation" and that the Amended Complaint referenced the state regulations merely for "additional context." (Jan. 16, 2025 Hr'g Tr. 52:23–2.) I have found no legal authority supporting the notion that RCRA Section 7002(a)(1)(A)—which expressly authorizes courts to address "violations[s] of any . . . regulation . . . *which has become effective pursuant to this chapter*"— provides a remedy for violations of non-federal regulations. 42 U.S.C. § 6972(a)(1)(A) (emphasis added). Accordingly, I do not consider whether the Amended Complaint has stated an RCRA Section 7002(a)(1)(A) claim based on the allegation that Northrop Grumman's historical dumping practices violate state regulations.

Northrop Grumman moves to dismiss the Town's RCRA Section 7002(a)(1)(A) claim for lack of subject matter jurisdiction under Rule 12(b)(1). Concerning its historical PCB dumping practices, Northrop Grumman argues that controlling caselaw holds that purely historical disposal does not constitute an "open dump" under the RCRA because RCRA Section 4005 and implementing regulation 40 C.F.R. § 257.2 require the ongoing "introduction" of contaminants, not merely their existence. MTD Mem. at 13–14; *S. Rd. Assocs.*, 216 F.3d at 256 ; *June v. Town of Westfield*, 370 F.3d 255, 259 (2d Cir. 2004). Accordingly, there is no ongoing violation and the claim is moot. (Mem. at 14.) Concerning its plans to rebury certain PCB-contaminated soil, Northrop Grumman again argues that this claim is not ripe since Northrop Grumman is still awaiting EPA approval on its Risk Based Disposal Approval Application. (*Id.* at 14–15.)

Northrop Grumman also moves to dismiss the RCRA Section 7002(a)(1)(A) claim for failure to state a claim under Rule 12(b)(6). First, Northrop Grumman argues that the Town's plan to rebury soil containing PCBs pursuant to its proposed remedy, sanctioned by DEC and awaiting EPA approval, would not qualify as an "introduction" of PCB waste under RCRA Section 4005. (*Id.* at 25.) Second, Northrop Grumman argues that the Town's RCRA Section 7002(a)(1)(A) claim operates as a "collateral attack" on the 2013 DEC ROD; the appropriate remedy, it argues, would have been for the Town to institute an Article 78 proceeding challenging the 2013 DEC ROD within four months of its issuance. (*Id.* at 16–17.)

Applying the ripeness and mootness standards detailed above, *see supra* at Discussion: Motion to Dismiss § II.D.i, I hold that the Town's alternative RCRA Section 7002(a)(1)(A) claim is justiciable. As noted above, the Second Circuit has previously addressed the question of whether historical dumping practices constitute an actionable "introduction" of contaminants under RCRA implementing regulations, specifically analyzing this question under Rule 12(b)(6)

and not Rule 12(b)(1). *S. Rd. Assocs.*, 216 F.3d at 256. This issue is not jurisdictional, and, accordingly, dismissal under Rule 12(b)(1) is not warranted.

Nevertheless, I grant dismissal of the Town's alternative RCRA Section 7002(a)(1)(A) claim under Rule 12(b)(6). The statutory language of the RCRA and implementing regulations, as well as controlling caselaw, are clear that the relevant RCRA implementing regulations only prohibit "the act of *introducing* a substance that causes . . . exceedances, not the action of the [hazardous substance] on the environment." *S. Rd. Assocs.*, 216 F.3d at 256 (emphasis added). Thus, the Town's RCRA Section 7002(a)(1)(A) claim based on Northrop Grumman's historical dumping practices does not establish a claim concerning the "introduction" of contaminants.[20] Accordingly, the Town's RCRA Section 7002(a)(1)(A) claim is dismissed under Rule 12(b)(6).

## F. Public Nuisance

Northrop Grumman moves to dismiss the Town's public nuisance claim both for lack of subject matter jurisdiction and for failure to state a claim. (MTD Mem. at 20–21.) First, Northrop Grumman argues that the Town's public nuisance claim is moot insofar as it seeks injunctive relief to "take all actions necessary to abate" the alleged nuisance, given the remedial efforts already underway. (*Id.* at 21.) Second, Northrop Grumman argues that the Town's claim for damages is time-barred under N.Y. C.P.L.R. § 214-c, which provides a three-year statute of limitations beginning from the earlier of "the date of discovery of the injury . . . or from the date when through the exercise of reasonable diligence such injury should have been discovered by

---

[20] To the extent that the Amended Complaint alleges an RCRA Section 7002(a)(1)(A) claim with respect to the potential *future* backfilling of PCB-contaminated soil on the Park, this claim is dismissed under Rule 12(b)(1). As already discussed above, the plan under which such backfilling would occur is still pending EPA approval and thus is subject to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Traficante*, 966 F.3d at 106.

the plaintiff." *Id.* at 20; N.Y. C.P.L.R. § 214-c(2). Since the Amended Complaint alleges that the

Town knew about the soil contamination at least by 2002 and groundwater contamination at least

by 2003, the statute of limitations with respect to these hazards ran by 2006 at the latest,

according to Northrop Grumman. (MTD Mem. at 21; Am. Compl. ¶¶ 52–54.)

       i.   *Rule 12(b)(1) Justiciability*

The Town's public nuisance claim seeking injunctive relief is not moot. As with the

Town's RCRA Section 7002(a)(1)(B) claim, *see* Discussion: Motion to Dismiss § II.C, the

public nuisance claim is founded on plausible allegations concerning the insufficiency of

Northrop Grumman's coordination with state and federal regulators to remediate the release and

threatened release of hazardous materials in the Park and proposes injunctive relief to abate the

alleged public nuisance, including setting an enforceable schedule for conducting additional PCB

sampling and submitting a Risk Based Disposal Approval Application for EPA approval. (*See*

Am. Compl. ¶¶ 121–31.) Further, unlike the Town's TSCA Section 20(a)(1) claim, which is

premised upon Northrop Grumman *potentially* taking remedial action without the requisite EPA

approval, its public nuisance claim is premised on alleged nuisances actively existing in the Park,

namely the presence of VOCs and PCBs in the soil and groundwater emanating from the Park.

