IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOWN OF OYSTER BAY,<br><br>      Plaintiff,<br><br>  v.<br><br>NORTHROP GRUMMAN SYSTEMS CORPORATION,<br><br>      Defendant. | **SECOND AMENDED COMPLAINT**<br><br>Civil Action No. 2:23-cv-07146-NJC-AYS |

Plaintiff Town of Oyster Bay (the "Town"), for its Second Amended Complaint against Defendant Northrop Grumman Systems Corporation ("Northrop Grumman"), alleges as follows:

## I.    NATURE OF THE COMPLAINT

1.    The Town seeks injunctive, declaratory, and monetary relief against Northrop Grumman Systems Corporation ("Northrop Grumman" or "Grumman") for environmental contamination of an 18-acre property in Nassau County, New York, now known as Bethpage Community Park (referred to interchangeably as the "Community Park" or "Community Park Property" or the "Park").

2.    The Town's claims arise from (1) Northrop Grumman's past and present releases and threatened releases of hazardous substances at the Park; (2) Northrop Grumman's decades-long efforts to evade responsibility for those releases by fraudulently concealing the true nature and extent of the contamination and indefinitely delaying and obstructing efforts to investigate fully the contamination; and (3) the New York Department of Environmental Conservation's

("DEC") chronic and repeated failures to enforce its own requirements against Northrop Grumman.

3.    The Town initially commenced this action on September 26, 2023.  Six months later, while Northrop Grumman boasted in its submissions to this Court that it had "demonstrated diligence in investigating and remediating the Park,"[1] contractors working at the Park inadvertently uncovered over twenty 55-gallon drums that decades earlier Grumman had encased in concrete and buried beneath the Park. Some of the drums contained unidentified yellow-green and blue-green sludge that subsequent testing revealed contained hazardous heavy metals and industrial solvents. Testing of the soil surrounding the drums, conducted by the Town at its own expense, revealed the presence of toxic and highly carcinogenic hexavalent chromium, a hazardous substance that Northrop Grumman had repeatedly assured was not and could not be present at the Park.  Blindly trusting Northrop Grumman's false assurances, DEC had not even listed hexavalent chromium as a potential contaminant at the Park.  Responding to this development, on May 19, 2025, this Court granted the Town leave to amend its Complaint to address the newly discovered hexavalent chromium that may present an imminent and substantial endangerment.

4.    Since the literal unearthing of Northrup Grumman's long-hidden waste drums, Northrop Grumman has continued its deception and concealment tactics to evade sampling Park materials which – when tested by the Town – show significant amounts of hexavalent chromium. Even while discovery proceeds in this suit and even after repeated assurances to this Court, Northrop Grumman is deliberately ignoring excavated Park soil with starkly visible metals contamination in order to avoid creating sampling data showing detections of hexavalent chromium.  Instead, Northrop Grumman is creating a false investigation record that minimizes

---

[1] *See* ECF No. 31-1, p. 21.

detections of hexavalent chromium because Northrop Grumman is intentionally excluding yellow-green and blue-green substances indicative of metals contamination in the soil from sampling and analysis.

5.      This is not an isolated event.  The history of Northrop Grumman's duplicity extends more than sixty years.  In 1962, Northrop Grumman donated the Community Park Property to the Town with the express condition that the property be used as a community park.  But what Northrop Grumman really donated was a toxic waste dump that had been used by Northrop Grumman and only Northrop Grumman from the 1930s until the "gift" in 1962.  Northrop Grumman had used the Community Park Property as a dumping ground for hazardous industrial wastes and chemicals.  Northrop Grumman then undertook a decades-long scheme that continues even to present to deceive, conceal, deny, obstruct, and delay discovery and disclosure of the nature and extent of the contamination Northop Grumman had created.   Northrop Grumman's environmental fraud has been so extensive and so effective that even today the full extent of what Northrop Grumman disposed of at the Park remains unknown to anyone except Northrop Grumman, and the bulk of the contamination remains unremediated in the Community Park soil. Northrop Grumman cynically amplified the risks to human health and the environment, prolonged the closure of public lands, occasioned significant fear in the surrounding community, and wasted millions of dollars on investigation and remediation efforts that Northrop Grumman knew were inadequate and were designed and implemented by Northrop Grumman as part of a deliberate strategy *not* to uncover the contamination that Northrop Grumman knows to exist but has been attempting to conceal for decades.  Northrop Grumman has continued this strategy to deceive, conceal, deny, obstruct, and delay even after the discovery of the company's hidden drums and even while defending this litigation with repeated false assurances to this Court.

6.     Northrop Grumman's intent is to treat the Park as a its own perpetual hazardous waste dump.  Northrop Grumman seeks to impose on the Town permanent land use restrictions so that its contamination can remain in place, meaning that the Town's use, enjoyment, and future development of the Park will be materially limited forever, depriving generations of Town residents of use of the Community Park.

7.     The inadequately investigated and unremediated contaminants in Park soil threaten and will continue to threaten the health of Town residents and future contamination of the drinking water of both Town residents and the rest of the 2.9 million people living on Long Island. In addition, Northrop Grumman has caused and will continue to cause substantial financial harm and monetary loss to the Town by effectively expropriating land, thereby imposing past and future lost and diminished revenues from the use of Community Park facilities and the associated benefits to the surrounding neighborhoods, and by needlessly multiplying investigation and remediation costs.

8.     Although Northrop Grumman successfully concealed and continues to conceal very material information about the nature and scope of the contamination, DEC has been aware of some of Northrop Grumman's contamination at the Community Park since at least 2002, and part or all of the Community Park has been closed to the public since that time. Moreover, DEC has identified some of Northrop Grumman's contamination at the Community Park and its larger Bethpage Facility as one of the sources contributing to massive plumes of contamination migrating off-site and threatening the future contamination of the sole-source aquifer providing drinking water to 2.9 million residents in the Town and throughout Long Island.  But even as efforts may be underway to combat that contamination *off-site* (the efficacy of which is far from certain), Northrop Grumman still has not yet disclosed fully its disposal activities or investigated the

resulting contamination of what it has disposed of *on-site* at the Park. Through the Town's own recent investigation at taxpayer expense, the list of hazardous chemicals detected at the Park continues to grow with additional contaminants that Northrop Grumman should have disclosed decades ago but instead willfully and intentionally concealed.  Even now, Northrop Grumman has refused to address or even admit fully that it is the source of the contamination, and DEC has failed utterly for more than a decade to prosecute diligently Northrop Grumman's contamination of the Community Park Property.   Instead, DEC continues to act as a passive bystander, allowing Northrop Grumman to set its own terms and delay indefinitely cleanup of the Community Park Property, thereby forcing the Town to conduct its own investigations at its own expense in order to obtain the truth.  DEC refuses even to hold Northrop Grumman to the terms of its own work plans developed under DEC's "order" which wrongly allows Northrop Grumman license to do as it wishes without sanction from DEC.

9.    The Town must seek relief from this Court because DEC repeatedly has impeded an effective environmental response at the Community Park through its failure to comply with established federal standards, its failure to set any enforceable standards for the investigation and remediation of the toxic waste at the Community Park Property, and its acquiescence in Northrop Grumman's deception, obstruction, and delay.  Though DEC issued a Record of Decision in March 2013 ("2013 ROD") for an area including the Community Park, the 2013 ROD does not provide for an adequate remediation of the Park, primarily because Northrop Grumman has concealed and continues to conceal fraudulently the full scope of what it disposed of at the Park. Northrop Grumman's intentionally incomplete disclosures and artfully selective sampling plans inevitably and by design underestimated the scope of the off-site VOC-contaminated groundwater plume, which *already* has required DEC to amend the 2013 ROD. Since that amendment in December

2019, twenty-two drums of toxic sludge, previously unknown to anyone but Northrop Grumman, have been unearthed from Community Park soil. In the subsequent and still ongoing search for and removal of additional drums, the Town's own sampling has detected alarming levels of highly toxic hexavalent chromium, also known as Chrome-6. Notably, throughout the decades of investigation and remediation at the Park, Northrop Grumman has refused to test adequately for hexavalent chromium and has repeated the now obvious falsehood that it did not dispose of hexavalent chromium at the Park. Even though substances and materials containing chromium are plainly apparent to the naked eye in some excavated Park soil, the 2013 ROD does not even list hexavalent chromium as a contaminant at the Park, let alone address its remediation. Despite the overwhelming evidence that Northrop Grumman's falsehoods and omissions have rendered the 2013 ROD woefully inadequate, Northrop Grumman and DEC insist that the 2013 ROD should continue to govern the Park cleanup activities.

10.     Even if the 2013 ROD were sufficiently protective, DEC has not enforced the 2013 ROD. In May 2014, Northrop Grumman and DEC executed a second Administrative Order on Consent (the "2014 AOC") that stipulated the performance of five workplans as outlined by the 2013 ROD. But the 2014 AOC is non-binding and unenforceable against Northrop Grumman. The 2014 AOC does not impose any specific schedule or time limits for Northrop Grumman to initiate or complete work. It sets no penalties or other enforcement mechanisms should Northrop Grumman fail to comply. Indeed, compliance with the 2014 AOC is optional for Northrop Grumman because the 2014 AOC expressly provides Northrop Grumman the right to opt out of specific requirements without impacting the remainder of the order. Not surprisingly, with no enforcement mechanisms in the 2014 AOC, Northrop Grumman has not met *any* of the very limited so-called deadlines included in the 2014 AOC. Northrop Grumman has submitted some

plans and reports years after they were due to DEC, while other reports it still has not submitted even a decade later.

11.    Not only has DEC failed to enforce the 2013 ROD, but DEC also took *ultra vires* action in the 2013 ROD by setting a cleanup standard for PCBs at the Community Park Property that was beyond the State's power.  Under federal law, PCB cleanup standards are under the control of the United States Environmental Protection Agency ("EPA") alone, and the State must seek and obtain EPA approval of a PCB cleanup standard, which DEC did not do.

12.    After more than a decade of DEC's failure to require Northrop Grumman to meet its most basic environmental obligations, the Town has been forced to take matters into its own hands by commencing this suit pursuant to the Resource Conservation and Recovery Act ("RCRA") and state common law to ensure a proper and expedited cleanup of the Community Park Property, to protect Town citizens and Long Island drinking water resources, and to compensate Town residents for the loss of a valued public space already for decades and likely many years into the future.

13.    The Town first gave notice of its intent to sue to Northrop Grumman, DEC, and EPA on December 16, 2023, thereby initiating a 90-day notice period in which DEC or EPA could have barred this suit by asserting their authority over the issue.[2] Neither agency elected to do so. Northrop Grumman still has yet to commit to remediating its contamination at the Community Park, and DEC and EPA have been unable or unwilling to impose any binding requirements on Northrop Grumman to proceed.

---

[2] Pursuant to 42 U.S.C. § 6972(b)(2), EPA could have barred the Town's suit by commencing a RCRA enforcement action or by obtaining a court order or consent decree requiring Northrop Grumman to diligently investigate and remediate the Park, and DEC could have barred the Town's suit by initiating its own RCRA enforcement action in federal court.

14.     The Town seeks the relief outlined below to expedite the cleanup of the Community Park, to ensure the selected cleanup standards are protective of human health and the environment, to ensure the cleanup is properly enforced under the supervision of the Court, and to compensate the Town for its losses resulting from Northrop Grumman's fraud, obstruction, and delays:

a.     A mandatory injunction against Northrop Grumman pursuant to RCRA, to, within a timeframe specified by a schedule to be enforced by the Court, investigate and remediate the Community Park Property in order to take all actions necessary to address the solid and hazardous wastes that may present an imminent and substantial endangerment to human health and the environment.

b.     A mandatory injunction pursuant to New York law to, within a timeframe specified by a schedule to be enforced by the Court, permanently abate any interference with the public use and enjoyment of the Community Park Property.

c.     Damages for (1) futile past investigations that did not address all contaminants Northrop Grumman knew were present or very likely to be present at the Park; (2) the substantial time, cost, and effort of uncovering Northrop Grumman's fraudulent concealment of hexavalent chromium contamination; (3) the past, current, and future costs associated with the Town's need to supervise and verify Northrop Grumman's investigation activities at the Park; and (4) diminution in value of the Community Park Property for the Town and the use and enjoyment of the Town's residents.

## II.     THE PARTIES

15.     Plaintiff Town of Oyster Bay is a municipal corporation organized under the laws of the State of New York.  Its principal offices are located at 54 Audrey Avenue, Oyster Bay, New York, 11771.

16.     Defendant Northrop Grumman is a corporation incorporated under the laws of the State of Delaware. On information and belief, its principal place of business is in Falls Church, Virginia.

17.     Defendant Northrop Grumman was formed through the merger of the Grumman Corporation (formerly known as the Grumman Aircraft Engineering Corporation) with the Northrop Corporation, and defendant Northrop Grumman is the successor and continuation of the Grumman Corporation and the Grumman Aircraft Engineering Corporation.

### III.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over the Town's federal claims pursuant 28 U.S.C. § 1331, 15 U.S.C. § 2619(a), and 42 U.S.C. §§ 6972(a)(1)(A) and (B), 9607(a), and 9613(f). This Court has supplemental jurisdiction over the Town's state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same case or controversy as the Town's federal claims. The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the Town's claims occurred within this district.