(Am. Compl. ¶¶ 163–65.) Accordingly, the Town's public nuisance claim is justiciable.

       ii.   *Rule 12(b)(6) Failure to State a Claim*

Public nuisance claims seeking damages are governed by the statute of limitations

provided in N.Y. C.P.L.R. § 214–c(2), which sets a limitations period of three years "from the

date of discovery of the [nuisance] by the plaintiff or from the date when through the exercise of

reasonable diligence such [nuisance] should have been discovered by the plaintiff, whichever is

earlier." N.Y. C.P.L.R. § 214–c(2). This statute of limitations applies only to public nuisance

claims for damages, not for injunctive relief. *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004) ("[T]he timeliness of a claim for injunctive relief is not governed by [N.Y. C.P.L.R. § 214–c(2)], and an injunctive remedy may be available to halt a continuing nuisance or trespass even when the recovery of money damages is barred by the statute of limitations."); *Jensen v. Gen. Elec. Co.*, 623 N.E.2d 547, 553–54 (N.Y. 1993). Under this rule, a plaintiff must bring its public nuisance claim for damages within three years of when it "*first* discovered that it had been injured," not within three years of any continuous or recurring injury. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 111 (2d Cir. 2013).

By contrast, public nuisance claims seeking injunctive relief are governed by New York's common law statute of limitations rule. *New York v. West Side Corp.*, 790 F. Supp. 2d 13, 29–30 (E.D.N.Y. 2011). Under this rule, "a continuing injury to real property gives rise to successive causes of action for the duration of the injury, and the right of the property owner to invoke the equitable power of the court similarly continues, regardless of the lapse of time that might occur before the commencement of legal proceedings." *Id.* at 30.

The parties appear to agree that N.Y. C.P.L.R. § 214–c's "discovery" rule applies to the Town's public nuisance claim for damages. Further, the Amended Complaint alleges that the Town discovered soil contamination in 2002 and groundwater contamination 2003. (Am. Compl. ¶¶ 52–54.) Thus, the statute of limitations for seeking damages ran in 2006 at the latest.[21]

---

[21] In its opposition brief, the Town also argues that, even if the discovery rule applies, "the Town is learning of new nuisances caused by [Northrop] Grumman's activities at the Park as recently as this month with the unearthing of chemical drums." (MTD Opp'n at 19–20.) However, the discovery rule requires that the three-year limitations period start at the time of the initial discovery. The Town does not establish that the recently uncovered chemical drums are a different public nuisance, rather than another fact relating to the same public nuisance—soil and groundwater contamination due to Northrop Grumman's historical dumping practices, which were discovered over 20 years ago.

However, concerning the Town's public nuisance claim seeking injunctive relief, the Town has plausibly alleged the existence of a "continuing injury" giving rise to an ongoing violation, which is not time-barred. *See, e.g.*, *Town of Oyster Bay v. Occidental Chemical Corp.*, 987 F. Supp. 182, 209–10 (E.D.N.Y. 1997) (public nuisance claim for injunctive relief concerning groundwater contamination emanating from landfill not time-barred under "continuing injury" theory). Accordingly, to the extent the Town seeks damages for its public nuisance claim, I grant dismissal. To the extent the Town seeks injunctive relief to abate the alleged public nuisance, this claim is not time-barred and dismissal is denied.[22]

## G. Promissory Estoppel

Northrop Grumman raises three arguments in support of dismissing the Town's promissory estoppel claim. First, Northrop Grumman argues that the heightened pleading standard in Federal Rule 9(b) concerning pleadings alleging fraud or mistake applies and that the Amended Complaint does not meet this standard. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); MTD Mem. at 21–22. According to Northrop Grumman, the Amended Complaint does not

---

[22] In its reply brief, Northrop Grumman argues, for the first time, that the Town "cites no authority supporting its claim that limiting access to a portion of the Park during remediation to protect the public constitutes a 'substantial interference with a right common to the public'—a necessary element of a public nuisance claim." (MTD Reply at 9 (citing *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 448 (E.D.N.Y. 2003)).) As Northrop Grumman did not raise this argument in its Motion, it is untimely. *See Pettaway v. Nat'l Recovery Solutions, LLC*, 955 F.3d 299, 305 n.2 (2d Cir. 2020); *Fisher v. Kansas*, 487 F. Supp. 2d 270 (E.D.N.Y. 2007), *aff'd*, 288 F. App'x 721 (2d Cir. 2008). In any event, courts have consistently held that the presence of hazardous chemicals on public property are public nuisances under New York law. *See, e.g.*, *New York v. West Side Corp.*, 790 F. Supp. 2d 13, 29 (E.D.N.Y. 2011) ("Certainly, the release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right, thus making such a release a public nuisance as a matter of New York law."); *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 428 (E.D.N.Y. 2017) (holding that "the release or threat of release of hazardous waste into the environment is clearly a nuisance").

identify a single communication constituting a "clear and unambiguous promise" as required to establish a promissory estoppel claim, and general references to agreements, public statements, and phone calls do not suffice. (MTD Mem. at 22.) Nor does the Town sufficiently allege reliance on Northrop Grumman's promises, since the Town "was never precluded from taking" its own remedial actions. (*Id.*) Second, Northrop Grumman argues that even if the lower Rule 12(b)(6) pleading standard applies, there is still no viable promissory estoppel claim, given that the [2004 and 2014 DEC Administrative Orders on Consent] explicitly disclaim third-party rights and that the general statements to which the Town points are too "vague" and "indefinite" for the purposes of promissory estoppel. (*Id.* at 23.) Third, Northrop Grumman argues that the Town's promissory estoppel claim is time-barred. (*Id.* 23.) According to Northrop Grumman, the relevant statute of limitations is six years from the alleged breach of the relevant promise, which (in Northrop Grumman's view) the Amended Complaint alleges was a deadline Northrop Grumman missed in 2006. (*Id.* at 23–24 (citing Am. Compl. ¶ 26).) Northrop Grumman thus argues that the statute of limitations ran by 2012. (*Id.* at 24.)

A promissory estoppel claim under New York law requires a plaintiff to show: (1) "a clear and unambiguous promise made by the defendant"; (2) "reasonable and foreseeable reliance on that promise"; and (3) "injury to the plaintiff as a result of the reliance." *Lampros v. Banco do Brasil, S.A.*, 538 Fed. Appx. 113, 114 (2d Cir. 2013) (citing *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000)). "A promise is not clear and unambiguous where the allegations are premised on an ambiguity or where the alleged promise is conditional upon further agreements or negotiations." *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, No. 23-8083-cv, 2024 WL 4315128, at *4 (2d Cir. Sept. 27, 2024) (citing *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996)).