### IV.     ALLEGATIONS COMMON TO ALL COUNTS

**A.     General Background**

   ***i.     Northrop Grumman's Bethpage Facility Disposed of Hazardous Substances on Land that it Donated to the Town for Express Use as a Park***

20.     Beginning in the 1930s, Northrop Grumman, through two of its predecessors, Grumman Aircraft Engineering Corporation and Grumman Corporation, developed, tested, and manufactured military aircraft used in World War II and during the Cold War, and conducted related administrative operations, among other activities, on an approximately 600-acre site in

- 9 -

Bethpage, New York, formerly known as the Grumman Aerospace-Bethpage Facility (the "Bethpage Facility").

21.     As detailed further below, Northrop Grumman used a portion of the Bethpage Facility as an earthen dumping ground for toxic chemicals beginning in the 1930s. In 1962, that dump became the Community Park Property when Northrop Grumman conveyed the Community Park Property to the Town with an express condition that the property be used as a park.

22.     While wastes were deposited in other areas of the Town, including what are now residential yards, *see* ECF No. 33-1, what is now the Community Park Property was used as a primary and exclusive landfill for the deposit of Northrop Grumman wastes for a period of decades.

23.     Northrop Grumman's activities contaminated the soil at the Community Park Property with massive amounts of CERCLA hazardous substances, including hexavalent chromium and other heavy metals, volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOC"), and PCBs.

24.     Over sixty years later, much of that contamination remains in the Community Park soil today, posing an endangerment to Park workers and recreational users, depriving Town residents of the full use of the Community Park and the Town itself of revenue related to Park operations, and threatening public drinking water supplies.

25.     DEC has identified some of the hazardous substances released by Northrop Grumman at the Bethpage Facility, including the Community Park Property, as the source of widespread plumes of contamination in the groundwater spreading underneath Nassau County.  As of 2022, DEC estimates that the contaminated plumes are approximately 4.3 miles long and 2.1 miles wide, extending to a depth of approximately 900 feet below ground level.

26.     The plume emanating from the Community Park, designated by DEC as the "Eastern Plume," extends south from the Community Park where it joins and commingles with separate plumes of contamination emanating from other portions of the Bethpage Facility. *See* Exhibit A.

27.     These plumes of contamination have entered the EPA designated sole-source drinking water aquifer that serves 2.9 million Long Island residents.  DEC has determined that contamination has already affected groundwater intake at 11 public water supply wells across multiple communities and threatens to contaminate groundwater intake at additional public water supply wells as the plumes expand to the south and south-east.

28.     Recent samples taken by the Town at its own expense have indicated that there are significant levels of hexavalent chromium contamination at the Park, a hazardous heavy metal that was largely excluded from Northrop Grumman's sampling work plans and not identified as a contaminant of concern by Northrop Grumman's prior investigations.

29.     In just the past year, large quantities of chromium-containing sludge, both in Park soil and in previously unknown 55-gallon drums that were buried within the Park, have been discovered, demonstrating both Northrop Grumman's extraordinary lack of honesty and diligence in prior investigations, as well as the imminent and substantial hazard posed by Northrop Grumman's contamination.



30.    The above photograph was taken on April 18, 2024, and depicts a drum filled with yellow-green chromium-containing sludge that was excavated from the Community Park Property.



31.    The above photograph was taken on May 29, 2024, and depicts a "test pit" excavated by Northrop Grumman at the Community Park Property during its search for additional buried drums. Yellow-green materials consistent with the sludge found in the buried drums are clearly visible in the excavated soil.



32.     The above photograph was taken on May 29, 2024, and depicts a close-up view of the yellow-green chromium-containing sludge discovered in the "test pits" excavated at the Community Park.

33.     Despite disposing large volumes of chromium sludge at the Community Park Property, Northrop Grumman failed to adequately test for hexavalent chromium and publicly denied that hexavalent chromium could be present in Park soil, in fact denying that hexavalent chromium could be present at all.

ii.    *Northrop Grumman Repeatedly Has Delayed Cleanup Efforts at the Community Park, and Regulators Have Been Unable or Unwilling to Meaningfully Require Northrop Grumman to Adhere to Any Cleanup Schedule.*

34.    Northrop Grumman knew or, in the alternative should have known, that it had caused significant contamination at the Community Park Property by at least the early 1980s, when it began investigating and remediating PCB, heavy metal, VOC, and SVOC contamination throughout the former Bethpage Facility.

35.    Northrop Grumman knew, or in the alternative should have known, that the contamination was likely to include hexavalent chromium.

36.    DEC has been aware of some of Northrop Grumman's contamination at the Community Park Property since at least 2002, when soil sampling conducted by Northrop Grumman showed the presence of PCBs and hazardous metals at concentrations exceeding New York State standards, forcing the Town to close the Community Park.

37.    Since that time, little progress has been made in remediating the Park, and no regulator has been able to enforce a reasonable schedule or impose any penalty on Northrop Grumman for its failure to remediate the Community Park Property.

38.    DEC issued a Record of Decision for the Community Park Property in 2013, but DEC repeatedly has allowed Northrop Grumman to undermine the Record of Decision, and DEC has acknowledged the Record of Decision is practically and legally insufficient.

39.    *Exhibit B* is a map detailing the various areas of the Community Park and the progress, or lack thereof, of remediation efforts to date.

40.    Northrop Grumman consistently has failed for nearly two decades to comply with deadlines or schedules for remediation of the Community Park Property. This includes deadlines imposed by DEC through consent orders or letters, as well as self-imposed deadlines Northrop Grumman has presented to DEC and the Town.

41.     The following table is a "report card" summarizing Northrop Grumman's lack of compliance with numerous deadlines, as well as the complete absence of any penalties or other enforcement actions by DEC against Northrop Grumman:

| July 4, 2005, Administrative Order on Consent ("2005 AOC") | | | |
|---|---|---|---|
| *Required Action or Submittal* | *Deadline for Completion* | *Actual Date of Completion* | *Penalties or Enforcement* |
| Remedial Investigation ("RI")/Feasibility Study ("FS") Work Plan[3] | September 2, 2005 | March 8, 2006 | None |
| Draft RI Report | June 13, 2007 | February 1, 2008 (first draft) February 8, 2011 (final) | None |
| Draft FS Report | October 19, 2007 | May 12, 2010 (first draft) March 4, 2011 (final) | None |
| Proposed Remedial Action Plan (by DEC) | April 21, 2008 | May 2012 | N/A |
| Record of Decision (by DEC) | June 24, 2008 | March 2013 | N/A |
| **May 21, 2014, Order on Consent and Administrative Settlement ("2014 AOC")[4]** | | | |
| *Required Action or Submittal* | *Deadline for Completion* | *Actual Date of Completion* | *Penalties or Enforcement* |
| Bethpage Park Containment System Pre-Design Hydraulic Effectiveness Evaluation | April, 2015 | July 2015 (initial) August 2018 (final) | None |
| Pre-Design Sampling Work Plan for PCBs | April, 2015 | January 19, 2016 (revised) March 2, 2018 (addendum) | None |
| Pre-Design Sampling Work Plan for VOC Source Area | April, 2015 | October 16, 2015 (initial) February 2, 2018 (addendum) | None |
| Pre-Design Work Plan for Groundwater Hotspot | September, 2016 | Unknown/Not Yet Completed | None |
| Pre-Design Work Plan for Soil – Residential Properties | May, 2015 | Unknown/Not Yet Completed | None |

[3] The remaining deadlines under the 2005 AOC were set by the schedule set forth in the RI/FS Work Plan.
[4] No investigation or remediation work was conducted by Northrop Grumman at the Community Park Property *for over 6 years* between approximately July 2007 and November 2014.

| June 30, 2016, Remedial Design Work Plan for VOC Source Area | | | |
|---|---|---|---|
| *Required Action or Submittal* | *Deadline for Completion* | *Actual Date of Completion* | *Penalties or Enforcement* |
| Remedial Action Work Plan | December, 2016 | August 21, 2020 | None |

| October 31, 2019, Schedule for VOC Source Area Remedy[5] | | | |
|---|---|---|---|
| *Required Action or Submittal* | *Deadline for Completion* | *Actual Date of Completion* | *Penalties or Enforcement* |
| VOC Delineation | Q4, 2019 | September 28, 2020 | None |
| Revised Remedial Action Work Plan ("RAWP") incorporating DEC and Town Comments | Q4, 2019 | August 21, 2020 | None |
| RAWP Addendum for VOCs Outside Ballfield | Q1, 2020 | June 30, 2023 | None |
| Installation of Buried Process Piping & Electrical Service | Q4, 2019 | Unknown/Not Yet Completed | None |
| Public Meeting for Remedy Construction | Q1, 2020 | Unknown/Not Yet Completed | None |
| Ball Field Remedial System Construction | Q1-Q2, 2020 | Unknown/Not Yet Completed | None |
| Remedial System Operation | Q2-Q4, 2020 | Aug., 2020 – Feb., 2022 | None |
| Post-Treatment Confirmation Sampling | Q4, 2020 | Unknown/Not Yet Completed | None |
| Remedy Cool-Down | Q4, 2020 – Q1, 2021 | Unknown/Not Yet Completed | None |
| Equipment Removal & Site Restoration | Q1, 2021 | Q4, 2023 | None |

| August 11, 2021, DEC Letter to Northrop Grumman | | | |
|---|---|---|---|
| *Required Action or Submittal* | *Deadline for Completion* | *Actual Date of Completion* | *Penalties or Enforcement* |
| Conceptual Plan for VOC Remediation Outside Ballfield | October 31, 2021 | June 17, 2022 (incomplete) | None |
| Remedial Design for PCB and Metals Contamination | October 31, 2021 | Not Completed | None |

| Schedule for Phase 2 of In-Situ Thermal VOC Remedy ("ISTR") (as presented to DEC and the Town on June 17, 2022) |
|---|

---

[5] DEC issued a letter on October 16, 2019, requiring Northrop Grumman to provide a schedule for completion of the VOC Source Area Remedy. Northrop Grumman submitted a schedule on October 31, 2019.

| Required Action or Submittal | Deadline for Completion | Actual Date of Completion | Penalties or Enforcement |
|---|---|---|---|
| Work Plan for site preparation and ISTR well installation | Q3, 2022 | April 28, 2023 | None |
| Complete ISTR Construction | Q2, 2023 | Q3, 2024 | None |
| Remedial System Operation | Q2-Q4, 2023 | Q3, 2024-ongoing | None |
| Post-Treatment Confirmation Sampling | Q4, 2023 | Not Yet Completed | None |
| Equipment Removal & Site Restoration | Q1, 2024 | Not Yet Completed | None |

42.    Notably, the above requirements and deadlines did not even address hexavalent chromium because Northrop Grumman has asserted and continues to assert that it did not dispose of hexavalent chromium on the Community Park Property.

43.    Regarding PCBs, Northrop Grumman has yet to initiate *any* PCB remediation but has faced no consequences from State or Federal regulators.

44.    In over two decades since first confirming PCB contamination in Community Park soil, Northrop Grumman has conducted multiple rounds of testing but still has yet to fully delineate the extent of the contamination.

45.    Additionally, the limited and insufficient sampling conducted by Northrop Grumman cannot meet the requirements of Federal law.

46.    As detailed further in Section IV.D.iii., Northrop Grumman is required under TSCA to obtain a Risk Based Disposal Approval ("RBDA") from EPA prior to remediating PCB contamination at the Community Park but failed to undertake any serious efforts to seek this approval for years after.

47.    Northrop Grumman met with EPA during 2016 and 2017 regarding PCB investigation and remediation at the Community Park but did not submit any RBDA application or otherwise enter into any binding agreements with EPA at that time.

48.     Northrop Grumman did not meet with EPA regarding PCB investigation and remediation at the Community Park again until May 2022 and again did not submit any RBDA application or otherwise enter into any binding agreements with EPA at that time.

49.     On or about February 2, 2023, Northrop Grumman Submitted a PCB Current Conditions Report to DEC and EPA.  A current conditions report is a non-binding, preliminary step to submitting an RBDA application for PCB remediation.

50.     On or about March 15, 2023, EPA prepared maps of "data gaps" in Northrop Grumman's PCB Current Conditions Report, and EPA informed Northrop Grumman that EPA could not review any RBDA application until Northrop Grumman addressed the data gaps.

51.     As of July 2025, Northrop Grumman has still not completed addressing the data gaps outlined by EPA.

52.     As of July 2025, Northrop Grumman has not submitted any RBDA application to EPA and has not otherwise made any enforceable commitment to submit an RBDA application to EPA.

**B.      Northrop Grumman Created a Hazardous Waste Dump and Has Concealed the Extent of Its Contamination for Decades**

*i.      Northrop Grumman Knowingly Disposed of Hazardous Waste Including Hexavalent Chromium, VOCs, and PCBs at the Community Park Property.*

53.     The former Grumman Aerospace-Bethpage Facility included both Northrop Grumman-owned and operated plants (the "Bethpage Facility") and a U.S. Navy-owned facility, which Northrop Grumman operated under contract with the U.S. Navy (the Naval Weapons Industrial Reserve Plant or "NWIRP"). Northrop Grumman's operations at the Bethpage Facility began in 1937 and started at the NWIRP in 1942.

54.     By the time its manufacturing operations at the Bethpage Facility concluded in 1996, Northrop Grumman had produced tens of thousands of military aircraft but also had

- 19 -

generated massive amounts of waste containing CERCLA hazardous substances, including hexavalent chromium and other heavy metals, volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOC"), and PCBs.

55.    Northrop Grumman's past disposal practices of hazardous substances at the Bethpage Facility have contaminated groundwater at the facility and the EPA-designated Long Island Sole Source Aquifer system, which is the primary source of drinking water for 2.9 million Long Island residents.   The migration of the groundwater contamination from the Bethpage Facility, referred to by the DEC as the "Navy Grumman Groundwater Plume," has now spread beneath a nearly seven-square-mile, heavily developed commercial and residential area of the Town and Nassau County.