The Amended Complaint fails to allege a "clear and unambiguous promise" sufficient to give rise to a promissory estoppel claim.[23] It does not identify any specific promise or promises Northrop Grumman made—instead pointing generally to the various agreements with regulators, statements on its website, and unspecified conversations with the Town. (Am. Compl. ¶¶ 169a–d.) In its opposition brief, the Town generally mentions Northrop Grumman's "representations . . . as to the substance and speed of its recovery efforts that it has not lived up to" without identifying any specific representations. (MTD Opp'n at 23–24.) Such general representations to clean up the Park and to work with DEC and EPA are "conditional upon further agreements [and] negotiations" with the Town and regulators. *Rowe Plastic Surgery of N.J.*, 2024 WL 4315128, at *4. Likewise, the Amended Complaint's allegation that Northrop Grumman's conveyance of the property under the "express condition that [it] be used as a community park induced the Town to expend significant public resources developing the property into a community park" is not sufficient, standing alone, to establish a "promise" with respect to the subject matter at issue here (i.e., remedying the contamination of the Park). (Am. Compl. ¶ 168.) Further, the Town has not sufficiently alleged "reasonable and foreseeable reliance" on any such promise, instead generally claiming that it would have undergone its own remedial efforts and/or pursued legal action sooner had it known Northrop Grumman's remediation efforts would take so long. (Am. Compl. ¶ 170.)

---

[23] Northrop Grumman's argument that I should apply the heightened pleading standard under Federal Rule of Civil Procedure 9(b), concerning pleadings relating to fraud or mistake, is unpersuasive. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); MTD Mem. at 21–22. Northrop Grumman does not point to any alleged fraud or mistake that would trigger this provision, and the promissory estoppel case on which it relies applied Rule 9(b) because the alleged fraud was "an integral part of the conduct giving rise to the claim." *Mumin v. Uber Tech's, Inc.*, 239 F. Supp. 3d 507, 529 (E.D.N.Y. 2017). Accordingly, I apply the usual standard under Rule 12(b)(6) for failure to state a claim.

Because I dismiss the Town's promissory estoppel claim on the ground that it has failed to state a claim under the elements of promissory estoppel, I do not reach the question whether the claim is time-barred under New York's statute of limitations. (*See* MTD Mem. at 23–24.)

## DISCUSSION: MOTION FOR A PRELIMINARY INJUNCTION

### I.    Legal Standards

The Second Circuit has long established that a party seeking a preliminary injunction must show three things: (1) irreparable harm in the absence of an injunction pending resolution of the action, (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party, and (3) that a preliminary injunction is in the public interest. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018). It has made clear that when a party seeks "mandatory" rather than "prohibitory" preliminary relief, "the likelihood-of-success and irreparable-harm requirements become more demanding still, requiring that the plaintiff show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, No. 23-690, 2024 WL 1145347, at *3 (2d Cir. Mar. 18, 2024) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)) (emphasis in original).

A mandatory temporary restraining order typically requires the non-movant to take some action, whereas a prohibitory temporary restraining order "typically requires the non-movant to refrain from taking some action." *Id.* Determining whether the requested preliminary relief is mandatory or prohibitory "is sometimes unclear":

> In borderline cases, essentially identical injunctions can be phrased either in mandatory or prohibitory terms. We have therefore explained that [p]rohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it. In this context, the status quo is really the status quo *ante* –

that is, the last actual, peaceable[,] uncontested status which preceded the pending

controversy.

*Id.* (citing *N. Am. Soccer League*, 883 F.3d at 36 n.4, 37 n.5).

The Town claims that it seeks a prohibitory injunction subject to the lower standard,

characterizing the relief it seeks as a "preliminary injunction prohibiting [Northrop] Grumman

from reburying contaminated soils on Park property." (PI Mem. at 16.) It asserts that Northrop

Grumman's plan to rebury the soil following its investigation would alter the status quo ante by

redistributing the contaminants and thus "mak[ing] characterizing the Park more difficult,"[24]

while disposing of the soil off-site would preserve the status quo. (PI Reply at 4.) By contrast,

Northrop Grumman argues that the Town seeks a mandatory injunction, not just prohibiting it

from reburying the contaminated soil but affirmatively requiring it to "immediately and

permanently remove any excavated soil from the Park." (PI Opp'n at 13.)

In light of the status quo between the parties at the time the PI Motion was filed, the

Town seeks a mandatory injunction. On November 11, 2024, the Anomaly Workplan had been

approved and work was about to begin the following day, but none of the thirteen test pits

contemplated by the plan had yet been dug. The Town expressly does not seek to preserve this

status quo by enjoining the Anomaly Workplan altogether. (PI Mem. at 6 (stating that "the Town

does not seek to delay [the Anomaly Workplan] investigation").) Nor does the Town merely seek

to prohibit Northrop Grumman from reburying soil that it has already dug up. Rather, the Town

contemplates that the Anomaly Workplan will begin, and asks me to issue an injunction ordering

Northrop Grumman to, among other actions, "place any excavated soil that will be dug up

---

[24] At the January 16, 2025 hearing, counsel for Northrop Grumman explained that
"characterization" refers to sampling the soil to determine the contents and concentrations of
contaminants. (Jan. 16, 2025 Hr'g Tr. 114:2–3.)

pursuant to the Anomaly Workplan into bulk waste transport containers . . . or load any excavated soil directly into dump trucks or trailers for off-site disposal." (PI Proposed Order at 3 ¶ 3.) This is a mandatory injunction, which seeks to alter the "last actual, peaceable, uncontested status which preceded the pending controversy."[25] *See Daileader*, 2024 WL 1145347, at *3. Accordingly, the higher standard—requiring a *clear or substantial* likelihood of success on the merits and a *strong showing* of irreparable harm—applies. *See id.*

## II.    Analysis

In its motion papers, the Town seeks a preliminary injunction ordering the following: (1) that Northrop Grumman is "enjoined from redepositing any excavated soil during the course of the investigations of buried drums and related soil sampling in the Park"; (2) that Northrop Grumman "place any excavated soil directly into bulk waste transport containers (e.g., 'roll-offs') or load any excavated soil directly into dump trucks or trailers for off-site disposal"; (3) that the off-site disposal location be "an appropriately licensed disposal facility"; and (4) that a status hearing before the Court be set for 60 days after the entry of the injunction. (PI Proposed Order at 3–4.) In its supplemental submissions following the January 16, 2025 hearing, the Town makes additional requests for changes to the Anomaly Workplan, including: (1) that Northrop Grumman should be required to test excavated soil from all test pits, not only those containing encasements, drums, or "grossly contaminated media"; (2) that the term "grossly contaminated media," as used in the Anomaly Workplan, should be interpreted to include soil with visible

---

[25] The fact that the Town seeks a mandatory injunction is further underscored by its representations in its supplemental submissions following the Court's January 16, 2025 hearing. (*See* Town Suppl. Opp'n Ltr. at 4–5 (seeking to negotiate the definition of "grossly contaminated media" in the Anomaly Workplan); *id.* at 5–6 (seeking to be permitted to conduct its own independent sampling of soil excavated pursuant to the Anomaly Workplan).) These submissions make clear that the Town does not merely seek to enjoin enforcement of a specific provision of the Anomaly Workplan, but rather to renegotiate various provisions of the Anomaly Workplan.

evidence of "sludge and sludge-like materials"; and (3) that the soil sampling should specifically test for hexavalent chromium, not only total chromium. (Town Suppl. Opp'n Ltr. at 1–2.) Despite raising these additional objections to the Anomaly Workplan's terms, the Town has not filed a modified motion for a preliminary injunction, nor has it represented that it intends to file any such modification. (*See* Min. Entry, Jan. 16, 2025 (ordering that the Town's supplemental submission "must specifically address whether it would like to withdraw or modify its PI Motion in light of the representations made by Northrop Grumman at the January 16, 2025 hearing").)