56.    Contaminants in the Navy Grumman Groundwater Plume have contaminated the groundwater intakes at 11 public water supply wells, and the continued expansion of the plume threatens to contaminate groundwater intakes at additional public water supply wells in the Town.

57.    The Community Park Property is an approximately 18-acre parcel on the eastern edge of Northrop Grumman's Bethpage Facility.

58.    From approximately 1949 through 1962, Northrop Grumman owned and operated the land that became the Community Park Property as part of the Bethpage Facility.

59.    During the period of time from approximately 1949 to 1962, Northrop Grumman used the land that became the Community Park Property to dump wastes containing hazardous substances that it generated from its Bethpage Facility operations conducted at both the Grumman Facility and the NWIRP.

  a.    The wastes disposed by Northrop Grumman at the Community Park Property included:

  •    Paint, coating materials, and oily wastes;

- PCBs;
- Chromium laden sludge;
- Cadmium and arsenic;
- Chlorinated and non-chlorinated solvents;
- Semi-volatile organic compounds.

b. Wastewater treatment sludge generated at Northrop Grumman's Plant 2 Industrial Wastewater Treatment Facility located at the Bethpage facility was transported to the Community Park Property and placed directly on the soil in unlined sludge drying beds.

c. The sludge drying beds at the Community Park Property, also known as the former Grumman Settling Ponds, were used for dewatering of sludge, including chromic acid waste, from the Northrop Grumman industrial wastewater treatment facility.

d. Spent rags generated from paint booth cleaning in Northrop Grumman's Plant 2 were transported to the Community Park Property where they were emptied into a pit located on the property.

e. Spent paint, coating materials, waste rags and machine oil containing chlorinated and non-chlorinated solvents were buried in the rag pit on the Community Park Property.

f. Additional materials including metals and soluble oils were disposed in a second, larger pit on the Community Park Property.

g. Northrop Grumman employees would empty the contents of drums into the pits, and additional drums, crushed drums, and other metals and miscellaneous wastes and debris were disposed in the pits.

h. Barrels containing green-tinted wastes were buried in concrete sarcophagi under portions of the Community Park.

i. A portion of the Community Park Property was used by Northrop Grumman as a fire training area where waste oil, jet fuel, and other liquids were poured onto the ground, ignited, and extinguished.

60.     In or around 1948, Northrop Grumman built an Industrial Wastewater Treatment Facility ("IWTF") at the Bethpage Facility to remove chromic acid wastes from its industrial wastewater.

61.     The IWTF produced sludges containing chromium and other heavy metal precipitates removed from the industrial wastewater.

- 21 -

62.    While the IWTF was intended to convert hexavalent chromium into trivalent chromium, that process was only partially effective. Northrop Grumman's hazardous waste management permits for the Bethpage Facility in the 1970s and 1980s report that industrial waste sludge generated from activities consistent with Northrop Grumman's past operation when it dumped sludge at the Community Park contained up to 415 mg/kg of hexavalent chromium, orders of magnitude higher than New York soil cleanup objectives for unrestricted or restricted-residential use.[6]

63.    Northrop Grumman placed the chromium-laden sludge produced by the IWTF in the sludge drying beds at the Community Park Property on a daily basis from approximately 1948 until the Park was transferred to the Town in 1962.

64.    At some point in 1960 or 1961, Northrop Grumman conducted "autoclave" operations at Plant 3 of the Bethpage Facility.  The autoclave process used a fluid called "therminol," which contained approximately a 97% to 98% concentration of PCBs.  Northrop Grumman's autoclave operations used and stored several thousand gallons of the PCB-laden therminol at any given time.

65.    Some of the therminol fluid spilled and leaked onto the floor in the areas of autoclave operations, which contained one or more floor drains. The therminol fluid traveled through the drains which, eventually, discharged to a storm water collection system that was directed to recharge basins located east of Plant 3.

---

[6] The current soil cleanup objectives for hexavalent chromium are 1 mg/kg for unrestricted use and 110 mg/kg for restricted residential use. 6 NYCRR 375-6.8. DEC has proposed to lower the restricted-residential standard to 1 mg/kg.

66.     Prior to October 1962, Northrop Grumman employees used bulldozers to scrape the soils at the bottom of the recharge basins located east of Plant 3, and, again, dumped these scraped soils on various areas of the Community Park Property.

67.     On or about October 17, 1962, Northrop Grumman conveyed the Community Park Property to the Town, with an express condition that the property be used as a park.

68.     After the Town took ownership of the Community Park Property, the Town developed it into Bethpage Community Park.  Bethpage Community Park featured and continues to feature a swimming pool, an ice-skating rink, basketball courts, a baseball field, playground, tennis courts, and other amenities for Town residents, all of which were constructed by the Town for the use and enjoyment of its residents and, directly and indirectly, for the financial and reputational benefit of the Town.

   *ii.     As It Began to Discover Environmental Contamination at the Bethpage Facility, Northrop Grumman Sought to Avoid Responsibility For Its Former Toxic Waste Dump at the Community Park Property.*

69.     In 1983, the DEC listed the Bethpage Facility and the NWIRP as "the Grumman Aerospace Bethpage Facility Site" (No. 130003) on its Registry of Inactive Hazardous Waste Disposal Sites in New York State.

70.     The DEC subsequently divided the Bethpage Facility and the NWIRP into separate sites for purposes of the Registry of Inactive Hazardous Waste Disposal Sites, and later, further subdivided the Bethpage Facility. The resulting three sites, now known as the Northrop Grumman Bethpage Facility (No. 130003A), the NWIRP site (No. 130003B), and the Northrop Grumman-Steel Los Plant 2 (No. 130003C) are also organized into four Operable Units ("OUs"). Operable Unit 1 is the soil remediation at both the Northrop Grumman Bethpage Facility and NWIRP manufacturing plants.  Operable Unit 2 consists of the groundwater contamination at and migrating away from both the Northrop Grumman Bethpage Facility and NWIRP sites, and Operable Unit 3

is the former Northrop Grumman Settling Ponds, which includes the Community Park, the Northrop Grumman Access Road immediately south of the Community Park, and soil and groundwater at and migrating away from the Community Park Property. Finally, Operable Unit 4 is a U.S. Navy site addressing soil, soil vapor, and groundwater contamination at a former drum marshaling site.

71.    Notably, Northrop Grumman intentionally omitted its former dumping ground, the Community Park Property, from its description of the Bethpage Facility, an omission that the DEC failed even to notice.

72.    From the late 1980s through mid-1990s, Northrop Grumman and the U.S. Navy conducted numerous environmental investigations to identify soil and groundwater contamination at the Bethpage Facility and the NWIRP, but not the Community Park Property. These investigations revealed elevated levels of PCBs, metals, VOCs, and SVOCs at both the Grumman Facility and the NWIRP.

73.    Despite knowing that it had buried those same toxic substances beneath the Community Park Property, Northrop Grumman did not conduct any investigations at the Park, nor did it alert the Town that the Park may be contaminated or pose a threat to human health and the environment.

74.    In 1990, Northrop Grumman submitted to DEC a Remedial Investigation/Feasibility Study Work Plan designed to characterize the scope of Northrop Grumman's contamination from the Bethpage Facility in order to select an appropriate remedy. In the portion of the report detailing the history of waste generation and disposal at the Bethpage Facility, Northrop Grumman did not name the Community Park Property as a former disposal site.

75. By intentionally omitting its private dumping ground from its site history, Northrop Grumman wrongfully avoided responsibility for its hazardous wastes at the Community Park Property.

76. Relying on Northrop Grumman's intentionally incomplete investigations, in 1995 DEC issued a Record of Decision for Northrop Grumman's main Bethpage Facility that not only failed to provide for the cleanup of the Community Park Property, reflecting Northrop Grumman's intentionally incomplete prior reports, but did not even mention the Community Park Property as a former dumping ground for Northrop Grumman's waste.

77. In response to public comments questioning whether Northrop Grumman's former properties, including the Community Park Property, had been investigated, DEC responded that no "direct investigation" into the Community Park Property was conducted, but that "[a]ll potential source areas which were owned/operated by Grumman in the Bethpage area have been identified and investigated." Northrop Grumman knew this response was false and that any remedy that excluded the Community Park Property would fail to adequately protect human health and the environment from Northrop Grumman's contamination.

78. Northrop Grumman intentionally omitted the Community Park Property from its facility history in order to avoid investigating the Community Park Property because Northrop Grumman knew that an investigation would reveal its extensive contamination and impose on Northrop Grumman substantial financial liability.

79. Northrop Grumman knew that remediation of the Community Park Property was necessary to protect human health and the environment, but because of Northrop Grumman's dishonesty, the remediation Community Park Property did not begin in the 1990s alongside the rest of the Bethpage Facility, and the Park remained open to the public.

80.     In the late 1990s, Northrop Grumman conducted additional soil samples on parts of its Bethpage Facility in preparation for a possible real estate sale. Those samples detected PCB contamination on an access road and grassy area which ran along a fence separating the Northrop Grumman-owned Bethpage Facility from the Community Park. These sampling results showed that highly toxic and persistent chemicals were present immediately adjacent to land where children played at the Community Park Property. Northrop Grumman knew that it had disposed of those same chemicals within the Community Park Property, but in order to avoid the costs of further cleanup, Northrop Grumman did not seek to investigate contamination at the Community Park Property or otherwise alert the Town or DEC that there was hazardous contamination caused by Northrop Grumman's own disposal activities at the Community Park.

81.     In 2001, Northrop Grumman learned that the fence separating its property from the Community Park was actually two to three feet over the Park property line, meaning its earlier samples had actually detected PCBs on the Community Park Property.

82.     It was only this mistake, years after Northrop Grumman had begun remediation at the Bethpage Facility, that forced Northrop Grumman finally to inform DEC and the Town that the Community Park Property may be contaminated.

83.     In the ensuing decades, Northrop Grumman knowingly has misrepresented and continues knowingly to misrepresent the extent of contamination within the Community Park Property through a pattern and practice of inaccurately minimizing known contamination, omitting known contamination from investigation plans, and artfully designing and implementing investigations to avoid detecting known contamination.

84.     In 2002, DEC ordered Northrop Grumman to obtain soil samples from areas within the Community Park Property.  That testing revealed the presence of PCBs and certain hazardous

metals, including chromium,[7] at concentrations that exceeded New York State's standards, criteria, and guidance for acceptable levels.

85.    The results of Northrop Grumman's testing at the Community Park were disclosed to the DEC, and, in May 2002 the Town closed the Community Park for the protection of the public in recognition of the potential threat to health of those who use and work at the Community Park.    Following the installation of a fence to prevent access to certain grassed areas, the Community Park partially reopened in November 2002.    However, the ballfield, which was built over portions of Northrop Grumman's rag disposal pit and sludge settling ponds, has remained continuously closed and not cleaned up 23 years after test results forced Northop Grumman to acknowledge that its contamination caused an immediate threat to public health and the environment.

86.    In 2003, twenty years after the larger Bethpage Facility was listed as a hazardous waste disposal site, Northrop Grumman finally conducted an initial groundwater investigation at the primary toxic waste dump for that same facility (i.e., the Community Park).    VOCs consistent with residual chlorinated solvents were found at levels in three monitoring wells at the Community Park that exceeded the New York State groundwater standards, and Northrop Grumman indicated that "…the baseball field area may be an historic source of these VOC concentrations."    The baseball field area was constructed over top of Northrop Grumman's rag disposal pit, where "solvent-soaked" rags were disposed.

87.    Northrop Grumman's December 2003 Field Report – Town of Oyster Bay, Bethpage Community Park, Investigation Sampling Report, which Northrop Grumman and DEC

---

[7] Chromium refers to "total chromium", which does not distinguish between the two forms of chromium, trivalent chromium and hexavalent chromium.

later relied upon when setting investigation and remediation strategies for the Community Park Property, omitted any discussion of Northrop Grumman's past intentional disposal of hexavalent chromium at the Community Park.

88.    Despite its undisclosed knowledge that it had disposed of mass quantities of hazardous waste including VOCs, PCBs, and hexavalent chromium beneath the Community Park Property, Northrop Grumman publicly concluded that further investigation was necessary to determine the source of the VOCs detected in the groundwater beneath the Community Park.

**C.    Northrop Grumman Continues to Prevent Remediation of the Community Park by Concealing the Extent of Contamination and by Delaying Investigation; DEC Fails to Diligently Prosecute Northrop Grumman.**

***i.    Northrop Grumman Undertook a Slow and Knowingly Incomplete Remedial Investigation that Revealed only Some of the Extensive and High-Level Contamination of the Community Park and the Groundwater for Miles Beyond.***

89.    Between 2004 and 2007, Northrop Grumman conducted a Remedial Investigation of the Community Park (referred to as the "Site Area") and the VOC-contaminated groundwater that had migrated south and south-east of the Community Park (referred to as the "Study Area") to define the nature and extent of contamination, as required by an Administrative Order on Consent executed by Northrop Grumman and DEC, effective July 4, 2005 (the "2005 AOC").

90.    Northrop Grumman did not propose to sample adequately for hexavalent chromium during these investigations. Instead, Northrop Grumman continued to minimize or obscure the extent of its past disposals at the Community Park Property and intentionally designed and conducted the Remedial Investigation to avoid collecting sampling data that would result in disclosure of the seriousness of the contamination it had caused at the Community Park Property.

91.    In March 2006, Northrop Grumman submitted a Remedial Investigation/Feasibility Study Work Plan for OU3, which yet again omitted Northrop Grumman's past hexavalent

chromium disposal activities and did not provide for an investigation of hexavalent chromium throughout the Park.