As an initial matter, Northrop Grumman asks me to deny the PI Motion based on certain arguments advanced in the Motion to Dismiss. Northrop Grumman again argues that the Court lacks subject matter jurisdiction over the Town's RCRA and TSCA claims. (PI Opp'n at 9–10.) While I dismissed a portion of the Town's TSCA Section 20(a)(1) claim for lack of subject matter jurisdiction and the remainder of that claim under Rule 12(b)(6), this Court has subject matter jurisdiction over the Town's RCRA Section 7002(a)(1)(B) claim for "imminent and substantial endangerment" as addressed above.[26] The PI Motion is vague as to which claims it advances in support of its argument for preliminary injunctive relief and instead generally references the RCRA and TSCA. At a minimum, however, the Town clearly seeks a preliminary injunction with respect to its RCRA Section 7002(a)(1)(B) imminent and substantial endangerment claim. (PI Mem. at 19 ("The evidence demonstrates that there may be an imminent and substantial endangerment to the public's health and safety if [Northrop] Grumman is permitted to continue to rebury contaminated soils.").) Thus, this Court has subject matter jurisdiction to decide the Town's PI Motion.

---

[26] *Supra* at Discussion: Motion to Dismiss § II.C.

In opposition to the Preliminary Injunction Motion, Northrop Grumman reiterates its abstention arguments under the primary jurisdiction doctrine. (PI Opp'n at 10–13.) As addressed above, I declined to abstain from addressing the Town's RCRA Section 7002(a)(1)(B) imminent and substantial endangerment claim and New York common law public nuisance claim for injunctive relief. The Town's PI Motion seeks preliminary relief under these claims. Accordingly, for the reasons provided above, I decline to abstain from deciding the Town's PI Motion under the primary jurisdiction doctrine.[27]

Turning to the elements required for a preliminary injunction—a strong showing of irreparable harm, clear likelihood of success on the merits, the balance of the equities, and the public interest—I find that the Town has not established that a preliminary injunction is warranted here.

A.  Irreparable Harm

The Town presents three arguments that it will be irreparably harmed unless I issue the requested preliminary injunction. First, the Town argues that if the Anomaly Workplan goes forward without a preliminary injunction requiring removal of all soil excavated during the process of investigating the existence of additional buried drums, "the hazardous wastes are likely to be moved closer to the surface where the potential for detrimental human exposure is greater." (PI Mem. at 14.) According to the Town, since hexavalent chromium is toxic through inhalation, there is a risk that reburial of the soil will "generate new exposure pathways through surfacing buried materials which could be released to air as dust." (PI Reply at 4.) The Town characterizes the Anomaly Workplan's directive to redeposit the soil in reverse order as

---

[27] *Supra* at Discussion: Motion to Dismiss § II.A.

unrealistic because, "[e]ven with maximum possible care, using a backhoe to excavate ten-foot holes, place sludge dirt in piles, and then push it back into the holes will unavoidably result in extensive redistribution of contaminants." (*Id.*at 4.)[28]

Second, the Town argues that "hazardous waste will remain in the Park soils and the full extent of contamination will remain unknown." (PI Mem. at 14.) Consequently, the Town argues, the redistribution of soil as it is reburied will "make it impossible for Town residents to characterize the Park for remediation." (PI Reply at 4.)

Third, the Town argues that "reburied contaminated soil could remain at the Park indefinitely." (PI Mem at 15.) Although DEC claims that the reburial of soil is a temporary solution as the PCB remediation plan is implemented (which will result in the re-excavation and off-site disposal of Park soil), the Town suspects this remediation will not be completed for "several years." (*Id.*) Further, the Town argues that the eventual excavations will not necessarily remove all soil contaminated with hexavalent chromium, given that it will only target areas contaminated with PCBs. (*Id.*) In other words, soil contaminated with hexavalent chromium but not PCBs (if any such soil exists at the Park) will not necessarily be removed.

---

[28] *See also* Third Shea Decl. ¶ 6 ("This is impracticable because the excavated soil, and the hazardous substances contained within, will be subject to unavoidable mixing of soil from different depths. First, as the excavator bucket digs the hole in the ground, some soil from the sidewalls will slough or fall into the open pit, while some will spill back into the hole from the bucket as it maneuvers to the surface, redistributing the soil. Next, when the soil is presumably placed on plastic sheets near the hole, the soil from one bucket will inevitably partially overlap with soil from another bucket. Then, after completion of the pit, the soil will undergo further mixing as it is returned to the pit because each bucket will contain a different distribution/configuration of soil then was present when it was undisturbed in the ground. Replacing each bucket of soil at its original location and depth is simply not plausible."); Jan. 16, 2025 Hr'g Tr. 79:22–23 ([Town's counsel] MR. PREWITT: "It's not like it's just going to stay there on the surface. They can either put it back while they dig it out and by definition that means the contaminants are going to be mixed up.").

Northrop Grumman argues that "[t]he current state of the Park and Northrop Grumman's planned investigation present no imminent risk of any harm, much less irreparable harm, to the public." (PI Opp'n at 21.) Concerning the Town's claims that "hazardous waste will remain in the Park soils and the full extent of the contamination will remain unknown," Northrop Grumman notes that the 2013 DEC ROD and EPA's review and approval of Northrop Grumman's eventual Risk Based Disposal Approval Application will require further sampling and remediation. (PI Opp'n at 22.) Concerning the "potential" for human exposure, Northrop Grumman characterizes the Town's concerns as too speculative to constitute a showing of irreparable harm under the RCRA. (PI Opp'n at 22 (citing *Christie-Spencer Corp. v. Hausman Realty Co., Inc.*, 118 F. Supp. 2d 408, 423 (S.D.N.Y. 2000) ("Because the danger is de minimis or non-existent, there is no danger to the public interest for the purposes of irreparable injury.")).)