92.     Northrop Grumman did not finalize and submit the results of its Remedial Investigation of the Community Park until February 2011. In its submission, Northrop Grumman omitted the majority of its former disposal operations from its narrative of the Park history and falsely asserted that the "apparent historical activities that occurred in the Park are not well understood or documented."

93.     Even with Northrop Grumman's attempts to conceal its own knowledge of its own disposal activities and the resulting contamination, the results of the Remedial Investigation of the Community Park still revealed some of the extensive and high-level contamination of soil, groundwater, and soil gas at the Community Park:

   a. Soil contamination was identified in areas designated as PCB Fill Material, a Low Permeability Zone, Rag Disposal Pit, the Former Grumman Settling Ponds, and beneath the parking lot located to the east of the ballfield. These areas were impacted with TCE, PCE, dichlorothene ("DCE"), toluene, xylene, and Freon. The former rag pit area "is highly impacted with chlorinated and non-chlorinated solvents…Additionally, the low permeability zone…has also been highly impacted with Site-related VOC contamination including TCE, PCE, DCE, toluene and xylene."

   b. Contamination was found in the groundwater beneath the Community Park at levels that exceed the New York State groundwater quality standards. Contaminants found included chlorinated VOCs such as TCE, DCE, vinyl chloride, as well as non-chlorinated VOCs such as toluene and xylene. Groundwater migration from the Community Park has resulted in a significant off-site groundwater plume.

   c. Soil gas sampling results indicated TCE, DCE, and toluene at elevated levels that posed a risk of vapor intrusion to Park structures and to the residences located south of the Community Park.

94.     The results of the Remedial Investigation of the groundwater underlying the area south and southeast of the Community Park, which were not finalized and submitted to DEC until February 2011, revealed widespread VOC contamination:

a.  VOC-contaminated groundwater was reported to extend approximately 3.5 miles in length by 1.6 miles in width, including an area immediately south and south-east of the Community Park approximately 8,300 feet in length and 2,100 feet in width.

b.  Chlorinated VOCs, including TCE and DCE, as well as toluene and other VOCs were found in the groundwater.

c.  VOCs were detected in several Bethpage Water District public water supply wells.

95.    Northrop Grumman's nondisclosures still partially achieved its goal to conceal the full extent of the contamination.  Because Northrop Grumman did not fully disclose its past disposal activities, the Remedial Investigation was materially inadequate, and a significant portion of the VOC Source Area at the Community Park that feeds the groundwater contamination beneath and migrating away from the Community Park was not found until about 10 years after the submittal of the Remedial Investigation reports to DEC, as further described in Section IV.D.i.

96.    Northrop Grumman's misrepresentations allowed it to delay expensive VOC Source Area remediation projects for over a decade while exacerbating the risk to human health and the environment.

97.    As required by the 2005 AOC, Northrop Grumman implemented two Interim Remedial Measures ("IRMs") to address contaminant migration in soil vapor and groundwater leaving the Community Park.

98.    In February 2008, Northrop Grumman installed and began operating a soil gas containment system IRM along the Northrop Grumman-owned access road adjacent to the southern and western Community Park boundaries. The purpose of the soil gas IRM was to mitigate the migration of VOCs in soil gas from the Community Park.

99.    In July 2009, Northrop Grumman installed and began operating a groundwater extraction and treatment system IRM using four recovery wells installed in the Northrop Grumman-owned Access Road adjacent to the southern Community Park boundary.  The purpose

of the groundwater IRM was to mitigate the migration of VOCs in groundwater leaving the Community Park.

100.    Throughout this period, Northrop Grumman knew that it had not disclosed the full extent of likely contamination and that these remedial efforts would not be sufficient to protect human health and the environment. Northrop Grumman nevertheless continued to risk the health and safety of Town residents in order to avoid entirely or at least delay indefinitely the costs required for a complete cleanup of the Park.

101.    The groundwater IRM was designed to capture groundwater that had total VOC concentrations greater than 5 micrograms per liter ("ug/L") in the upper 20 feet of the surficial aquifer, and to capture groundwater below the upper 20 feet of the surficial aquifer that had total VOC concentrations greater than 50 ug/L.  As such, the groundwater IRM was not designed to capture all the VOC contamination leaving the Community Park in groundwater, but only the VOC concentrations exceeding an arbitrary level.

102.    The IRM also was not designed to capture or treat heavy metals, including hexavalent chromium. Because Northrup Grumman was actively concealing its disposal of this highly toxic contaminant, no one else except Northrop Grumman knew that an effective remedy would have to address hexavalent chromium.

103.    The groundwater captured by the IRM was and continues to be treated at a treatment plant at Northrop Grumman's McKay Field located west of the Community Park, and the treated water is discharged to a Nassau County-owned recharge basin, where it percolates back into the groundwater on the adjacent former NWIRP property.  Northrop Grumman referenced the interim State Pollutant Discharge Elimination System ("SPDES") discharge limits as the applicable regulatory discharge limits.

104.    Northrop Grumman knew during the design of and throughout the implementation of the IRM that it would not adequately remove all of the hazardous contaminants that would likely be present at the Community Park but concealed and misrepresented this information to avoid additional expense.

### ii.    Northrop Grumman's Delays Necessitated that the Town Expedite the Cleanup of 7 Acres of Northrop Grumman's Contaminated Soil at the Community Park, Costing Taxpayers $22 Million.

105.    In 2005, while waiting for Northrop Grumman and DEC to come to an agreement on the required further investigation and remediation of the Community Park Property, the Town sought DEC approval "…to expedite remediation of a portion of the property…" comprising a seven-acre area, where the Town planned to construct a new ice-skating rink and other recreational facilities ("the Construction Area").

106.    In March 2005, the Town voluntarily entered into an Order on Consent ("Town Consent Order") with the DEC to conduct investigation and remedial activities with respect to the historically contaminated soils within the Construction Area. The Town Consent Order required: (1) that the Town develop an Interim Remedial Measure ("IRM") to address the presence of contamination in the soil in the Construction Area; (2) that all actions taken by the Town to discharge its obligations under the Town Consent Order be approved by the DEC; and (3) all actions taken by the Town to discharge its obligations be consistent with CERCLA and the National Contingency Plan.

107.    In November 2005, the Town submitted an Investigation Report and Remedial Action Plan (the "November 2005 RAP") to DEC.  The November 2005 RAP described the results of extensive soil and shallow groundwater investigations conducted in the Construction Area, which confirmed the presence of VOCs, PCBs, and metals, including arsenic, cadmium, chromium, mercury, and zinc, above New York State recommended levels in soil.  SVOCs called

polycyclic aromatic hydrocarbons ("PAHs") including benzo(a)pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, and dibenzo(a,h)anthracene were also detected in soils. VOCs including 1,2-dichloroethene, trichloroethene (TCE), tetrachloroethene (PCE), and Freon-12 were also detected in soil vapor. VOCs including 1,2-dichloroethene and trans-1,3 dichloropropene, were detected in groundwater.

108.    In the November 2005 RAP, the Town proposed to remedy the contamination by removing all contaminated soils in the Construction Area to meet DEC's recommended soil cleanup objectives for unrestricted use to a depth of at least ten feet below grade.  As indicated in the November 2005 RAP, "A depth of ten feet was chosen because most typical construction/development and maintenance activity would not require deeper excavation."   In effect, the Town planned to remediate Northrop Grumman's soil contaminants to a depth that would allow for unrestricted use, consistent with DEC's Unrestricted Use soil cleanup standards at this time.

109.    The Town subsequently submitted to DEC a revised Remedial Action Plan (the "2006 RAP"), which was a comparative analysis of five remedial alternatives to address Northrop Grumman's soil contamination in the Construction Area. The Town advised the DEC that the Town had selected "Remedial Alternative IV," which required excavation and off-site disposal of all contaminated soil throughout the Construction Area to a depth of at least ten feet, with some additional deeper contaminant removal to 20 feet in certain areas to meet the recommended Unrestricted Use soil cleanup levels.

110.    DEC ultimately approved the Town's selection of "Remedial Alternative IV," stating that the selected remedy "…is protective of public health and the environment."

111.    By June 2007, four years before Northrop Grumman completed its Remedial Investigation of the Community Park, the Town finished remediation of the seven-acre Construction Area by removing over 173,000 tons of Northrop Grumman contaminated soil and debris.

112.    The Town spent in excess of $22 million in investigating the extent of Northrop Grumman's contamination in the Construction Area and expediting the cleanup of the seven-acre area.

113.    In November 2005, the Town filed a lawsuit against Northrop Grumman and the federal government to recover the money that the Town had expended remediating the Construction Area as a result of the waste generated by Northrop Grumman pursuant to its work for the U.S. Navy.  The Town brought its claims pursuant to CERCLA, 42 U.S.C. §§ 9607 and 9613, and the common law of the State of New York.

114.    Northrop Grumman counterclaimed against the Town pursuant to CERCLA, alleging that Northrop Grumman had incurred costs responding to contamination at the Community Park allegedly caused by the Town.

115.    In 2009, after the Town, Northrop Grumman, and the federal entities named in the Town's complaint (the U.S. Navy and the United States of America) had fully briefed cross-motions for summary judgment, the District Court granted summary judgment to Northrop Grumman and the federal entities, dismissed the Town's CERCLA claims with prejudice, and dismissed the Town's state law claims without prejudice.  On a motion for reconsideration by the federal entities, the Town's state law claims were dismissed with prejudice.

116.    The District Court denied the Town leave immediately to appeal the dismissal of the Town's CERCLA claims, and Northrop Grumman's counterclaims against the Town remain pending.  Accordingly, there has been no final judgment in that litigation.

### iii.    DEC Issues its Flawed 2013 Record of Decision for OU3, Including the Community Park, Relying on Northrop Grumman's Knowingly Incomplete Investigation.

117.    In March 2013, the DEC issued a Record of Decision ("2013 ROD") for Operable Unit 3 of the Northrop Grumman Bethpage Facility, which includes the Community Park Property. The 2013 ROD stated that the soil and groundwater at Operable Unit 3 contained more than a dozen constituents of concern that exceeded State of New York standards, criteria, or guidance. Among the constituents of concern were Trichlorethylene, Tetrachloroethene, 1,1,1 Trichloroethane, Aviation engine oil, Chrome Etchant, Machine Oil, Paint, Paint Solvents, Polychlorinated Biphenyl, oil, Toluene, Chlorodifluoromethane (Freon 22), Dichlorodifluoromethane (Freon 12), Chromium, Cadmium, Arsenic, and Freon 113.

118.    The 2013 ROD considered only total chromium and did not address hexavalent chromium specifically.

119.    The 2013 ROD stated that the majority of soil contamination was located in the area of Northrop Grumman's former sludge settling ponds and rag pit disposal area.  The constituents of concern in those two areas were chlorinated and non-chlorinated solvents and highly impacted fill materials containing mainly PCBs, chromium, and other hazardous metals.

120.    The 2013 ROD also identified Northrop Grumman's solvent-soaked rag disposal pit and a larger Low Permeability Zone, as sources of groundwater contaminated with TCE and other VOCs (the "VOC Source Area" or "source area").  The ROD further stated that the contaminated groundwater from the source area was traveling outside the boundaries of the Community Park Property and Operable Unit 3, where it commingled with the plume emanating

from the Grumman Facility and the NWIRP site.   The entire area of VOC-contaminated groundwater originating from the Grumman Facility and the NWIRP site (OU 2 and OU 3) is now referred to by DEC as the Navy Grumman Groundwater Plume.

121.    Northrop Grumman knew that the 2013 ROD did not fully describe the extent of likely contamination at the Community Park Property, including but not limited to the omission entirely from the 2013 ROD of hexavalent chromium.

122.    To address the contamination at Operable Unit 3, the 2013 ROD selected as the preferred remedial action an extensive cleanup, "Remedial Alternative 5," the present cost of which DEC estimated at $81 million.

123.     The components of Remedial Alternative 5 required by the ROD included, among other measures:

  a.  Excavation in the former Grumman Settling Ponds area, located in the ballfield and areas adjacent to the ballfield, of all soils with concentrations of PCBs in excess of 50 parts per million ("PPM") and disposal off-site at a permitted disposal facility.

  b.  Excavation in the former Grumman Settling Ponds area of all soils to a depth of 10 feet of all other contaminants with concentrations in excess of the DEC's restricted-residential soil cleanup objectives and disposal off-site at a permitted facility.

  c.  Provision for soil that is excavated from the former Grumman Settling Ponds area that has less than 50 ppm PCBs to be reused as backfill in excavation areas deeper than 10 feet.

  d.  Implementation of a site cover to assure that restricted residential soil cleanup objectives in the upper 2 feet of the Operable Unit 3 area are achieved.

  e.  Implementation of in-situ thermal remediation of the VOC Source Area "…to attain the protection of groundwater SCOs [soil cleanup objectives] for the VOCs present".

  f.  Installation of a groundwater extraction and treatment system to remediate the VOC-contaminated groundwater "…emanating from OU 3" and to "…capture and treat the 'hot spot' area of the plume…".

- 36 -

g.  Continued operation, and upgrading as necessary, of Northrop Grumman's groundwater extraction and treatment system IRM "…to assure the capture/containment of the full depth and area of contaminated groundwater leaving the site".

h.  Continued operation of Northrop Grumman's soil vapor extraction and treatment system IRM.

i.  Implementation of institutional controls on the Community Park Property, in the form of an environmental easement that would include use and development restrictions, as well as a site management plan.