"Notwithstanding the broad powers of RCRA's citizen suit provision, the commencement of a[n] RCRA suit does not automatically warrant entry of [a preliminary] injunction." *Christie-Spencer Corp.*, 118 F. Supp. 2d at 420. "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge . . . is not mechanically obligated to grant an injunction for every violation of law." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). "Courts should decline granting preliminary injunctive relief if, for instance, the risk of harm is speculative in nature." *Phoenix Beverages, Inc v. Exxon Mobil Corp.*, No. 12-cv-3771, 2015 WL 588826, at *4 (E.D.N.Y. Feb. 11, 2015); *see also Faiveley Trans. Malmo AB, v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (holding that irreparable harm must be "neither remote nor speculative, but actual and imminent").

"In cases brought pursuant to an environmental health statute, the focus of the irreparable harm inquiry shifts to the concern for the public interest." *Phoenix Beverages, Inc.*, 2015 WL 588826, at *4 (citing *Christie-Spencer*, 118 F. Supp. 2d at 423). In *Phoenix Beverages*, the Court denied a motion for mandatory preliminary injunction requiring the defendant gas corporation to install a methane monitoring and extraction system emanating underneath the plaintiff's property from a waste plume. *Id.* at *5. The court reasoned that, while methane is flammable, the plaintiffs "fail[ed] to present evidence that the methane under the . . . building is likely to ignite, or is likely to migrate to an enclosed space where ignition can occur." *Id.*

Here, the Town has failed to show irreparable harm absent the specific injunctive relief they seek. The Town, through its expert Shea, establishes that hexavalent chromium is carcinogenic, and that there is evidence of hexavalent chromium in the soils sampled near the unearthed barrels. (Second Shea Decl. ¶¶ 13, 20; ECF No. 40-9; ECF No. 43.) However, the Town has not established that the specific action it seeks to enjoin—temporarily reburying the soil excavated in connection with the Anomaly Workplan in the same hole from which it was excavated—would cause irreparable harm because the area in question is closed to the public. (Am. Compl. ¶ 2 ("[P]art or all of the [] Park has been closed to the public since [2002]."); Second Shea Decl. ¶ 10 (stating that "the ballfield has been closed to the public since 2002" and "the skate park area was recently closed to accommodate Northrop Grumman's remedial activities); PI Opp'n at 7–8 (citing Anomaly Workplan at 2).) As in *Phoenix Beverages*, where the plaintiffs could not show that an explosion was likely, the Town has not shown here that any members of the public are likely to come into contact with the contaminated soil due to its reburial. Additionally, the Town does not object to excavating soil for the thirteen test pits as part of a plan to discover additional buried drums and does not show why the specific act of

reburying that soil—rather than the excavation of it in the first place—would disperse hexavalent chromium contamination into the air. (Second Shea Decl. ¶ 13 (claiming only that hexavalent chromium is carcinogenic "via inhalation exposure").) Indeed, the Town does not explain why excavating the contaminated soil and bringing it to surface-level (which it *does not* seek to enjoin, and, in fact, wants to go forward[29]) *will not* cause irreparable injury while reburying that same soil (which it *does* seek to enjoin) *will* cause irreparable injury.

Moreover, the Town's claim that, given DEC's and Northrop Grumman's track record for delay, it is likely that the soil will not be reburied on a temporary basis is speculative. At the January 16, 2025 hearing, counsel for Northrop Grumman represented, and the Town did not dispute, that the ultimate remediation of the Park soil requires EPA approval of the forthcoming Risk Based Disposal Approval Application, and, thus, the timeline for the ultimate remediation of the Park is somewhat based on EPA's actions. (*See* Jan. 16, 2025 Hr'g Tr. 121:12–16 ("Once EPA approves it can [*sic*] work will be done, whatever soil needs to be removed will be removed. Whatever soil needs to be remediated will be remediated and we would give the ball field back to the town, which is in everybody's interest.").) Whatever the ultimate timeline for Park remediation is, the Town has not shown why the Anomaly Workplan's procedure (reburying the potentially contaminated soil for a period of time until the Park's ultimate remediation) would cause irreparable harm, versus the alternative proposed by the Town (backfilling the test pits with new, uncontaminated soil to mix with the Park's contaminated soil for a period of time until the Park's ultimate remediation).

---

[29] Jan. 16, 2025 Hr'g Tr. 80:1–6 ("We are not asking the court to enjoin DEC. What we are asking is that the court issue a very limited prohibitory injunction, prohibiting Grumman from doing one specific thing, prohibiting Grumman from putting back into the ground contaminants that they are going to put on the surface first.").

The Town has also not provided evidence to support its claim that reburial of the soil would irreparably complicate its efforts to "characterize" the extent of the contamination—i.e., to identify the nature and extent of the contamination of the Park's soil. Here too, the Town does not explain why disposing of the soil excavated from the test pits off-site (where presumably it will not be able to test it *at all*) *would not* constitute irreparable harm, while reburying the soil (where it would remain at the Park for testing, albeit disturbed from its original state) *would*.

The Town's supplemental submissions following the January 16, 2025 hearing further underscore its failure to make a showing of irreparable harm here. At the January 16, 2025 hearing, Northrop Grumman represented that under the Anomaly Workplan, it would conduct sampling of soil surrounding any encasements or drums uncovered, and the Town indicated that it had not previously understood this to be the case. (Jan. 16, 2025 Hr'g Tr. 137:9–13 ("We have to see what these anomalies are or are not and the DEC has entered a work plan that both parties here had a chance to comment on. That followed the same approach that has been used previously."); *id.* 140:17–18 ("It is a different understanding than we had coming to court."); *id.* 128:16–19 ("So it's surprising to us and a relief to if [Northrop] Grumman is actually saying that they are going to diligently sample the soil that is excavated and haul it off.").) In light of these developments, I noted that the extent of the sampling and disposal contemplated under the Anomaly Workplan "sounds different to the [T]own based on what they understood previously" and that the Town "may need some time to think about whether this impacts their precise request for a preliminary injunction." (*Id.* 140:12–16.) Accordingly, I ordered Northrop Grumman to provide a detailed submission describing the sampling and disposal procedures used in connection with its prior drum investigation and removal at the Park (i.e., the same procedures it represented on the record in court that it intends to use again in this instance) and the Town to

respond by "specifically address[ing] whether it would like to withdraw or modify its PI Motion in light of the representations may be Northrop Grumman." (Min. Entry, Jan. 16, 2025.)