124.  The 2013 ROD has several flaws that may present an ISE to public health and the environment:

a.  The soil cleanup requirements are unclear and inconsistent in different areas of the Community Park. For example, in the former Grumman Settling Ponds area, the 2013 ROD requires that contaminated soil that exceeds the DEC's restricted-residential use SCOs to a depth of 10 feet be excavated and disposed off-site in a permitted facility. However, in other areas of the Community Park, a cover system is specified to attain restricted residential use SCOs only in the upper 2 feet.  There is no rational basis for differing cleanup levels for different areas of the Community Park with respect to protection of human health and the environment and the Town has the same potential need to conduct excavations deeper than 2 feet in all areas of the Community Park, not just the ballfield, to perform maintenance and improvements.  Such excavations will expose workers to the hazards of any of Northrop Grumman's soil contamination left behind.

b.  The 2013 ROD provides for the excavation of chromium sludge only where it is co-located with (found in the same soil with) PCBs, and even then, only "to the extent necessary to achieve the PCB removal goals." Chromium sludge, shown to contain hexavalent chromium, not co-located with significant PCB contamination is wrongly allowed to remain in Park soil in perpetuity.

c.  The 2013 ROD provides for excavated soil containing PCBs at concentrations less than 50 ppm to be re-used as backfill of excavated areas below a depth of 10 feet. In effect, this provision allows the Community Park to continue to be used as a PCB landfill without adhering to the applicable or relevant and appropriate federal and state requirements for siting, designing, constructing, or operating a landfill.

d.  The EPA was not consulted, nor did it review or approve, the PCB cleanup requirements stipulated in the 2013 ROD.  The EPA, not DEC, has primary authority for review and approval of the cleanup of PCB remediation waste under 40 CFR 761.61.  These rules require the responsible party to prepare a

Risk Based Cleanup and Disposal application, which requires, among other things, that the owner of the property be consulted on the current and planned future use of the property before PCB cleanup levels will be approved by EPA. Northrop Grumman did not prepare a Risk Based Cleanup and Disposal application, nor did it consult with the Town as the property owner, before DEC issued the 2013 ROD and the purported PCB cleanup levels. The Town's current and future use of the Community Park Property conflict with the 2013 ROD cleanup levels in a manner that may present a risk to human health and the environment.

**D.    Subsequent Developments at the Community Park Have Demonstrated That Northrop Grumman Intentionally Has Concealed the Extent of Its Contamination and That the 2013 ROD Cannot Protect Human Health or the Environment.**

*i.    After Initiating The VOC Cleanup At The Community Park, Northrop Grumman Discovered The VOC Source Area To Be Almost Four Times Bigger, But Has Not Committed To A Complete Cleanup.*

125.    In June 2016, three years after the 2013 ROD, Northrop Grumman submitted a Remedial Design Work Plan for VOC Source Area for the Community Park.

126.    In DEC's approval of the above work plan, in an August 18, 2016, letter to Northrop Grumman on which the Town was not copied, DEC also approved a less stringent VOC cleanup standard for the VOC Source Area soil than stipulated in the 2013 ROD.

127.    The 2013 ROD had recognized the importance of VOC Source Area cleanup by establishing the VOC cleanup levels as the "protection of groundwater" soil cleanup objectives stipulated in 6 NYCRR Part 375 Table 375-6.8(b). However, without notice to the Town or public or the opportunity for comment, DEC set aside the "protection of groundwater" cleanup levels for a less stringent and arbitrary standard of 10 PPM total VOCs, which allows certain VOC hazardous substances to remain behind in the Community Park soil at levels more than ten times higher than those stipulated in the 2013 ROD.

128.    Neither Northrop Grumman nor DEC provided a technical justification for why a concentration of 10 PPM of total VOCs was an acceptable cleanup goal given that any remaining VOCs in soil have the potential to leach into groundwater and continue to feed the plume.

Case 2:23-cv-07146-NJC-AYS    Document 62    Filed 07/18/25    Page 39 of 73 PageID #: 3167

129.    In 2020, Northrop Grumman received approval to construct and operate an *in-situ* thermal remediation ("ISTR") system for the VOC Source Area in the former rag pit disposal area and adjacent area, covering approximately 0.5 acres in the ballfield of the Community Park Property.  This system involved numerous wells that heat the soil and volatize the VOCs, which are captured by vapor extraction wells and then treated.

130.    Northrop Grumman operated the ISTR system from August 2020 to February 2022, despite the fact that Northrop Grumman had not yet completed a full delineation of the size of the VOC Source Area in need of remediation.  Again, Northrop Grumman knowingly forewent a sufficient investigation and attempted to complete a truncated remedy that it knew would not be fully protective of human health and the environment.

131.    During the period from January 2020 to March 2022 encompassing the ISTR operation, Northrop Grumman conducted soil sampling as required by DEC to delineate the extent of the VOC Source Area.  As a result of this soil sampling, Northrop Grumman was forced to admit that the VOC Source Area, where Northrop Grumman found total VOC concentrations in soil greater than the DEC-revised cleanup goal of 10 PPM, was approximately four times larger (i.e., approximately 2 acres) than the area being treated by the ISTR system (i.e., approximately 0.5 acres).

132.    The areas with elevated levels of VOCs that were not detected by Northrop Grumman's prior intentionally underinclusive investigations extend beneath the Community Park's parking lot, skateboard park, tennis courts, and recharge basin. *See* Exhibit B.

133.    In June 2023, Northrop Grumman submitted a Remedial Action Work Plan Addendum for Phase 2 In-Situ Thermal Remedy to address a portion of the now much larger VOC

Source Area. Construction and operation of Phase 2 was projected to run for approximately two years between September 2023 and August 2025.

134.    During Northrop Grumman's 2020-2022 soil sampling programs to delineate the VOC Source Area, the Town had to close portions of the parking lot, skateboard park, and tennis courts.

135.    During construction and operation of Phase 2, the Town has had to close the skateboard park and portions of the parking lot and tennis courts.

136.    Phase 2 does not treat the entire VOC Source Area even as delineated by Northrop Grumman.

137.    As long as the VOC Source Area remains partially treated, VOC contaminants in the soil will continue to leach into the groundwater beneath the Community Park and potentially migrate with groundwater flowing off-site, a condition that may present an imminent and substantial endangerment to the Sole Source Aquifer system that provides drinking water to Town residents.

> ii.    *The Effectiveness of Northrop Grumman's Groundwater Extraction System Near the Community Park Boundary is not Sufficiently Demonstrated to Prevent Continual Recontamination of the Sole Source Drinking Water Aquifer.*

138.    The 2013 ROD stipulated that Northrop Grumman's groundwater extraction system IRM "…assure the capture/containment of the full depth and area of contaminated groundwater leaving the Site."

139.    Northrop Grumman knowingly designed a groundwater extraction system IRM that would not capture fully the contaminants migrating in groundwater leaving the Community Park as required by the 2013 ROD.

140.    Northrop Grumman's and DEC's basis for setting aside the 2013 ROD cleanup standards for VOCs (the "protection of groundwater" SCOs) for a less stringent and arbitrary

standard of 10 PPM total VOCs was that the groundwater extraction IRM would prevent migration of contaminants from leaving the Community Park Property.  Northrop Grumman's and DEC's reliance on the groundwater extraction system IRM to justify a lesser VOC cleanup standard has not met an adequate burden of proof that the groundwater extraction system is and will be perpetually effective.

141.    During the period between approximately 2015 and 2018, and in accordance with a condition of the 2013 ROD, Northrop Grumman commissioned studies of the effectiveness of the groundwater extraction IRM to prevent contaminants in the groundwater beneath the Community Park from leaving the OU3 site.  The studies concluded that the groundwater extraction IRM was effective.

142.    However, the studies of the effectiveness of Northrop Grumman's groundwater extraction IRM were based on a very limited and insufficient number and depth of monitoring wells that leave unacceptable uncertainty regarding the full capture/containment of the contamination, as required by the 2013 ROD, given that anything less than full capture of the contaminants at the Community Park will cause continuing harm to the Sole Source Aquifer system.

143.    Northrop Grumman's groundwater extraction IRM likely does not provide for a full cleanup of the VOC Source Area. Northrop Grumman privately and outside of the public ROD process arranged for a less stringent VOC cleanup standard.  Northrop Grumman has been forced to admit that the VOC Source Area is almost four times larger than contemplated by the design of the IRM. As a result, Northrop Grumman's contaminants may continue to be leaving the Community Park, causing an imminent and substantial endangerment to human health and the environment.

144.     Northrop Grumman did not design its groundwater treatment system to remove hexavalent chromium, or any other heavy metal, that Northrop Grumman disposed at the Community Park property and that may be present in the groundwater. Northrop Grumman has not and does not plan to test the discharges from its treatment system for hexavalent chromium. Based on information and belief, the discharge from Northrop Grumman's treatment system to the recharge basins may contain hexavalent chromium and other heavy metals that may present an ISE.

   *iii.*     ***Northrop Grumman Refuses to Develop a Risk-Based Cleanup and Disposal Program that is Approvable Under TSCA.***

145.     Pursuant to a 2014 Order on Consent and Administrative Settlement ("2014 AOC") with DEC pertaining to the implementation of the 2013 ROD, Northrop Grumman conducted sampling in 2014 through 2017 to delimit the extent of PCB and hazardous metals contamination within OU3, including the Community Park.

146.     Northrop Grumman again knowingly designed and implemented an incomplete investigation, including specifically by failing to sample for hexavalent chromium.

147.     Northrop Grumman presented the results of the 2014-2017 sampling for PCBs and hazardous metals in two reports submitted to DEC titled Pre-Design Sampling and Remedial Alternative Evaluation Report for PCBs and Metals in Soil, dated January 2016, and Addendum to Pre-Design Sampling and Remedial Alternative Evaluation Report for PCBs and Metals in Soil, dated March 2018 (the "2016 and 2018 PCB Sampling Reports"). These reports describe the results of hundreds of soil samples collected at the Community Park, and also evaluate potential PCB remedial technologies.

148.     Northrop Grumman's 2014-2017 sampling for PCBs to obtain data to support PCB cleanup was conducted without EPA review and approval, even though the 2016 PCB Sampling

Report acknowledged that for PCB cleanup, "Both the ROD remedy and the alternate remedy described herein would require submittal of an application to the U.S.EPA for a risk-based disposal under 40 CFR 761.61(c) and the agency's written approval of the remedy as set forth in this report."

149.    Even prior to the 2014-2017 PCB sampling program, Northrop Grumman was aware of EPA's authority over a risk-based PCB cleanup. Its 2011 Feasibility Study report for OU3 noted that a 2009 Human Health Risk Assessment was conducted in consideration of both DEC and EPA guidance, and that "The HHRA differed slightly from a standard baseline risk assessment in that certain exposure assumptions were made…", and "…the results of the HHRA confirmed that the Northop Grumman recommended remedy…is protective of human health." Neither Northrop Grumman nor DEC sought EPA's review and approval of the 2009 HHRA as required under TSCA for a risk-based cleanup of PCBs before DEC issued a PCB remedy with its 2013 Record of Decision for OU3, including the Community Park Property.

150.    In June 2022, nearly ten years after the 2013 ROD, EPA informed the Town that Northrop Grumman had approached EPA about implementing a PCB risk-based cleanup and disposal under TSCA for OU3, including the Community Park.  As part of the RBDA to EPA, EPA required Northrop Grumman to prepare and submit a Current Conditions Report ("CCR") in accordance with a CCR outline that EPA provided to Northrop Grumman in September 2022.

151.    EPA's CCR outline, which runs nearly 4 pages of single-spaced type, specifies the communication, steps, and documentation required from Northrop Grumman to allow EPA to review the PCB cleanup that Northrop Grumman proposed for OU3, including the Community Park.  EPA's CCR outline highlights many deficiencies in Northrop Grumman's sharing of information and data with the EPA and the Town, including the requirements, among other things,

for Northrop Grumman to consult with the Town on "current and proposed future land uses" of the Community Park Property, and to conduct a comprehensive PCB data gaps analysis to support a proper cleanup.

152.    The CCR outline makes clear EPA's authority under TSCA for review and approval of PCB cleanup at the Community Park, an authority that was ignored in DEC's 2013 ROD and in Northrop Grumman's actions for nearly ten years afterward.

153.    In February 2023, Northrop Grumman submitted a Current Conditions Report ("CCR") to EPA.  Ignoring EPA's requirements described in EPA's CCR outline, Northrop Grumman did not consult with the Town on current and future uses for the Community Park, nor on PCB cleanup objectives in consideration of the Town's plans for the Community Park or human health and environmental concerns.

154.    Northrop Grumman indicated in the CCR that it intends to excavate and re-bury a significant portion of the PCB-contaminated soil on the Community Park Property exactly as described in the 2013 ROD and against the express objections of the Town.

155.    To implement the PCB remedy described in the 2013 ROD and CCR, 40 CFR 761.61(a) requires that a deed restriction and certification be provided to EPA by the landowner wherever PCB remediation waste is left behind at levels greater than 1 PPM.  Northrop Grumman has never approached the Town, nor executed an agreement with the Town, to establish a deed restriction for the Community Park Property and to submit a certification of such deed restriction to EPA.

156.    As such, Northrop Grumman has shown that it does not respect the Town's legitimate position as landowner, nor does it respect the EPA's authority to establish PCB cleanup levels, an authority which supersedes DEC's.

157.    DEC ultimately required Northrop Grumman to conduct additional data gap sampling to delineate PCB and metals contamination (See Section IV.E.iv. below). That investigation – at least under the parameters Northop Grumman chooses to honor – is ongoing.