In its February 6, 2025 response to Northrop Grumman's letter outlining the Anomaly Workplan procedure, the Town raised issues with the mechanics of Northrop Grumman's plans to sample the soil excavated pursuant to the Anomaly Workplan, specifically: (1) that it intends to sample soil only from test pits that contain encasements, drums, or "grossly contaminated media"; (2) that its definition of what constitutes "grossly contaminated media" "omits soil with visible evidence of sludge or sludge-like materials known to contain hazardous levels of toxic chemicals, including hexavalent chromium"; and (3) that it only intends to sample soil for total chromium, not hexavalent chromium specifically. (Town Suppl. Opp'n Ltr. at 1.) However, the Town did not represent that it would like to "withdraw or modify" the preliminary injunctive relief it has requested. (*See id.*) Thus, while the Town's subsequent correspondence filed with the Court indicates that it believes the extent of the sampling plan Northrop Grumman is contemplating in connection with the Anomaly Workplan is deficient, the issue of whether the Town would be irreparably harmed if Northrop Grumman carries out this allegedly deficient sampling plan is not relevant to this PI Motion because those aspects of the Anomaly Workplan are not before the Court on this Motion. The Town has not sought a mandatory preliminary injunction requiring Northrop Grumman to undertake specific sampling with respect to all soil excavated pursuant to the Anomaly Workplan or to allow the Town to conduct its own testing of all soil. (*See generally*, PI Mot.) Concerning the relief it has sought in the PI Motion—an order requiring Northrop Grumman to cart away all soil dug up pursuant to the Anomaly Workplan— the Town has not shown why this would cure any irreparable harm that may result in the event that Northrop Grumman does not conduct sufficient sampling of the soil prior to carting it away.

Accordingly, the Town has not made a strong showing of irreparable harm, as required to succeed in securing a mandatory preliminary injunction.

B. <u>Success on the Merits</u>

The Town argues under the lower prohibitory injunction standard that the requested injunction "raises sufficiently serious questions relating to the merits" of their claims and that the "balance of harms tips heavily in the Town's favor." (PI Mem. at 17–20.) As to the merits of its claims, the Town argues that denial of the requested injunction requiring the removal and disposal offsite of soil excavated from the test pits raises the risk that longstanding contamination at the Park would threaten the public health and the environment with an imminent and substantial endangerment, particularly "when wastes which had been historically present at depth are disinterred and reburied in shallower (or even surface) soil where the potential for human contact and/or offsite migration is far greater." (*Id.*) The Town concedes that the area at issue is currently restricted from public access but argues that "DEC cannot guarantee that holds true 3, 5, 10, or 20 years into the future." (*Id.*)

Northrop Grumman raises four arguments in opposition. First, it relies on Second Circuit and district court authority to argue that the Town's allegations of an "endangerment" under RCRA Section 7002(a)(1)(B) are too speculative. (PI Opp'n at 16 (citing *Simsbury-Avon*, 575 F.3d at 210 ("No matter how broadly read . . . the text of [RCRA Section 7002(a)(1)(B)] requires the presence of . . . hazardous waste that may present an 'endangerment' that is 'imminent' and 'substantial.'")).) Northrop Grumman emphasizes that the relevant area of the Park is closed and that DEC found that "people will not come into contact with site-related contaminants in soil unless they dig below the surface." (*Id.* at 16–17.)

Second, Northrop Grumman argues that the Town's claims of new risks to human health resulting from the Anomaly Workplan are misleading. It notes that the Anomaly Workplan calls for the reburial of soil "in reverse order" and requires that the area be "restricted to prevent any public access or exposure to the contaminated soil while it temporarily remains on site and will be managed appropriately before being placed back into the shallow test pit where the soil originated from." (PI Opp'n at 17 (citing Oct. 11, 2024 DEC Ltr. to Town).)

Third, Northrop Grumman dismisses the Town's claim that the Park area subject to excavation and testing in the Anomaly Workplan might not always be restricted as "rank speculation." (*Id.* at 18.) Likewise, it characterizes the Town's claim that DEC has engaged in "decades-long" non-enforcement of the Park remediation plans is "irrelevant" to the question whether he reburial of the Park soil presents an imminent and substantial endangerment under the RCRA. (*Id.*)

Fourth, Northrop Grumman claims that the Town misrepresents the record regarding the presence of hexavalent chromium in the Park. Northrop Grumman maintains that the Park property was never used for hexavalent chromium dumping, pointing to a 1963 letter from the Nassau County Department of Health, which reports that the "less toxic" trivalent chromium was deposited at the Park "with this department's knowledge and consent." (PI Opp'n at 19 (citing Dec. 19, 1963 Nassau Cnty. Dep't of Health Ltr. to Town).) Northrop Grumman also notes that the 1992 RCRA Hazardous Waste Management Permit—the document on which the Town relies to argue that Northrop Grumman produces hexavalent chromium waste—refers to activities that took place 30 years after Northrop Grumman conveyed the Park land. (*Id.* at 19–20 (citing 1992 RCRA Hazardous Waste Management Permit (Excerpt I)).) Further, the Town points to a section in the 1992 RCRA Hazardous Waste Management Permit indicating that the hexavalent

chromium "paint dust, chips, and sludge" waste referenced in the document were actually disposed off-site and did not remain in the Park. (*Id.* at 20.) Finally, Northrop Grumman disputes the applicable regulatory standards, arguing that the concentration of 33.4 mg/kg hexavalent chromium found in one of the Town's soil samples is still below current regulatory standards, and that hexavalent chromium accounted for only 0.2% of the total chromium found in that sample. (*Id.*) It argues that no soil samples contained hexavalent chromium or total chromium exceeding the applicable regulatory standards. (*Id.*)

"No matter how broadly read . . . the text of [RCRA Section 7002(a)(1)(B)] requires the presence of . . . hazardous waste that may present an 'endangerment' that is 'imminent' and 'substantial.'" *Simsbury-Avon*, 575 F.3d at 210. A preliminary injunction is appropriate only "if such injury is sufficiently likely." *Phoenix Beverages, Inc.*, 2015 WL 588826 at *4 (citing *Amoco Prod. Co.*, 480 U.S. at 545).

Here, the Town has not met its burden to show a clear likelihood of success on the merits of its RCRA Section 7002(a)(1)(B) and public nuisance claims—or even the lower standard of a likelihood of success on the merits—with respect to the temporary reburial of hexavalent chromium-contaminated soil that will be excavated in the process of searching for additional buried drums pursuant to the Anomaly Workplan. There are two reasons for this conclusion.