158.    Despite the incomplete investigation, Northrop Grumman maintains that it will not alter the PCB cleanup levels outlined in the 2013 ROD.

159.    Northrop Grumman's ongoing failure to address the PCBs at the Community Park in accordance with TSCA, and its failure to communicate with the Town on critical matters of current and future Community Park uses and the need for a deed restriction for its proposed remedial actions that will leave behind PCBs behind at the Community Park, may present an imminent and substantial threat to human health and the environment related to public and worker exposure to PCBs present in Community Park soil both now and in the future.

   **iv.    DEC's 2019 Amended Record of Decision Admits That Previous RODs Were Ineffective at Preventing the Vast Expansion of Northrop Grumman's Contamination, Pointing to the Need For Complete and Expeditious Cleanup of the Community Park.**

160.    In December 2019, DEC issued an Amended Record of Decision (the "2019 AROD") that amended and expanded the remedy for the vast region of groundwater contamination, referred to as the Navy Grumman Groundwater Plume, whose source is the Grumman Facility and the NWIRP, including the Community Park.

161.    The 2019 AROD was issued because:

> "…with data showing that the existing remedies are not fully effective at achieving remedial action objectives, this remedy has been developed to supplement the existing remedies and to address off-site groundwater contamination not adequately addressed under the existing RODs. Specifically, under the existing remedies, not only does groundwater contamination continue to migrate south toward currently unimpacted public water supplies and unimpacted portions of the Long Island Sole Source Aquifer, but this southward migration is causing contaminant concentrations to increase in off-site groundwater. This remedy specifically

addresses these threats to public health and the environment associated with this off-site groundwater contamination."

162.    The 2019 AROD explicitly and plainly acknowledges the threat to public health and the environment caused by Northrop Grumman's groundwater contamination based on data showing the ineffectiveness of existing remedies.

163.    The selected remedy in the 2019 AROD comprised the installation, long-term operation, and maintenance of 24 groundwater extraction wells and five treatment plants, among other requirements, with an estimated present worth cost of $585,000,000.00 ($585 million).

164.    The selected remedy in the 2019 AROD did not amend the remedy for the Community Park stipulated in the 2013 ROD.

165.    In July 2022, Northrop Grumman and DEC entered a Consent Decree (the "2022 Consent Decree") that stipulates, among other things, Northrop Grumman's responsibilities for implementing certain remedial elements of the 2019 AROD. (2022 Consent Decree, Paragraph 9).

166.    The 2022 Consent Decree stipulated that "Northop Grumman shall construct the remedial elements set forth in Paragraph 9 within five (5) years from the Effective Date of this Decree". (2022 Consent Decree, Paragraph 23).

167.    The 2022 Consent Decree did not stipulate a completion schedule for OU3, including the Community Park, even though eight years (now eleven years) had passed since the effective date of the 2014 AOC governing Northrop Grumman's responsibilities for remedial actions at the Community Park. DEC's decision not to include an enforceable schedule in the 2014 AOC for the cleanup of the Community Park, when compared to the inclusion of an enforceable schedule in the 2022 Consent Decree, clearly demonstrates that DEC has failed to diligently prosecute Northrop Grumman's contamination and remedial response actions at the Community Park.

168.    Furthermore, given the fact that the VOC Source Area at the Community Park is four times larger than assumed by the 2013 ROD, and considering the uncertainty in the data regarding the effectiveness of Northrop Grumman's groundwater extraction system IRM for the Community Park, Northrop Grumman and DEC have failed to act with urgency to complete a full cleanup of the VOC Source Area and decrease reliance on the IRM to prevent threats to public health and the environment engendered by not capturing/containing the full depth and width of VOC contamination in groundwater leaving the Community Park.

**E.    New Discoveries at the Community Park Show that Northrop Grumman Intentionally Has Concealed and Continues Intentionally to Conceal Hexavalent Chromium Contamination that is Not Addressed by the 2013 ROD.**

*i.    Northrop Grumman's Belated VOC Remediation Revealed 22 Barrels Filled With Fluorescent Yellow-Green and Blue-Green Sludge*

169.    In March and April 2024, when drilling a monitoring well in support of the delayed VOC treatment system, Northrop Grumman contractors encountered large concrete encasements buried in the Park soil that Northrup Grumman had buried there decades earlier.  Despite thousands of prior samples and various remediation efforts in the area, Northrop Grumman had not previously identified or disclosed this hidden disposal area.

170.    Inside the concrete encasements were sixteen 55-gallon drums, or barrels, many containing a fluorescent yellow-green and blue-green sludge, and similar materials were observed in the soils surrounding the drums. Sampling confirmed that the barrels contained multiple hazardous substances including VOCs, SVOCs, chromium and other metals, and PCBs.

171.    Upon information and belief, Northrop Grumman conducted what it claimed to be a thorough search for more drums using ground-penetrating radar ("GPR") scans of the Community Park, but somehow Northrop Grumman supposedly did not know where to look to find its own buried drums.

- 47 -

172.    In early May 2024, despite Northrop Grumman's assurance that it had concealed no other drums beneath the Park, the Town's consulting engineers identified a possible location of additional drums based on review of historical aerial photographs taken during Northrop Grumman's operation of the Community Park Property. The Town informed Northrop Grumman of its research findings, and the resulting investigation by Northrop Grumman discovered more concrete encasements containing six additional drums.

173.    The Town's identification of additional drums proved that Northrop Grumman's assertions that it had conducted a complete and diligent search were false. As a result, DEC required Northrop Grumman to conduct additional electromagnetic and GPR scans of the Park to search for additional drums.

ii.    *Northrop Grumman Obstructed a Full Evaluation of the Drums, Forcing the Town to Conduct its Own Investigations, which Revealed Hexavalent Chromium Contamination*

174.    Despite knowing that its chromium sludge likely contained hexavalent chromium, Northrop Grumman did not test the contents of any of the drums for hexavalent chromium, but did detect high concentrations of total chromium and cadmium, as well as VOCs.

175.    Ignoring the obvious possibility that the drums could present new or more severe contamination, Northrop Grumman and DEC stated that the contents of the drums and surrounding soil is consistent with other known contamination at the Park, and that accordingly no further soil investigation would be necessary because any contamination would be remediated pursuant to the 2013 ROD.

176.    The Town was unable to conduct split samples of the contents of the drums. However, the Town did obtain, at its own expense its own samples of the soil surrounding the buried drums including, in some locations, samples of chromium sludge.

177.    Laboratory analyses showed that the Town's soil samples obtained from the drum excavations contained elevated levels of hexavalent chromium above DECs current soil cleanup objective for unrestricted use and above the proposed cleanup level for restricted residential use. The Town shared this data with Northrop Grumman and with DEC, but neither took action in response to the Town's data.

178.    At this point, the Town finally discovered what Northrop Grumman had known and concealed for decades: that Northrop Grumman had disposed of wastes containing hexavalent chromium at the Community Park Property. However, because Northrop Grumman had prevented any prior investigations into hexavalent chromium contamination by lying about its own disposal activities and making assertions about the absence of hexavalent chromium from its industrial waste streams, the Town had no usable data regarding where there may be a need for hexavalent chromium remediation.

179.    Because of Northrop Grumman's lies and omissions about its hexavalent chromium disposals, the investigation into Northrop Grumman's contamination at the Community Park Property now must re-start more than two decades after it first began.

### iii.    *Northrop Grumman Continued to Deny and Conceal the Existence of Hexavalent Chromium at the Community Park; DEC and Northrop Grumman Ignored the Town's Concerns Regarding Hexavalent Chromium*

180.    Between May and July of 2024, the Town repeatedly expressed concerns to Northrop Grumman and to DEC that the drum discovery indicated additional potential endangerments to human health and the environment. In particular, the Town explained that the drums showed that there may be significant heavy metals contamination, including hexavalent chromium, that the 2013 ROD did not require Northrop Grumman to remove or remediate.

181.    Northrop Grumman and DEC continued to maintain that the drums did not present any additional risks and that no change to investigation or remediation plans was necessary.

182.    On or about August 15, 2024, the Town submitted a proposed Metals Data Gaps Investigation Work Plan and called on DEC to investigate fully the Park for the presence of hazardous metals including hexavalent chromium.

183.    On or about September 25, 2024, Northrop Grumman informed the Town that it would not sample for hexavalent chromium. Northrop Grumman stated without basis that "[i]t is well settled that under normal environmental conditions, hexavalent chromium will be reduced over time to trivalent chromium in the presence of soil organic matter and common minerals such as iron and sulfur. Any chromium attributed to Northrop Grumman has been in Park soil since prior to 1962, and thus hexavalent chromium, if ever there, would not be present."

184.    On or about September 27, 2024, the Town wrote to DEC demanding that it require Northrop Grumman to conduct a comprehensive data gap investigation that included sampling for hexavalent chromium.

185.    That same day, Northrop Grumman submitted its data gap sampling plan for PCBs and metals in the Park. Northrop Grumman still refused to sample for hexavalent chromium.

186.    In October 2024, the Town requested that DEC require Northrop Grumman to update its sampling plan to include a delineation of hexavalent chromium because hexavalent chromium was found in soil samples collected from the excavations associated with the removal of Northrop Grumman's buried drums.

187.    During this time Northrop Grumman prepared to begin excavations as part of the GPR anomaly pilot investigation, and the Town expressed concerns that Northrop Grumman planned to rebury soils without first testing for contaminants including hexavalent chromium.

188.    In late August and early September 2024, the Town requested that Northrop Grumman commit not to re-bury any contaminated soil it excavated as part of the GPR anomaly

pilot investigation and repeated its request that Northrop Grumman commit to sampling for hexavalent chromium throughout the Park.  Northrop Grumman refused, forcing the Town to seek Court intervention on November 11, 2024.

189.    During litigation over the anomaly investigation, Northrop Grumman repeatedly assured the Town and the Court that any visibly contaminated materials excavated as part of the anomaly investigation would be sampled and would not be re-buried.  On information and belief, Northrop Grumman has reburied visibly contaminated materials which were excavated during its anomaly investigation as alleged below in Section IV.E.iv.

### iv.    *DEC Finally Asked Northrop Grumman to Investigate Hexavalent Chromium; Northrop Grumman Continues to Obstruct Investigation and Deny Without Basis the Existence of Hexavalent Chromium Contamination.*

190.    On or about November 27, 2024, DEC finally informed Northrop Grumman that it would require sampling for hexavalent chromium at the Community Park.

191.    Northrop Grumman delayed and did not submit a revised data gap investigation work plan including increased PCB sampling and sampling for hexavalent chromium until on or about March 18, 2025. The revised plan was approved by DEC on or about March 21, 2025.

192.    As part of the revised data gap investigation and GPR anomaly pilot investigation, the Town at its own expense collected split samples of certain samples taken by Northrop Grumman and observed and monitored Northrop Grumman's contractors on site.

193.    On or about April 25, 2025, Town contractors observed fabric with yellow or yellow-green substances in a Northrop Grumman boring hole indicating the presence of chromium sludge. The Town sampled these materials, but on information and belief Northrop Grumman did not.

194.    In early June 2025, ignoring the obvious signs of chromium contamination, Northrop Grumman informed DEC that its preliminary results of soil samples from the data gap investigation "do not show elevated levels of hexavalent chromium in the ballfield."

195.    The Town's preliminary sampling results, which it shared with Northrop Grumman and with DEC, showed that Northrop Grumman's investigation was again intentionally deficient: the Town's sampling results showed that extremely high levels of hexavalent chromium were detected in certain samples in the ballfield. The preliminary sampling results correlated high levels of hexavalent chromium with materials appearing consistent to the photos in Section IV.A.i. *See* Exhibit C. In other words, the Town was sampling excavated soil that showed visual discoloration from metals contamination, while Northrop Grumman avoided sampling precisely the subsurface soil that was most likely to be highly contaminated based on obvious visual evidence.

196.    Northrop Grumman, by choosing not to sample suspect materials like yellow-colored materials and fabric which had the potential to contain significant levels of hexavalent chromium, sought to conceal the risks posed by hexavalent chromium in the Community Park.

197.    This latest deliberate deception continues Northrop Grumman's long demonstrated pattern of obstruction of investigation efforts and concealment of known contamination at the Community Park Property.

198.    In late June 2025, during the implementation of the anomaly investigation, Northrop Grumman subsequently unearthed additional suspect hazardous materials similar in appearance to the sludge-like substances the Town had previously confirmed to contain hexavalent chromium.

199.    Despite Northrop Grumman's representations to the Town, to DEC and to this Court that it would not re-bury visibly contaminated materials as part of the anomaly investigation,

the Town observed Northrop Grumman's intentional reburial of a portion of these obviously suspect materials, and the Town promptly notified DEC.

200.    As of July 18, 2025, the Town's preliminary sampling results show that the yellow-green and blue-green colored substances re-buried by Northrop Grumman contain elevated levels of hexavalent chromium, total chromium, cadmium, and arsenic (see photographs and results in Exhibit C), and one sample indicated these re-buried materials met the definition of hazardous waste. This directly contradicts the assurances Northrop Grumman made to this Court on consideration of the Town's prior motion for a preliminary injunction.

### v.    *Northrop Grumman's Intentional Concealment of Hexavalent Chromium Contamination at the Community Park Has Rendered the 2013 ROD Insufficient to Protect Human Health and the Environment.*

201.    Notably, samples of the hazardous sludge unearthed during the anomaly investigation did not indicate elevated levels of PCBs. Therefore, under the terms of the 2013 ROD, Northrop Grumman would not be required to remediate its hazardous sludge because the 2013 ROD requires the removal of chromium sludge only ". . . to the extent necessary to achieve the PCB removal goals."