First, the Town's RCRA Section 7002(a)(1)(B) and public nuisance claim for injunctive relief—the two claims that survive NG's Motion to Dismiss—concern the alleged imminent and substantial endangerment caused by PCB and VOC contamination—not contamination by hexavalent chromium. Indeed, the Amended Complaint makes no reference to hexavalent chromium at all, much less any allegations regarding an imminent and substantial endangerment posed by the presence of hexavalent chromium at or near drums and/or encasements buried

underneath the Park.[30] (*See generally* Am. Compl.) Accordingly, the Town has not explained how it is clearly likely to succeed on its claims concerning PCB and VOC contamination or how its success on that specific claim supports the extraordinary remedy of a preliminary injunction concerning one aspect of the plan approved by DEC to discover buried drums causing the asserted hexavalent chromium contamination in one part of the Park. *See Williams v. Rosenblatt Securities Inc.*, 136 F. Supp. 3d 593, 616 n.11 (S.D.N.Y. 2015) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."); *Roundtree v. City of New York*, No. 15-cv-8198, 2018 WL 4335509, at *2 (S.D.N.Y. Sept. 11, 2018) (collecting cases).[31]

Second, for the same reasons addressed in the context of irreparable harm, the current record does not show that the reburial provision of the Anomaly Workplan constitutes an "imminent and substantial endangerment." *See* Discussion Motion for a Preliminary Injunction § II.A. On this point, I again emphasize the limited and specific preliminary injunctive relief that the Town seeks here—an order requiring Northrop Grumman to cart off-site all soil excavated pursuant to the Anomaly Workplan. The Town does not explain why *reburial* of the contaminated soil following the conclusion of the Anomaly Workplan investigation constitutes

---

[30] The Amended Complaint's five references to "chromium" (Am. Compl. ¶¶ 43, 52, 67, 77, 78) are insufficient to state a claim under RCRA Section 7002(a)(1)(B) or New York public nuisance law for multiple reasons, including because: (1) the Amended Complaint only references "chromium," not specifically the highly carcinogenic "hexavalent chromium"; and (2) although the Amended Complaint makes reference to "chromium," it does not allege any harm caused by chromium specifically.

[31] The Amended Complaint's failure to raise any allegations regarding the presence of hexavalent chromium or the presence of toxic waste drums and encasements buried underneath the Park is understandable, since the first drums were not discovered until late March 2024, after the Amended Complaint was filed. For this reason, I grant the Town leave to file a second amended complaint under Rule 15(a)(2). *See* Discussion: Motion for a Preliminary Injunction § III.

an imminent and substantial endangerment, as opposed to the digging up of the soil in the first place or the transportation of the soil off-site (both of which the Town does not object to).

For these reasons, the Town has not demonstrated a clear likelihood of success on the merits, or even the lower standard of a likelihood of success on the merits, of its RCRA Section 7002(a)(1)(B) and public nuisance claims for injunctive relief.

## C. Public Interest and Balance of the Equities

The Town argues that the injunction it requests will serve the public interest because "[t]he Town should not be expected to sit idly by and wait for remediation to be completed slowly and ineffectively." (PI Mem. at 21.) It generally asserts that "[t]he public has a strong interest in a court order barring [Northrop] Grumman from reburying contaminated soil at the Park." (*Id.*) It similarly argues that the balances of the equities tips in its favor because the plan to rebury excavated soil in the test pits threatens to put hexavalent chromium in the air which may be inhaled by workers and residents, especially given that there is not yet a timeline in place for the ultimate remediation of the Park. (*Id.* at 20.) Finally, the Town argues that removing the soil "would safeguard the health and safety of Park workers and of the Town residents" while coming at relatively little cost to Northrop Grumman. (*Id.* at 20–21.) The Town cites Shea's estimate that off-site disposal will cost Northrop Grumman less than $250,000, which is far less than the "tens of millions" Northrop Grumman has already spent on remediation. (*Id.*)

In opposition, Northrop Grumman notes that the Town's PI Motion forced Northrop Grumman to pause the implementation of the Anomaly Workplan, which, according to DEC "set[] back cleanup actions and [extended] the time for restoration of the [P]ark, contrary to [the parties'] mutual goals." (PI Opp'n at 24 (citing Sept. 25, 2024 DEC Ltr. to Town).) Northrop Grumman also asserts that the balance of the equities tips in its favor because the proposed

preliminary injunction will upend a complex, multifaceted remediation plan of which the investigation into buried drums is just one part. Northrop Grumman also claims that Shea's $250,000 estimated cost for off-site disposal is "baseless and inaccurate," but does not explain the alleged inaccuracy or provide any evidence that would support an alternative estimate of the cost of the requested preliminary injunctive relief. (*Id.* at 23.)

As to the public interest, there is no doubt that the contamination at the Park has long-interfered with the ability of the Town residents to use the Park. Moreover, the contaminants at the Park (hexavalent chromium, PCBs, and VOCs) are known to be hazardous to human health. Accordingly, the public has a strong interest in the remediation of the Park land. Nevertheless, I also understand DEC's argument, recited here by Northrop Grumman, that the injunctive relief the Town requests would cause *more* harm to the public interest than would temporarily reburying the soil that will be excavated from the test pits pursuant to the Anomaly Workplan. As DEC observed:

> [R]equiring Northrop Grumman to transport and dispose of test pit soils, backfill with clean soil, and subsequently removing that same soil (which would then be intermixed with contaminated soils around it) a second time during the larger excavation . . . is inefficient, wasteful, and incompatible with the State's policy under DER-31 to reduce greenhouse gas emissions during remedy implementation.

(Oct. 11, 2024 DEC Ltr. to Town.) Thus, the Town has not made a clear showing that the requested injunctive relief would serve the public interest.

As to the balance of the equities, I find that there are compelling equities on both sides. The record raises numerous equities in favor of the Town. In 1962, Northrop Grumman conveyed the property to the Town on the express condition that it be used as a public park; it was thus fully aware that the Town's residents would use their unremediated former hazardous waste dump for recreational activities. (Am. Compl. ¶¶ 1, 2, 14, 42, 47.) The Town first closed

the Park in 2002 upon discovery of PCB contamination, and today, more than 22 years later, significant contamination remains and portions of it remain closed. (*Id.* ¶¶ 2, 53.) Despite Northrop Grumman's statements regarding the diligence of its PCB cleanup efforts, it has still not submitted a Risk Based Disposal Approval Application to EPA. (*Id.* ¶ 90.) Likewise, Northrop Grumman has thus far only addressed approximately 22% of the area in need of VOC remediation. (First Shea Decl. ¶ 13.) In 2024, Northrop Grumman found over a dozen metal barrels containing highly flammable chemicals that had been buried in the Park. (*Id.* ¶ 11.) The Town—through its own testing because Northrop Grumman deemed such testing unnecessary—also found yet another hazardous substance in the Park soil: hexavalent chromium. (Second Shea Decl. ¶ 20.) Accordingly, the Town has legitimate concerns regarding Northrop Grumman's and DEC's approach to the Park remediation.