202.    The detected presence of hexavalent chromium in Community Park soil, Northrop Grumman's willful obstruction and refusal to investigate adequately the extent of hexavalent chromium contamination, and the failure of the 2013 ROD to address the removal of sludge containing hazardous levels of chromium and hexavalent chromium may present an imminent and substantial endangerment to human health and the environment.

203.    The 2013 ROD does not account for hexavalent chromium or contain any of the necessary information or investigation analyses needed to ensure that hexavalent chromium does not present a risk to human health or the environment, including but not limited to:

    a.   A comprehensive investigation of the presence and extent of hexavalent chromium at the Park;

    b.   A comprehensive assessment of human and ecological exposure;

    c.   A quantitative assessment of predictions of risk;

    d.   The establishment of remedial action objectives and evaluation of remedial alternatives to achieve them;

    e.   Identification of the remedial alternative best suited to address hexavalent chromium; and

    f.   Reliable community information on the risks of hexavalent chromium

204.    The 2013 ROD fails to account for hexavalent chromium because, for many years, Northrop Grumman deliberately minimized the potential for such contamination to exist at the Community Park or elsewhere related to Northrop Grumman's past operations.

205.    To the extent that the 2013 ROD addresses total chromium and other metals more generally, it does not require the removal or remediation of those contaminants throughout the Park. Instead, metals (including hexavalent chromium) would be removed only from limited depth intervals where they are co-located with PCB contamination and would be removed only "to the extent necessary to achieve the PCB removal goals."

206.    As explained above in Section IV.C.iii., the 2013 ROD's PCB removal goals will allow large quantities of PCB-contaminated soil to remain at depth throughout the Community Park, meaning that hexavalent chromium contamination will similarly be allowed to remain throughout the Community Park.

207.    DEC and Northrop Grumman continue to assert that the 2013 ROD's selected remedies are protective of human health and the environment, despite knowing that the 2013 ROD

does not protect against hexavalent chromium exposure and despite knowing that hexavalent chromium is present at the Community Park.

208.    Even after direction from EPA and DEC to sample for hexavalent chromium at the Community Park, Northrop Grumman continues to manipulate its sampling in order deliberately to avoid detecting the hexavalent chromium it knows to be present.

209.    DEC and EPA have been and continue to be unable or unwilling to require that Northrop Grumman investigate hexavalent chromium in good faith.

**F.    Northrop Grumman Still Does Not Have a Schedule for Cleanup of the Community Park, and DEC Has Failed to Enforce a Schedule.**

210.    Twelve years after the 2013 ROD, and eleven years after the 2014 AOC between Northrop Grumman and DEC, Northrop Grumman has not produced a comprehensive schedule for the full cleanup of the Community Park Property.

211.    DEC is an enforcement agency, yet DEC failed to include a "time is of the essence" provision in the 2014 AOC and enforce a schedule for the full cleanup of the Community Park Property.

212.    DEC's failure to establish or enforce a schedule for the cleanup of the Community Park is inconsistent with DEC's stipulation of a schedule for Northrop Grumman in the 2022 Consent Decree pertaining to the cleanup of the Navy Grumman Groundwater Plume.  It is nonsensical for the cleanup of a principal source area of the larger plume to not be subject to an enforcement schedule, particularly given that portions of the Community Park have been closed for over 20 years because Northrop Grumman's contamination threatens Community Park users and workers.

213.    Northrop Grumman's typical practice has been to submit a task-specific schedule with its work plans submitted to DEC.  However, the milestones in these schedules are routinely

missed without penalty.  For example, when Northrop Grumman submitted an updated schedule for the VOC Source Area Remedy on October 31, 2019, the completion date for the Remedial Action Work Plan Addendum to address the expanded VOC Source Area was indicated to be the first quarter of 2020.  The Remedial Action Work Plan Addendum was submitted on June 30, 2023, more than three years later. Notwithstanding the lateness of this submittal, the document is not complete in that it does not address remediation of the entire VOC Source Area in the Community Park Property.

214.    The absence of a comprehensive schedule from Northrop Grumman, and the failure of DEC to enforce a schedule for Northrop Grumman to complete the full cleanup of the Community Park, means that the VOC Source Area continues to release contaminants to the groundwater beneath the Community Park, which has the potential to migrate beyond the Community Park Property, re-contaminate the Sole Source drinking water aquifer, and may present an imminent and substantial endangerment to human health and the environment.

215.    As of July 2025, more than a dozen lawsuits have been filed against Northrop Grumman by area residents and landowners alleging personal injury and property damages arising out of Northrop Grumman's contamination at the Bethpage Facility and the Community Park.

216.    There is no dispute that Northrop Grumman's historical waste disposal operations of hazardous substances at the Community Park Property have contaminated the soil and groundwater at and beneath the Community Park, resulting in the long-term closure of portions of the Community Park.

217.    Over 20 years ago, the Town closed portions of the Community Park because PCBs and certain hazardous metals from Northrop Grumman's waste disposal operations were found in Community Park soil at levels that exceeded State and Federal standards, presenting an immediate

and substantial threat to Community Park users and workers. Despite this threat, Northrop Grumman has not made meaningful progress on removing these hazardous PCBs and metals from the Community Park. Northrop Grumman's lack of progress stands in stark contrast to the Town's expeditious cleanup of Northrop Grumman's contamination of a 7-acre area during the period of 2005-2007 to enable the construction of a new ice rink.

218.    Northrop Grumman intends to re-bury PCB remediation waste on the Community Park Property, in effect creating a PCB remediation waste landfill in violation of federal and state law that may present a threat to public health and the environment.

219.    Northrop Grumman has failed to adequately investigate and remediate the full extent of the VOC Source Area that feeds the groundwater contaminant plume that has impacted the Sole Source Aquifer, despite the requirements to do so stipulated in the DEC's 2013 ROD and 2014 AOC. The VOC Source Area is approximately four times larger than Northrop Grumman's initial estimates, yet Northrop Grumman has not committed to its complete cleanup.

220.    Northrop Grumman has repeatedly misrepresented the existence of hexavalent chromium at the Community Park and has deliberately designed its sampling plans to exclude known hexavalent chromium contamination, even when visible to the naked eye.

221.    DEC has failed to prosecute diligently Northrop Grumman's contamination of the Community Park Property as evidenced by the following:

a.    New hazardous contamination, particularly hexavalent chromium, continues to be discovered at the Community Park only because the Town has paid its own money to conduct its own sampling.

b.    DEC changed the VOC cleanup goal stipulated in its 2013 ROD to an arbitrary, less stringent level without notice to the Town, public comment, or other opportunity for Town and public input.

c.    Ten years after the 2013 ROD, DEC has not secured a commitment or schedule for Northrop Grumman to clean up the entire VOC Source Area, notwithstanding the fact

that the VOC Source Area was discovered to be approximately four times larger than initial assumptions.

d.  DEC has not ensured that the groundwater extraction system IRM is capturing the full depth and area of the contaminated groundwater leaving the Community Park, a situation exacerbated by the discovery of the larger VOC Source Area.

e.  DEC stipulated PCB cleanup levels for PCBs at the Community Park Property and the OU3 area in the 2013 ROD without the authority under TSCA to do so.

f.  As an enforcement agency, DEC failed to establish a "time is of the essence" provision in the 2014 AOC commensurate with the threat posed by Northrop Grumman's contamination or to enter or enforce a schedule for the full cleanup of the Community Park Property.

g.  DEC has entered no enforceable schedule and no penalties for Northrop Grumman under the 2013 ROD and 2014 AOC.  Indeed, compliance with the 2014 AOC is effectively optional for Northrop Grumman because it has the express right under the 2014 AOC to opt out of key requirements.  Northrop Grumman has taken advantage of DEC's abdication of its enforcement powers by ignoring the 2014 AOC's limited deadlines with impunity, submitting plans and reports years late or not at all.

h.  More than twenty years after Northrop Grumman's initial investigations of the Community Park forced the Town to close portions of the Community Park to the public for health and safety reasons, twelve years after the 2013 ROD, and eleven years after the 2014 AOC, no progress (in the case of PCBs and hazardous metals like hexavalent chromium) or inadequate progress (in the case of the VOC Source Area) has been made by Northrop Grumman and DEC towards the complete cleanup of the Community Park and the elimination of on-going potential threats to public health and the environment.

## <u>COUNT I – RESOURCE CONSERVATION & RECOVERY ACT (RCRA)</u><br><u>42 U.S.C. 6972(a)(1)(B)[8]</u>

222.    The Town repeats and realleges the allegations contained in paragraphs 1 through 222.

223.    RCRA § 7002, 42 U.S.C. § 6972 provides that "any person may commence a civil action on his own behalf . . . against any person . . . including any past or present generator, past

---

[8] On May 19, 2025, this Court dismissed with prejudice the Town's claims pursuant to RCRA Section 7002(a)(1)(A) and TSCA Section 20(a)(1), as well as for promissory estoppel under New York Law. The Town preserves and does not waive the right to appeal the Court's ruling on those claims.

or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

224.    Northrop Grumman is a "person" within the meaning of RCRA § 7002, 42 U.S.C. § 6972(a)(1)(B), *see id.* § 6903(15).

225.    RCRA defines "solid waste" to include "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities."  42 U.S.C. § 6903(27)

226.    RCRA defines "hazardous waste" as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may--(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."  42 U.S.C. § 6903(5).

227.    RCRA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).

228.    RCRA defines "storage" as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste."  42 U.S.C. § 6903(33).

229.    RCRA defines "treatment" as "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous."  42 U.S.C. § 6903(34).

230.    While under Northrop Grumman's ownership, control, and management, its facility generated "solid waste" and "hazardous waste" within the meaning of 42 U.S.C. § 6903(27) and 42 U.S.C. § 6903(5).

231.    Northrop Grumman contributed to the handling, storage, treatment, and/or disposal of solid and hazardous wastes into the environment within the meaning of 42 U.S.C. § 6903(3), 42 U.S.C. § 6903(33), and 42 U.S.C. § 6903(34).

232.    The solid and hazardous wastes handled, stored, treated, and/or disposed of at the facility remain onsite in a manner that may present an imminent and substantial endangerment to health or the environment.  42. U.S.C. § 6972(a)(1)(B).

233.    No responsible party has meaningfully characterized hexavalent chromium, is diligently conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action pursuant to a court order, consent decree, or administrative order under RCRA with respect to the conditions which may have contributed or are contributing to the activities which may present an endangerment to the environment or human health.

234.    Pursuant to RCRA 42 U.S.C. Section 6972(a)(1)(b), Northrop Grumman is liable for all equitable relief, including, without limitation, a mandatory injunction to immediately implement remedial measures at the Community Park Property

235.    At a minimum, remedial measures at the Community Park Property would include the full characterization and remediation of PCBs and metals, including hexavalent chromium, to a standard allowing for the unrestricted use of the Community Park Property.

## COUNT II – PUBLIC NUISANCE

236.    The Town repeats and realleges each allegation set forth in paragraphs 1 through 222.

237.    Northrop Grumman's concealment of contamination and excessive delay and obstruction in remediating its contamination at the Community Park Property has created or contributed to, and continues to create and contribute to, a substantial interference with the public use and enjoyment of the Community Park Property.

238.    Northrop Grumman's concealment of contamination and excessive delay in remediating its contamination at the Community Park Property has created or contributed, and continues to create and contribute to, a substantial endangerment to the citizens of the Town and of Nassau County.

239.    Northrop Grumman's concealment of contamination and excessive delay in remediating its contamination at the Community Park Property has resulted in a diminution in the value of the Community Park Property for the Town and its residents.

240.    Northrop Grumman knew, or should have foreseen, that its actions and omissions would result in this offense, interference with, and damage to the public in the exercise of common rights.

241.    The offense, interference with, and damage to the public in the exercise of common rights caused by Northrop Grumman's actions and omissions remain unabated.

## COUNT III – FRAUDULENT MISREPRESENTATION

242.    The Town repeats and realleges each allegation set forth in paragraphs 1 through 222.

243.    Northrop Grumman intentionally and fraudulently concealed for decades, and continues to conceal today, the presence of hexavalent chromium, including buried drums filled with chromium-containing sludge, at the Community Park Property as part of a broader effort by Northrop Grumman to minimize its responsibility and financial liability for hazardous contamination it caused at the Community Park Property.

244.    Northrop Grumman has at all times had actual knowledge of the type and volume of hazardous wastes that it disposed of at the Community Park Property, including but not limited to dozens of chromium-containing barrels encased in concrete that it deliberately concealed under the surface of the Park for decades.

245.    Northrop Grumman had actual knowledge that the chromium sludge it disposed of at the Community Park Property likely contained toxic and highly carcinogenic hexavalent chromium because Northrop Grumman has reported in permitting documents, including in a 1992 Hazardous Waste Management permit for the Bethpage Facility, that sludge produced by the same facility using similar processes contained hexavalent chromium.

246.    When Northrop Grumman detected hazardous contamination at the Bethpage Facility in the 1980s and 1990s, Northrop Grumman intentionally omitted the Community Park Property from sampling plans and site histories it submitted to DEC and into the public record during the development of initial Records of Decision for the Bethpage Facility. These fraudulently incomplete submissions include but are not limited to Northrop Grumman's March

1990 Remedial Investigation/Feasibility Study Work Plan, which formed the basis for DEC's 1995 Record of Decision outlining goals and strategies for the remediation of Northrop Grumman's contamination.

247.    Northrop Grumman knew at that time that the Community Park Property likely contained similar contamination, including hexavalent chromium, because it had used the Park as a private hazardous waste dump.