Nevertheless, there are equities weighing in favor of Northrop Grumman as well. In particular, Northrop Grumman engaged with DEC to devise and receive DEC approval of the Anomaly Workplan. DEC views the Anomaly Workplan's reburial provision as a safer method than the Town's off-site disposal proposal. DEC believes that the restrictions in place will "prevent any public access or exposure to the contaminated soil while it temporarily remains on site." (Oct. 11, 2024 DEC Ltr. to Town, ECF No. 41-4 at 1–2.)

Therefore, given that the irreparable harm, likelihood of success on the merits, and public interest factors weigh in favor of Northrop Grumman and that the balance of the equities does not decisively favor either party, I deny the Town's PI Motion.

## III.    Amendment

As noted above, in pleading RCRA Section 7002(a)(1)(B) and public nuisance claims, the Amended Complaint does not allege an imminent and substantial endangerment posed by the presence of hexavalent chromium at or near drums and/or encasements buried underneath the

Park. Thus, the Town's PI Motion fails in part because the Amended Complaint does not allege any facts concerning hexavalent chromium contamination, which is the subject of the PI Motion.

I previewed this concern at the January 16, 2025 hearing. There, I stated:

> One disjunct I see, is that the amended complaint doesn't talk about hexavalent chromium at all. The preliminary injunction motion is focused on it because these drums were discovered after the fact. We talked about this a little bit during the motion to dismiss argument, whether there needs to be supplementation of the allegations of the amended complaint such that claims concerning substantial and imminent endangerment regarding hexavalent chromium are encompassed within the RCRA claim, and your response at the time was no. You don't need to supplement the amended complaint at all.

(Jan. 16, 2025 Hr'g Tr. 94:24–95:11.) Counsel to the Town responded, "We defer to your Honor." (*Id.* 95:12.)[32]

Rules 15 and 16, Fed. R. Civ. P., govern parties' ability to amend their pleadings, and "when read together, set forth three standards for amending pleadings that depend on when the amendment is sought." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021). First, Rule 15(a)(1) permits a party to "freely amend [its] pleadings . . . as of right without court permission" 21 days after a complaint is served or 21 days after service of a responsive pleading or motion under Rule 12(b), (e), or (f), Fed. R. Civ. P. *Sacerdote*, 9 F.4th at 115. Second, after the time to amend as of right has passed—"either upon expiration of a specified period of time in a scheduling order or upon expiration of the default period set forth in Rule 15(a)(1)(A)"—a party

---

[32] *See also id* 35:17–25:

> THE COURT: Okay. So does the current pleading, does the current amended complaint encompass the town's argument that there's a substantial and imminent endangerment resulting from not just PCB and VOC contamination, but from hexavalent chromium contamination?

> MR. PREWITT: There is certainly more information that is available to the town now that we could assert by a further amended complaint if it would be helpful for the court to do so.

may amend its pleading "only with the opposing party's written consent or the court's leave." *Id.*; Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) sets forth a lenient standard under which "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2)*.* "Leave to amend [under Rule 15(a)(2)] should be freely given unless there is any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 148 n.4 (2d Cir. 2020); *see also Adlife Mktg. & Commc'ns Co. v. Best Yet Mkt., Inc.*, No. 17-cv-2987, 2018 WL 4568801, at *1 (E.D.N.Y. Sept. 24, 2018) ("Unless there is a showing of bad faith, undue delay, futility or undue prejudice to the non-moving parties, the district court should grant leave to amend."). Third, the period for amendment under Rule 15(a)(2) ends upon expiration of the date set by the court as the deadline after which no amendment will be permitted, at which point the plaintiff must show "good cause" to alter the schedule under Rule 16(b)(4). *Sacerdote*, 9 F.4th at 115.

Here, the Town has already amended the original Complaint once as of right. (Am. Compl.) Further, the Court has not yet set a date after which no amendment will be permitted.[33] Thus, Rule 15(a)(2)'s lenient standard for leave to amend applies.

Applying Rule 15(a)(2), I grant the Town leave to file a second amended complaint to bring any claims or raise any factual allegations relating to the alleged presence of hexavalent chromium at the Park. The Town's failure to plead facts relating to hexavalent chromium was

---

[33] Although the parties in their joint discovery plan propose a final amendment deadline of 60 days following the Court's decision on the Motion to Dismiss, Magistrate Judge Shields, to whom this case is referred for such matters, has not so-ordered the parties' plan. (ECF No 27 at 3.)

not the result of bad faith because, as previously noted, the reason for this failure was the simple fact that the barrels containing hazardous materials were not discovered until late March 2024, after the Amended Complaint was filed. Further, amendment with respect to this issue would not unduly delay the proceedings or prejudice Northrop Grumman, since the litigation is still in its early stages, and to-date the parties have only conducted limited "Tier I" discovery. (Elec. Order, Apr. 11, 2024 (setting Tier I discovery deadline of June 28, 2024).) Finally, while I reserve decision on the viability of any claims arising out of the alleged presence of hexavalent chromium at the Park, I find that amendment at this stage would not be futile since the presence of this known hazardous substance could, at least in theory, form the basis of an RCRA Section 20(a)(1)(B) "imminent and substantial endangerment" claim and a New York public nuisance claim.

Accordingly, within 60 days of the issuance of this Opinion and Order, the Town may file a second amended complaint specifically for the purpose of pleadings claims and/or facts concerning the alleged presence of hexavalent chromium at the Park.

## CONCLUSION

For the reasons explained above, Northrop Grumman's Motion to Dismiss the Amended Complaint (ECF No. 31) is granted in part and denied in part. I grant Northrop Grumman's Motion to Dismiss the Town's TSCA Section 20(a)(1) claim, its RCRA Section 7002(a)(1)(A) claim, its promissory estoppel claim, and its public nuisance claim, to the extent that the public nuisance claim seeks damages. I deny Northrop Grumman's Motion to Dismiss the Town's RCRA Section 7002(a)(1)(B) claim and its public nuisance claim, to the extent that the public nuisance claim seeks injunctive relief. I also deny Northrop Grumman's request that I abstain from hearing this case pursuant to the primary jurisdiction doctrine. Accordingly, only the

Town's RCRA Section 7002(a)(1)(B) claim and its public nuisance claim seeking an injunction will proceed. All other claims are dismissed.

The Town's Motion for a Preliminary Injunction (ECF No. 40) is denied for the reasons set forth above.

The Town may file a second amended complaint by July 18, 2025, as set forth above.


Dated: Central Islip, New York
       May 19, 2025

_____/s/ Nusrat J. Choudhury_____
NUSRAT J. CHOUDHURY
United States District Judge