248.    Northrop Grumman omitted the Community Park Property from its site histories and sampling plans in order to avoid financial responsibility for remediating its hazardous waste at the Community Park Property.

249.    Northrop Grumman's fraudulent omission of the Community Park Property from its descriptions of its waste generation at the Bethpage Facility in the March 1990 Remedial Investigation/Feasibility Study Work Plan and related documents prevented the Town from advocating for the full investigation of the Park in the 1990s, delaying needed remediation and exposing Town residents to Northrop Grumman's hazardous contamination.

250.    When finally forced to investigate the Community Park Property beginning in 2002, Northrop Grumman intentionally designed its Remedial Investigation plans to avoid the detection and public disclosure of hexavalent chromium contamination and to avoid the discovery of its own buried drums by conducting only minimal sampling for hexavalent chromium.

251.    These public documents include but are not limited to (1) Northrop Grumman's December 2003 Field Report – Town of Oyster Bay, Bethpage Community Park, Investigation Sampling Report, which omitted Northrop Grumman's intentional disposal of hexavalent chromium at the Community Park, and (2) Northrop Grumman's March, 2006 Remedial Investigation/Feasibility Study Work Plan for OU3, which repeated the omissions of the 2003

Field Report and did not provide for complete sampling of hexavalent chromium throughout the Park.

252. In its February 2011 Remedial Investigation Report for OU3, which formed the factual foundations for the 2013 ROD, Northrop Grumman falsely stated that "the apparent historical activities that occurred in the Park are not well understood or documented" by Northrop Grumman and did not disclose that it had disposed of hexavalent chromium-containing sludge at the Park. Northrop Grumman had spoken to only one of its former employees when preparing its own site history that was used as a factual foundation for developing investigation and remediation plans at the Community Park, again intentionally pursuing an approach calculated not to find material information within the knowledge of its own employees and contained in its own business records.

253. Northrop Grumman's misrepresentations of its past disposal and concealment of hexavalent chromium contamination tricked DEC and the Town into believing that there was not a risk of hexavalent chromium contamination at the Community Park.

254. The Town had no knowledge and no cause to suspect that Northrop Grumman had conducted its Remedial Investigation at the Community Park in bad faith or that Northrop Grumman had fraudulently misrepresented and concealed its hexavalent chromium disposal at the Community Park in the above public documents. Northrop Grumman was the only party that had actual knowledge of what Northrop Grumman had disposed of at the Park, Northrop Grumman appeared to be cooperating with DEC as the responsible party for contamination at the Park, and Northrop Grumman's publicly submitted work plans and investigation reports listed above were certified by professional engineers.

255.    Northrop Grumman's intentional concealment and misrepresentation of its hexavalent chromium disposal at the Community Park prevented the Town from providing informed input and participation in the investigation and remediation or advocating for study of hexavalent chromium at the Community Park during the development of the 2013 ROD.

256.    On information and belief, Northrop Grumman disclosed, admitted to, or produced documents containing many of the material facts that it withheld from the Town and from DEC in a separate litigation when it sought insurance coverage for its environmental liability at the Community Park and the Bethpage Facility in 2013, but these documents were filed under seal and hidden from public view.

257.    Because of the Town and DEC's reliance on Northrop Grumman's misrepresentations and omissions regarding hexavalent chromium contamination, DEC approved and the Town did not have an informed opportunity to object to investigation plans that Northrop Grumman knew were materially inadequate to characterize the full scope of contamination at the Park.

258.    Because of the Town and DEC's reliance on Northrop Grumman's misrepresentations and omissions regarding hexavalent chromium contamination, the Town and DEC participated in decades of remedial efforts at the Community Park that Northrop Grumman knew were materially inadequate to protect human health and the environment.

259.    The Town did not receive any indication that Northrop Grumman had concealed past disposal of hexavalent chromium at the Park until Northrop Grumman's fraud was revealed by Northrop Grumman's accidental uncovering of its own chromium-containing drums in March and April 2024.

260.     Despite visual indications that the drums and surrounding soils could contain high concentrations of chromium, and despite its own knowledge that it had disposed of hexavalent chromium at the Community Park, Northrop Grumman still refused to test for hexavalent chromium.

261.     After the initial drum discovery, Northrop Grumman asserted it had diligently searched for more drums and that no additional drums were present. This proved to be false, and numerous additional drums were discovered in the immediate vicinity.

262.     Northrop Grumman's refusal to address the Town's concerns forced the Town to conduct its own sampling of the soil surrounding the drums, which sampling revealed that hexavalent chromium was present in Community Park soil.

263.     This discovery prompted the Town to insist on further sampling for hexavalent chromium throughout the Park. Had the Town not taken the initiative to verify Northrop Grumman's investigation, Northrop Grumman's hexavalent chromium contamination at the Park would likely have remained hidden even today, and Northrop Grumman would have succeeded in its already decades-long fraud.

264.     In response to the Town's concerns, Northrop Grumman falsely insisted in a September 25, 2024, letter that it "is well settled that under normal environmental conditions, hexavalent chromium will be reduced over time to trivalent chromium in the presence of soil organic matter and common minerals such as iron and sulfur. Any chromium attributed to Northrop Grumman has been in Park soil since prior to 1962, and thus hexavalent chromium, if ever there, would not be present."

265.     On January 16, 2025, Northrop Grumman falsely represented to this Court that, during excavation activities involving the search for additional buried drums, Northrop Grumman

would (1) sample any visibly contaminated materials and safely dispose of confirmed hazardous materials offsite; and (2) that any soil removed from the Community Park during the drum investigations would be returned in the same sequence or column in which it was removed in order to avoid the distribution and/or of potentially contaminated soils.  Northrop Grumman made this representation knowing that it could not and would not actually comply.

266.    In a January 23, 2025 letter submitted to this Court, Northrop Grumman confirmed the representations made on January 16, 2025, again knowing that it could not and would not actually comply.

267.    When Northrop Grumman finally began to sample for hexavalent chromium contamination in June 2025, it informed the Town in a June 11, 2025, email that its sampling results did "not show elevated levels of hexavalent chromium in the ballfield."

268.    However, the Town had observed Northrop Grumman unearth highly suspect foreign materials such as yellow-green sludges and fabrics that Northrop Grumman deliberately excluded from sampling. When the Town sampled these materials, the Town's sample results showed these materials contain hazardous concentrations of metals, including hexavalent chromium.

269.    The samples with high levels of hexavalent chromium and other metals also had low levels of PCBs. According to the ROD, these materials would not require cleanup unless the PCBs were similarly elevated. This is a major flaw in the ROD, which presumed that elevated metals and PCBs would be co-located.  Northrup Grumman is attempting to exploit this loophole in order to escape financial responsibility for the metals contamination, including hexavalent chromium.

270.    Also in June 2025, during Northrop Grumman's anomaly investigation for potential buried drums, the Town again identified sludge in the excavated soil.

271.    When the Town sampled this sludge, the sludge tested positive for high levels of hexavalent chromium, total chromium, and cadmium.

272.    On June 26, 2025, during the anomaly investigation, the Town observed Northrop Grumman excavate visibly contaminated materials from the Community Park, including yellow-green and blue-green colored sludge. Contrary to its representations to the Town and to this Court, Northrop Grumman re-buried a portion of these substances without regard to their original depth, not "in the reverse order it was removed from the test pit" as stated in its DEC-approved work plan.

273.    The Town's sampling efforts in 2024 and 2025 have proved that (1) the sludge that Northrop Grumman dumped at the Park contained hexavalent chromium, contrary to its repeated claims and representations over decades; and (2) Northrop Grumman deliberately conducted its sampling results in a manner designed to fraudulently avoid detecting obvious contamination that Northrop Grumman knew was likely to be present.

274.    The Town's sampling efforts in 2024 and 2025 further prove that the 2013 ROD, which has guided remediation efforts at the park for over a decade, is inadequate to protect human health and the environment and must be changed.

275.    Northrop Grumman's fraudulent concealment of its hexavalent chromium contamination prevented the Town or DEC from addressing that contamination for decades, extending by many years the time needed to adequately remediate the Community Park.

276.    Northrop Grumman's fraudulent concealment of its hexavalent chromium contamination has wasted and will continue to waste millions of dollars of the Town's limited

resources and otherwise caused damages through (1) futile past investigations that did not address all contaminants Northrop Grumman knew were likely to be present at the Park; (2) the substantial time, cost, and effort of uncovering Northrop Grumman's fraudulent concealment of hexavalent chromium contamination; (3) the past, current, and future costs associated with the Town's need to supervise and verify Northrop Grumman's investigation activities at the Park; and (4) diminution in value of the Community Park Property for the Town and its residents.

277.    In order to avoid financial responsibility and liability for its own contamination, Northrop Grumman knowingly and willfully misrepresented and concealed its hexavalent chromium contamination at the Community Park, risking the health and safety of Town residents and the environment, wasting millions of dollars of public funds, and depriving Town residents of the use of public space. Northrop Grumman's fraudulent concealment of its hexavalent chromium was in willful and wanton disregard of the rights of the Town and safety of the public. Northrop Grumman's egregious efforts to conceal its hexavalent chromium contamination at the Community Park continue to this day and will continue to cause harm to the Town and its residents.

## COUNT IV – NEGLIGENT MISREPRESENTATION
### (IN THE ALTERNATIVE TO COUNT III)

278.    The Town repeats and realleges each allegation set forth in paragraphs 1 through 222 and 242 through 277.

279.    Northrop Grumman has a special relationship with the Town regarding the condition of the Community Park Property because Northrop Grumman donated the Community Park Property to the Town with the express condition that the land be used for a community park.

280.    Northrop Grumman has a special relationship with the Town because Northrop Grumman is the responsible party for an environmental cleanup at the Community Park Property and the Town is the landowner, and because Northrop Grumman has certified its representations

regarding contamination at the Public Park through documents and reports submitted to and approved by DEC.

281.    Northrop Grumman is the only party that could have full knowledge of the type and volume of hazardous wastes that Northrop Grumman disposed of at the Community Park Property.

282.    Northrop Grumman's representations to the Town and to DEC regarding the nature and extent of contamination at the Community Park Property, including but not limited to representations between 2000 and 2025 regarding the likelihood of hexavalent chromium contamination at the Community Park Property, were incorrect.

283.    Northrop Grumman's representations to the Town and to DEC regarding the nature and extent of contamination at the Community Park Property, including but not limited to representations between 2000 and 2025 regarding the absence of hexavalent chromium contamination at the Community Park Property, recklessly disregarded facts that Northrop Grumman knew or should have known.

284.    The Town's reliance of incorrect information it received from Northrop Grumman has caused and will cause the Town past and future out of pocket costs and economic loss and has harmed and will harm the Town's residents.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Town respectfully requests that this Honorable Court:

a.    Enter judgment for the Town as against Defendant Northrop Grumman;

b.    Declare that Defendant Northrop Grumman is in violation of RCRA;

c.    Pursuant to RCRA Section 7002 (42 U.S.C. § 6972(a)(1)(B)), permanently enjoin Defendant Northrop Grumman to immediately investigate and remediate the Community Park Property in order to take all actions necessary to address imminent

and substantial endangerment that may be presented by the solid and hazardous wastes at Community Park Property;

d.  Declare that Defendant Northrop Grumman's actions and omissions at the Community Park Property constitute a public nuisance;

e.  Pursuant to New York law, permanently enjoin Northrop Grumman to take all actions necessary to abate the public nuisance caused by its contamination at the Community Park Property;

f.  Pursuant to New York law, permanently enjoin Northrop Grumman to require specific performance of Northrop Grumman's repeated promises to conduct a complete and timely remediation of the Community Park Property to restore it to its intended use as a community park.

g.  Order Defendant Northrop Grumman to complete any injunctive relief granted according to an enforceable schedule established by this Court;

h.  Order Defendant Northrop Grumman to pay compensatory damages to the Town for the past and future out of pocket costs and economic loss caused by Northrop Grumman's misrepresentation regarding its contamination of the Community Park Property;

i.  Order Defendant Northrop Grumman to pay punitive damages to the Town caused by Northrop Grumman's fraudulent or reckless misrepresentation regarding its contamination of the Community Park Property with callous disregard for the risk to human health and the environment and solely for Northrop Grumman's own financial gain;

j.  Order Defendant Northrop Grumman to pay the Town's costs and attorneys' fees;

k.  Award such other relief as this Court deems just and proper.

## JURY DEMAND

The Town demands a trial by jury of all issues so triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure.


Dated: July 18, 2025                    Respectfully submitted,
                                        Town of Oyster Bay

                                        By its Attorneys,

                                        */s/ Matthew F. Prewitt*
                                        Matthew F. Prewitt
                                        J. Michael Showalter
                                        Sonul Rao
                                        ArentFox Schiff LLP
                                        1301 Avenue of the Americas, 42nd Floor
                                        New York, NY 10019 United States
                                        Phone:  212.484.3900
                                        Email : matthew.prewitt@afslaw.com
                                        Email:  j.michael.showalter@afslaw.com
                                        Email : sonul.rao@afslaw.com

                                        */s/ Russell Selman*
                                        Russell Selman (*pro hac vice*)
                                        Duncan M. Weinstein (*pro hac vice*)
                                        ArentFox Schiff LLP
                                        233 S. Wacker Drive, Suite 7100
                                        Chicago, IL 60606
                                        Phone:  312.258.5500
                                        Email:  Russell.Selman@afslaw.com
                                        Email: duncan.weinstein@afslaw.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on July 18, 2025, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which constitutes service on all parties of record.

_____*/s/ J. Michael Showalter*_____